PAUL HASTINGS LLP
Daniel A. Fliman
Sayan Bhattacharyya
Robert Nussbaum
Ryan Montefusco
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000

*Attorneys for Petitioning Creditors FFI Fund Ltd., FYI Ltd., and Olifant Fund, Ltd.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>BRASKEM AMERICA FINANCE COMPANY,<br><br>Alleged Debtor. | Case No. 26-12495<br><br>Chapter 11 |

**STATEMENT OF THE PETITIONING CREDITORS**
**IN SUPPORT OF INVOLUNTARY CHAPTER 11 PETITION**
**AGAINST BRASKEM AMERICA FINANCE COMPANY**

FFI Fund Ltd., FYI Ltd., and Olifant Fund, Ltd. (collectively, the "Petitioning Creditors"), holders of approximately $272.091 million in aggregate principal amount of the 7.125% Notes due 2041 issued by Braskem America Finance Company ("U.S. FinCo"), respectfully submit this statement (the "Statement") in support of their involuntary petition (the "Involuntary Petition") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") against U.S. FinCo. The Petitioning Creditors submit this Statement to provide background concerning U.S. FinCo, the circumstances necessitating the Involuntary Petition, and the basis for entry of an order for relief pursuant to Section 303 of the Bankruptcy Code.

## PRELIMINARY STATEMENT[1]

1. This involuntary chapter 11 case arises from U.S. FinCo's failure to satisfy hundreds of millions of dollars in outstanding debt obligations that are presently due and owing, and it follows U.S. FinCo's months-long pursuit of a failed restructuring strategy, aimed to further the broader objectives of its ultimate parent, Braskem S.A. ("Braskem"), at the expense of its existing creditors.

2. U.S. FinCo is a Delaware corporation and wholly owned financing subsidiary of Braskem America, Inc. ("BAI"), a U.S. operating company. Its principal liabilities arise from the issuance of the 7.125% Notes due 2041 (the "2041 Notes") and its principal assets consist of substantial intercompany receivables owed by BAI in respect of the proceeds of the 2041 Notes that U.S. FinCo advanced to BAI. U.S. FinCo is in default of its obligations under the 2041 Notes, of which the Petitioning Creditors hold approximately $272.091 million in aggregate principal amount.

3. On June 24, 2026, Braskem, U.S. FinCo's ultimate parent and guarantor of the 2041 Notes, together with U.S. FinCo and certain Braskem affiliates, commenced a court-supervised mediation proceeding (the "Brazilian Mediation") in Brazil pursuant to Brazilian Bankruptcy Law (as defined in the 2041 Notes Indenture). On June 26, 2026, those same entities commenced voluntary cases under Chapter 15 of the Bankruptcy Code (the "Chapter 15 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), seeking recognition of the Brazilian Mediation proceeding. On August 24, 2026, following the failed Brazilian Mediation, the same group of Braskem entities commenced an extrajudicial

1 Capitalized terms used but not otherwise defined in this Preliminary Statement have the meanings ascribed to them in other sections of this Statement.

reorganization proceeding in Brazil under Brazilian Bankruptcy Law (the "Brazilian EJ"). Commencement of the Brazilian Mediation proceeding, the Chapter 15 Cases and the Brazilian EJ each constituted immediate and independent Events of Default under the 2041 Notes Indenture, resulting in the automatic acceleration of the 2041 Notes pursuant to Section 6.02 thereof, without the need for any declaration or other action by the Indenture Trustee or the underlying holders.

4. Compounding those defaults, U.S. FinCo has participated in Braskem's broader restructuring efforts notwithstanding its separate corporate existence, independent board of directors, and distinct interests and fiduciary obligations. U.S. FinCo's board is responsible for exercising independent judgment in managing its affairs and protecting its stakeholders' interests, including where those interests diverge from those of Braskem and its affiliates. Yet, for at least the last few months, U.S. FinCo has pursued successive Brazilian restructuring proceedings that seek, without justification, to substantively consolidate U.S. FinCo's estate with the estates of Braskem and its other affiliates, solely for the benefit of Braskem and its own creditors. These efforts have failed to produce a viable restructuring for U.S. FinCo, denied its principal creditors a meaningful opportunity to negotiate a consensual resolution, and imposed continued delay and expense on U.S. FinCo and its creditors. Notably, while Braskem has engaged in restructuring discussions with an ad hoc group of creditors represented by Davis Polk & Wardwell LLP, which holds substantial claims against Braskem and its affiliates, U.S. FinCo has refused to engage with the Funds, its largest creditors, regarding a consensual restructuring.

5. These circumstances call into question whether U.S. FinCo's affairs are being managed independently and in accordance with its own interests. In particular, U.S. FinCo's principal assets consist of substantial intercompany receivables owed by BAI, creating inherent conflicts of interest with respect to the enforcement and administration of those assets. To protect

those assets in light of the substantial conflicts of interest arising from U.S. FinCo's relationships with BAI and Braskem, the Petitioning Creditors intend to seek the appointment of a chapter 11 trustee to independently evaluate U.S. FinCo's assets and liabilities, investigate potential claims against affiliates and other parties, and pursue a restructuring that maximizes value for U.S. FinCo's estate.

6. The Petitioning Creditors have therefore commenced this involuntary Chapter 11 case to obtain an order for relief under Section 303(h)(1) of the Bankruptcy Code and to facilitate an orderly restructuring of U.S. FinCo's affairs under the supervision of this Court. As demonstrated below, the Petitioning Creditors satisfy the requirements of section 303(b) of the Bankruptcy Code, and U.S. FinCo is generally not paying its debts as they become due. Therefore, entry of an order for relief is warranted.

## **JURISDICTION AND VENUE**

7. This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Venue in this District is proper pursuant to 28 U.S.C. § 1408(2) because the Chapter 15 Cases, including with respect to U.S. FinCo, are pending in this District. *See In re Braskem America Finance Company*, Case No. 26-11528 (MEW) (Bankr. S.D.N.Y.) *jointly-administered under In re Braskem S.A.*, Case No. 26-11522 (MEW) (Bankr. S.D.N.Y.).

## BACKGROUND

### A. *U.S. FinCo*

8. U.S. FinCo is a Delaware corporation incorporated on July 7, 2011, with its principal business address at 1735 Market Street, 28th Floor, Philadelphia, Pennsylvania. U.S. FinCo is a financing subsidiary with no independent operating business or employees.

9. U.S. FinCo is a direct, wholly owned subsidiary of BAI, a U.S. operating company, and indirect subsidiary of Braskem, a Brazilian petrochemical company. U.S. FinCo was formed to raise capital through the issuance of debt securities and to advance the proceeds thereof to BAI. U.S. FinCo's principal assets therefore consist of substantial intercompany receivables owed by BAI. BAI is not subject to an insolvency proceeding either in Brazil or in the United States.

### B. *The 2041 Notes and Indenture*

10. On July 22, 2011, U.S. FinCo issued $500 million in aggregate principal amount of the 2041 Notes pursuant to that certain Indenture, dated as of July 22, 2011 (as amended, supplemented or otherwise modified from time to time, the "2041 Notes Indenture"), among U.S. FinCo, as issuer, Braskem, as guarantor, and The Bank of New York Mellon, as trustee (the "Indenture Trustee"). U.S. FinCo subsequently issued an additional $250 million in aggregate principal amount of the 2041 Notes pursuant to the 2041 Notes Indenture. It is the Petitioning Creditors' understanding that, as of commencement of the Chapter 15 Cases, approximately $582 million principal amount of the 2041 Notes remained outstanding. The 2041 Notes Indenture is governed by New York law and provides for jurisdiction in New York. A copy of the 2041 Notes Indenture is attached hereto as **Exhibit A**.

11. The Petitioning Creditors collectively hold approximately $272.091 million[2] of the 2041 Notes, representing approximately 47% of the outstanding principal amount. The Petitioning Creditors' respective holdings are set forth in the Involuntary Petition and the accompanying documentation attached thereto.

12. The 2041 Notes Indenture provides that certain bankruptcy and restructuring proceedings involving Braskem or any Significant Subsidiary constitute Events of Default (each as defined in the 2041 Notes Indenture). Specifically, Section 6.01(6)(a)(i) of the 2041 Notes Indenture identifies the commencement of a voluntary case under any Bankruptcy Law as an Event of Default, while Section 6.01(6)(a)(vi) identifies the filing for judicial or extrajudicial recovery as an Event of Default. The definition of "Bankruptcy Law" expressly encompasses the Bankruptcy Code and Brazilian Federal Law No. 11,101/2005. Under Section 6.02, an Event of Default specified in Section 6.01(6) that occurs and is continuing automatically accelerates the outstanding principal amount of the 2041 Notes, together with accrued and unpaid interest, without any declaration or other act by the Indenture Trustee or any holder.

13. As described more fully below, the commencement of each of the Brazilian Mediation, the Chapter 15 Cases and the Brazilian EJ constituted a separate and independent Event of Default under the 2041 Notes Indenture, resulting in the automatic acceleration of the obligations thereunder. Those amounts became immediately due and payable and remain unpaid.

14. In addition, U.S. FinCo failed to make the scheduled interest payment due on July 22, 2026, in the amount of approximately $20.7 million which remains outstanding.

2 The aggregate principal amount reflects the Petitioning Creditors' holdings as of the date of filing of the Involuntary Petition on an as-traded basis, including certain transfers that remain pending settlement. Accordingly, the supporting documentation attached to the Involuntary Petition may reflect slightly different amounts due solely to the timing of settlement.

15. Accordingly, the Petitioning Creditors hold substantial, presently due and owing claims against U.S. FinCo arising from the acceleration of the 2041 Notes. Those obligations are not contingent as to liability and are not subject to a bona fide dispute as to liability or amount.

## C. *The Brazilian Proceedings and Chapter 15 Cases*

16. On June 24, 2026, Braskem and certain of its direct and indirect subsidiaries, including U.S. FinCo, commenced a protective injunction proceeding (*Tutela de Urgência Cautelar*) before the 2nd Bankruptcy and Judicial Reorganization Court of São Paulo (the "Brazilian Court") in support of a court-supervised mediation process (the "Brazilian Mediation"). The proceeding afforded the participating entities a 60-day stay of creditor enforcement actions to facilitate negotiations with their creditors concerning a potential restructuring.

17. On June 26, 2026, Antonio Reinaldo Rabelo Filho, in his capacity as the foreign representative of various Braskem entities including U.S. FinCo (the "Foreign Representative"), commenced the Chapter 15 Cases on behalf of Braskem, U.S. FinCo and certain affiliated entities (excluding BAI) before the Bankruptcy Court, seeking recognition of the Brazilian Mediation proceeding. On June 30, 2026, the Bankruptcy Court entered an order granting provisional relief with respect to the Brazilian Mediation proceeding, which relief was expressly limited to the scope of the relief granted by the Brazilian Court in the Brazilian Mediation proceeding.

18. On August 24, 2026, following the expiration of the 60-day stay without a consensual restructuring agreement, the same Braskem entities commenced a Brazilian *Recuperação Extrajudicial* (the "Brazilian EJ") before the Brazilian Court. The Brazilian EJ thus supplanted the unsuccessful Brazilian Mediation.

19. Following commencement of the Brazilian EJ, the Foreign Representative sought an extension of provisional relief in the Chapter 15 Cases. On August 25, 2026, the Bankruptcy

Court extended that relief pending a final determination on recognition, again expressly limiting such relief to the scope of the relief granted by the Brazilian Court in the Brazilian EJ.

20. In the Brazilian EJ, the Petitioning Creditors successfully challenged U.S. FinCo's inclusion as a debtor on the ground that U.S. FinCo had failed to obtain the requisite creditor support under Brazilian law to commence the Brazilian EJ. On September 24, 2026, the Brazilian Court rejected Braskem's attempt to aggregate creditor support across separate entities and determined that the requisite creditor-support threshold had to be satisfied separately for U.S. FinCo. The Brazilian Court further found that U.S. FinCo had obtained support from holders of only approximately 13.2% of its eligible claims, well below the required one-third threshold under Brazilian law.

21. The Brazilian Court afforded U.S. FinCo fifteen days to cure that deficiency and, in the interim, revoked the benefit of the Brazilian stay with respect to U.S. FinCo, effective as of September 24, 2026**.** U.S. FinCo appealed and sought to suspend the September 24 decision. On October 9, 2026, the Appellate Court, the São Paulo Court of Justice, denied U.S. FinCo's request for suspensive relief, leaving the revocation of the Brazilian stay in effect (and without an opportunity to cure)**.**

22. On October 19, 2026, the Bankruptcy Court held a status conference in the Chapter 15 Cases, at the request of the Petitioning Creditors, to address the effect of the Brazilian Court's September 24 decision and the subsequent appellate ruling on the provisional relief previously granted to U.S. FinCo. At the status conference, the Bankruptcy Court confirmed that the provisional relief stay granted in the Chapter 15 Cases was coterminous with the stay imposed in Brazil and that, to the extent the Brazilian stay was no longer in effect with respect to U.S. FinCo, the corresponding stay under the Bankruptcy Court's provisional relief order likewise ceases. As

of 11:59 p.m. (prevailing Eastern time) on October 20, 2026, the Brazilian stay and the U.S. stay have not been reinstated as to U.S. FinCo. Indeed, as of such time, U.S. FinCo has not submitted evidence to the Brazilian Court establishing that it has cured the deficiency in creditor support identified in the September 24 decision, even notwithstanding the expiration of the 15-day cure period afforded by the Brazilian Court, and so the Brazilian EJ as to U.S. FinCo is deemed entirely invalid.[3]

### D. *U.S. FinCo's Management Has Failed to Demonstrate Independent Judgment in Pursuing Braskem's Restructuring Strategy*

23. The foregoing developments underscore a fundamental concern regarding U.S. FinCo's participation in Braskem's broader restructuring efforts: although U.S. FinCo is a separate Delaware corporation with its own board of directors, assets, liabilities, and creditors, it has pursued a costly and unsuccessful restructuring strategy in a foreign jurisdiction that appears designed to advance Braskem's broader objectives, without adequately accounting for U.S. FinCo's distinct interests and U.S. presence.[4]

24. Even at the outset of Braskem's failed restructuring efforts, these concerns were manifest. Although the Brazilian Mediation proceeding was purportedly commenced to facilitate

---

3 The Petitioning Creditors maintain that the Brazilian Court's September 24, 2026 decision revoked the stay as to U.S. FinCo, notwithstanding the 15-day cure period. In any event, even assuming that the stay remained effective during that period and that the period is calculated using business days, the cure period expired no later than end of day on October 20, 2026—as conceded by counsel for the Foreign Representative at the October 19, 2026 status conference in the Chapter 15 Cases. The Petitioning Creditors do not concede that the cure period extended the stay or that the period should be calculated using business days.

4 Nothing herein should be construed as an acknowledgment that U.S. FinCo's center of main interests is located in Brazil or that U.S. FinCo maintains an establishment in Brazil within the meaning of sections 1502 and 1517 of the Bankruptcy Code. The Petitioning Creditors expressly reserve all rights to contest recognition of the Brazilian proceedings as either foreign main or foreign nonmain proceedings under chapter 15 of the Bankruptcy Code, to the extent any such proceedings remain pending with respect to U.S. FinCo.

negotiations with creditors, U.S. FinCo's principal creditors, including the Petitioning Creditors, were excluded from that process, and despite repeated efforts by the Petitioning Creditors to engage in restructuring discussions, Braskem declined to engage substantively with them. Thus, notwithstanding the benefit of a 60-day stay intended to facilitate a consensual resolution, the mediation concluded without any agreement addressing U.S. FinCo's obligations to its principal creditors.

25. The Brazilian EJ similarly failed to provide a viable restructuring path for U.S. FinCo. As described above, U.S. FinCo was included in that proceeding despite having obtained support from holders of only 13.2% of its eligible claims. Rather than secure the necessary support from U.S. FinCo's own creditors, Braskem sought to aggregate creditor support across separate entities, an approach rejected by the Brazilian Court. Accordingly, the second restructuring proceeding likewise failed to secure the creditor support necessary to afford U.S. FinCo the protections it sought, while further delaying any meaningful resolution of its outstanding obligations.

26. Driving these failures, at least in part, is the fact that U.S. FinCo's principal assets present significant conflicts of interest. U.S. FinCo holds substantial intercompany receivables owed by BAI—its direct parent and non-debtor in the current Braskem restructuring proceedings. Those receivables represent a potentially significant source of recovery for U.S. FinCo's creditors, and U.S. FinCo's own board of directors is responsible for independently evaluating U.S. FinCo's rights and obligations in connection with those intercompany claims—including whether to enforce, restructure, compromise, or otherwise address its claims against BAI. The restructuring decisions made to date, however, raise questions regarding whether U.S. FinCo's board has adequately exercised its independent judgment in evaluating the interests of U.S. FinCo and its

creditors, particularly where those interests may diverge from the broader restructuring objectives of Braskem and its affiliates. In particular, U.S. FinCo's board has to date been supportive of a restructuring strategy that seeks to effectively eliminate, or use for the benefit of Braskem's other creditors, U.S. FinCo's principal asset (*i.e.*, its intercompany claims against BAI) via substantive consolidation under the relatively more lenient standards under Brazilian law. The interests of U.S. FinCo in maximizing recoveries on those receivables may therefore be directly adverse to the interests of BAI and Braskem.

27. These conflicts are particularly concerning given Braskem's efforts to pursue a restructuring involving multiple affiliated entities. Any effort to compromise U.S. FinCo's intercompany claims or otherwise deploy its assets in furtherance of a broader enterprise-wide restructuring, without adequate regard for U.S. FinCo's separate interests, risks diminishing the value available to its creditors. The Petitioning Creditors are also concerned that Braskem may seek to subject U.S. FinCo to yet another Brazilian restructuring proceeding, including a judicial reorganization (*recuperação judicial*), notwithstanding the failure of the prior proceedings to produce a viable restructuring for U.S. FinCo.

28. Taken together, these circumstances raise serious concerns regarding whether U.S. FinCo's existing management has adequately exercised independent judgment in protecting U.S. FinCo's separate interests, particularly where those interests conflict with those of BAI and Braskem. For these reasons, the Petitioning Creditors intend to seek the appointment of a chapter 11 trustee to independently evaluate U.S. FinCo's assets and liabilities, investigate potential claims against affiliates and other parties, and pursue an appropriate restructuring that maximizes value for U.S. FinCo's estate.

## ARGUMENT

### A. *The Petitioning Creditors are Eligible to Commence this Involuntary Case Under Section 303(b)*

29. Section 303(b)(1) of the Bankruptcy Code authorizes the commencement of an involuntary case under chapter 11 by three or more entities, each holding a claim against the alleged debtor that is not contingent as to liability or subject to a bona fide dispute as to liability or amount, provided that the qualifying claims aggregate at least $21,050 more than the value of any liens on property of the debtor securing those claims. 11 U.S.C. § 303(b)(1).

30. The Petitioning Creditors satisfy those requirements. Each Petitioning Creditor holds a claim against U.S. FinCo arising from its ownership of the 2041 Notes. Those claims are fixed, noncontingent obligations of U.S. FinCo under the 2041 Notes Indenture, exceed the minimum threshold, and are not subject to a bona fide dispute as to liability or amount.

31. Moreover, as described above, the commencement of the Brazilian Mediation proceeding on June 24, 2026 constituted an Event of Default under Section 6.01(6) of the 2041 Notes Indenture, resulting in the automatic acceleration of the 2041 Notes pursuant to Section 6.02. Separately, the commencement of the Chapter 15 Cases on June 26, 2026 constituted an independent Event of Default under Section 6.01(6)(a)(i), which applies to the commencement of a voluntary case under any Bankruptcy Law, expressly including the Bankruptcy Code. The commencement of the Brazilian EJ on August 24, 2026 constituted yet another independent Event of Default under Section 6.01(6)(a)(vi), providing an additional basis for automatic acceleration. Accordingly, the outstanding principal amount of the 2041 Notes, together with accrued and unpaid interest, became immediately due and payable without any declaration or other action by the Indenture Trustee or the holders. To date, U.S. FinCo has failed to satisfy those obligations.

32. The Petitioning Creditors collectively hold approximately $272.091 million in principal amount of the 2041 Notes, exclusive of accrued and unpaid interest. Their claims are unsecured and substantially exceed the statutory threshold set forth in section 303(b)(1). The Petitioning Creditors' respective holdings and supporting documentation are identified in the Involuntary Petition and accompanying materials, including the documents and statements submitted pursuant to Federal Rule of Bankruptcy Procedure 1003(a).

33. Accordingly, the Petitioning Creditors satisfy the requirements of section 303(b)(1) and are eligible to commence this involuntary chapter 11 case.

## B. *U.S. FinCo is Generally Not Paying its Debts as They Become Due*

34. Section 303(h)(1) of the Bankruptcy Code provides that, where an involuntary petition is timely controverted, the court shall enter an order for relief if the debtor is generally not paying its debts as they become due, excluding debts subject to a bona fide dispute as to liability or amount. 11 U.S.C. § 303(h)(1).

35. In determining whether a debtor is generally paying its debts as they become due, courts consider the totality of the circumstances, including (i) the number of unpaid claims, (ii) the amount of such claims, (iii) the materiality of the nonpayments, and (iv) the debtor's overall conduct of its financial affairs. *See In re Euro-Am. Lodging Corp.*, 357 B.R. 700, 713 (Bankr. S.D.N.Y. 2007); *In re B.D. Int'l Disc. Corp.*, 701 F.2d 1071, 1074–76 (2d Cir. 1983). The failure to pay even a single significant creditor may establish general nonpayment where the unpaid debt represents a substantial portion of the debtor's overall liabilities. *See Euro-Am. Lodging*, 357 B.R. at 713–14 (finding general nonpayment where a single creditor held more than 90% of the debtor's outstanding debt).

36. Here, the relevant circumstances overwhelmingly support entry of an order for relief. U.S. FinCo's only known obligations are the 2041 Notes. U.S. FinCo has no business operations and, therefore, no trade creditors or payables.

37. U.S. FinCo has failed to repay the 2041 Notes, which have been fully accelerated and due and owing since June 24, 2026. The principal amount outstanding as of such acceleration, the Petition Creditors believe, was approximately $582 million, which amount remains fully outstanding. Moreover, U.S. FinCo failed to make the most recently scheduled interest payment on the 2041 Notes, due in the amount of $20.7 million.

38. The magnitude of these defaults is particularly significant in light of U.S. FinCo's limited business activities. The failure to satisfy the accelerated obligations under the 2041 Notes is not merely an isolated missed payment or a technical default. Rather, it represents a failure to pay the substantial financial obligations that form the core of U.S. FinCo's debt structure.

39. Nor are these obligations subject to a bona fide dispute as to liability or amount. U.S. FinCo's obligations under the 2041 Notes Indenture are fixed and enforceable, and the acceleration of the 2041 Notes occurred automatically upon the commencement of the Brazilian Mediation proceeding and, independently, upon the commencement of each of the Chapter 15 Cases and the Brazilian EJ. U.S. FinCo has not satisfied the accelerated obligations or cured its outstanding payment defaults.

40. Under the totality of the circumstances, including U.S. FinCo's limited business activities, the magnitude of the accelerated debt obligations, and its failure to pay the principal and interest presently due under the 2041 Notes, U.S. FinCo is generally not paying its debts as they become due within the meaning of Section 303(h)(1). Accordingly, entry of an order for relief is warranted.

## C. *Chapter 11 Relief is Necessary to Protect U.S. FinCo's Estate and Facilitate the Appointment of an Independent Trustee*

41. The need for Chapter 11 relief is further underscored by the substantial conflicts of interest arising from U.S. FinCo's relationship with Braskem and BAI.

42. As described above, independent oversight is necessary to protect U.S. FinCo's estate and to ensure that its assets and potential claims are evaluated and administered free of conflicts or divided loyalties.

43. A chapter 11 trustee would be best positioned to independently pursue U.S. FinCo's intercompany claims; investigate potential claims against affiliates, directors, and other parties; and evaluate restructuring alternatives based on the interests of U.S. FinCo and its estate rather than the competing interests elsewhere in Braskem enterprise.

44. Section 1104(a) of the Bankruptcy Code authorizes the appointment of a Chapter 11 trustee for cause, including fraud, dishonesty, incompetence, gross mismanagement, or similar cause, or where appointment is in the interests of creditors and other interests of the estate. 11 U.S.C. § 1104(a). The Petitioning Creditors intend to seek, via a separate motion, the appointment of a Chapter 11 trustee pursuant to Section 1104(a) and will be prepared to show that the facts and circumstances warrant independent fiduciary oversight.

45. Entry of an order for relief will provide the necessary framework for the appointment of an independent trustee to protect U.S. FinCo's assets, investigate its intercompany relationships and potential claims, and pursue a restructuring that maximizes value for U.S. FinCo's estate. Such relief is particularly appropriate where U.S. FinCo's principal assets are claims against affiliates whose interests may diverge materially from those of U.S. FinCo and its creditors.

## CONCLUSION

46. For the foregoing reasons, and such other evidence as may be presented at any hearing on the Involuntary Petition, the Petitioning Creditors respectfully request that the Court enter an order for relief against U.S. FinCo pursuant to Bankruptcy Code Section 303(h)(1), together with such other and further relief as the Court deems just and appropriate.

## RESERVATION OF RIGHTS

47. The Petitioning Creditors expressly reserve all rights, claims, defenses, and remedies, including the right to amend or supplement this Statement or the Involuntary Petition, submit additional evidence, and advance additional arguments in support of the Involuntary Petition, in each case subject to applicable law and the Federal Rules of Bankruptcy Procedure.

[*Remainder of Page Left Intentionally Blank*]

Dated: October 21, 2026
New York, New York

Respectfully submitted,

*/s/ Daniel A. Fliman*

PAUL HASTINGS LLP
Daniel A. Fliman
Sayan Bhattacharyya
Robert Nussbaum
Ryan Montefusco
200 Park Avenue
New York, NY 10166
Telephone: 212-318-6000
E-Mail: danfliman@paulhastings.com
sayanbhattacharyya@paulhastings.com
robertnussbaum@paulhastings.com
ryanmontefusco@paulhastings.com

*Attorneys for Petitioning Creditors FFI Fund Ltd., FYI Ltd., and Olifant Fund, Ltd.*

**Exhibit A**

Indenture

EXECUTION VERSION

DATED JULY 22, 2011

BRASKEM AMERICA FINANCE COMPANY,
AS ISSUER

BRASKEM S.A.,
AS GUARANTOR

AND

THE BANK OF NEW YORK MELLON,
AS TRUSTEE, REGISTRAR, TRANSFER AGENT AND PAYING AGENT

---

# INDENTURE

# 7.125% NOTES DUE 2041

---

# CONTENTS

Clause Page

ARTICLE I DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION ........ 1
Section 1.01. Definitions. ........ 1
Section 1.02. Rules of Construction. ........ 12
Section 1.03. Table of Contents; Headings. ........ 12
Section 1.04. Form of Documents Delivered to Trustee. ........ 13
Section 1.05. Acts of Holders. ........ 13
ARTICLE II THE NOTES ........ 14
Section 2.01. Form and Dating. ........ 14
Section 2.02. Execution, Authentication and Delivery. ........ 15
Section 2.03. Transfer Agent, Registrar and Paying Agent. ........ 16
Section 2.04. Paying Agent to Hold Money in Trust. ........ 17
Section 2.05. Payment of Principal and Interest; Principal and Interest Rights Preserved. ........ 18
Section 2.06. Holder Lists. ........ 19
Section 2.07. Transfer and Exchange. ........ 19
Section 2.08. Replacement Notes. ........ 21
Section 2.09. Temporary Notes. ........ 21
Section 2.10. Persons Deemed Owners. ........ 22
Section 2.11. Cancellation. ........ 22
Section 2.12. Defaulted Interest. ........ 22
Section 2.13. CUSIP and ISIN Numbers. ........ 22
Section 2.14. Open Market Purchases. ........ 23
ARTICLE III REDEMPTION ........ 23
Section 3.01. Right of Redemption. ........ 23
Section 3.02. Applicability of Article. ........ 24
Section 3.03. Election to Redeem; Notice to Trustee. ........ 24
Section 3.04. Notice of Redemption by the Company. ........ 24
Section 3.05. Selection of Notes to Be Redeemed in Part. ........ 25
Section 3.06. Deposit of Redemption Price. ........ 26
Section 3.07. Effect of Notice of Redemption. ........ 26

Section 3.08. Change of Control....26
ARTICLE IV COVENANTS....29
Section 4.01. Payment of Principal, Premium and Interest Under the Notes....29
Section 4.02. Maintenance of Office or Agency....29
Section 4.03. Money for Note Payments to Be Held in Trust....29
Section 4.04. Maintenance of Corporate Existence....31
Section 4.05. Payment of Additional Amounts....31
Section 4.06. Reporting Requirements....34
Section 4.07. Available Information....35
Section 4.08. Limitation on Liens....35
Section 4.09. Waiver of Certain Covenants....38
Section 4.10. Additional Limitations on the Company....38
ARTICLE V CONSOLIDATION, MERGER, CONVEYANCE, TRANSFER OR LEASE....39
Section 5.01. Limitation on Consolidation, Merger or Transfer of Assets....39
Section 5.02. Successor Substituted....40
Section 5.03. Notes to Be Secured in Certain Events....40
ARTICLE VI EVENTS OF DEFAULT AND REMEDIES....40
Section 6.01. Events of Default....40
Section 6.02. Acceleration of Maturity, Rescission and Amendment....42
Section 6.03. Collection Suit by Trustee....43
Section 6.04. Other Remedies....43
Section 6.05. Trustee May Enforce Claims Without Possession of Notes....44
Section 6.06. Application of Money Collected....44
Section 6.07. Limitation on Suits....44
Section 6.08. Rights of Holders to Receive Principal, Premium and Interest....45
Section 6.09. Restoration of Rights and Remedies....45
Section 6.10. Trustee May File Proofs of Claim....45
Section 6.11. Delay or Omission Not Waiver....45
Section 6.12. Control by Holders....45
Section 6.13. Waiver of Past Defaults and Events of Default....46
Section 6.14. Rights and Remedies Cumulative....46
Section 6.15. Waiver of Stay or Extension Laws....46
ARTICLE VII TRUSTEE AND PAYING AGENTS....46
Section 7.01. Duties of Trustee and Paying Agents....46

Section 7.02. Rights of Trustee. 48
Section 7.03. Individual Rights of Trustee. 49
Section 7.04. Trustee's Disclaimer. 50
Section 7.05. Notice of Defaults and Events of Default. 50
Section 7.06. Compensation and Indemnity. 50
Section 7.07. Replacement of Trustee. 52
Section 7.08. Successor Trustee by Merger. 52
Section 7.09. Eligibility; Disqualification. 53
Section 7.10. Resignation of a Paying Agent. 53
ARTICLE VIII DISCHARGE OF INDENTURE; DEFEASANCE 53
Section 8.01. Discharge of Liability on Notes. 53
Section 8.02. Conditions to Defeasance. 54
Section 8.03. Application of Trust Money. 55
Section 8.04. Repayment to Company. 55
Section 8.05. Indemnity for U.S. 56
Section 8.06. Reinstatement. 56
ARTICLE IX AMENDMENTS 56
Section 9.01. Without Consent of Holders. 56
Section 9.02. With Consent of Holders. 57
Section 9.03. Revocation and Effect of Consents and Waivers. 58
Section 9.04. Notation on or Exchange of Notes. 59
Section 9.05. Trustee to Sign Amendments. 59
Section 9.06. Payment for Consent. 59
ARTICLE X GUARANTEES 59
Section 10.01. Unconditional Guarantees. 59
Section 10.02. Execution and Delivery of the Guarantees. 61
Section 10.03. Release of Braskem. 61
ARTICLE XI SUBSTITUTION OF THE COMPANY AS ISSUER 61
Section 11.01. Substitution of the Company as Issuer. 61
ARTICLE XII MEETINGS OF HOLDERS 64
Section 12.01. Purposes for Which Meetings May Be Called. 64
Section 12.02. Manner of Calling Meetings. 64
Section 12.03. Call of Meetings by Company, Braskem or Holders. 65
Section 12.04. Who May Attend and Vote at Meetings. 65

Section 12.05. Regulations May Be Made by Trustee; Conduct of the Meeting; Voting Rights; Adjournment. ....65
Section 12.06. Voting at the Meeting and Record to Be Kept. ....66
Section 12.07. Exercise of Rights of Trustee or Holders May Not Be Hindered or Delayed by Call of Meeting. ....66
Section 12.08. Procedures Not Exclusive. ....66
ARTICLE XIII MISCELLANEOUS ....66
Section 13.01. Provisions of Indenture and Notes for the Sole Benefit of Parties and Holders of Notes. ....66
Section 13.02. Notices. ....67
Section 13.03. Officer's Certificate and Opinion of Counsel as to Conditions Precedent. ....68
Section 13.04. Statements Required in Officer's Certificate or Opinion of Counsel. ....69
Section 13.05. Rules by Trustee, Registrar, Paying Agent and Transfer Agents. ....69
Section 13.06. Currency Indemnity. ....69
Section 13.07. No Recourse Against Others. ....70
Section 13.08. Legal Holidays. ....70
Section 13.09. Governing Law; Waiver of Jury Trial. ....70
Section 13.10. Consent to Jurisdiction; Waiver of Immunities. ....70
Section 13.11. Successors and Assigns. ....72
Section 13.12. Multiple Originals. ....72
Section 13.13. Severability Clause. ....72
Section 13.14. Tax Purposes. ....72
Section 13.15. Patriot Act. ....72

**EXHIBITS**:

EXHIBIT A - Form of Note
EXHIBIT B - Form of Guarantee
EXHIBIT C - Form of Transfer Notice
EXHIBIT D - Form of Certificate for Transfer from Restricted Global Note or Certificated Note Bearing a Securities Act Legend to Regulation S Global Note or Certificated Note Not Bearing a Securities Act Legend
EXHIBIT E - Form of Transfer Certificate for Transfer from Regulation S Global Note or Certificated Note Not Bearing a Securities Act Legend to Restricted Global Note or Certificated Note Bearing a Securities Act Legend

EXHIBIT F - Form of Certificate for Removal of the Securities Act Legend on a Certificated Note

INDENTURE, dated as of July 22, 2011, among BRASKEM AMERICA FINANCE COMPANY, a corporation incorporated under the laws of the State of Delaware (the "**Company**"), BRASKEM S.A., a corporation (*sociedade por ações*) organized under the laws of Brazil, as guarantor ("**Braskem**"), and THE BANK OF NEW YORK MELLON, as Trustee, Registrar, Transfer Agent and Paying Agent.

RECITALS

The Company has duly authorized the issue of 7.125% Notes due 2041 (the "**Notes**"), initially in an aggregate principal amount of U.S.$500,000,000, and has duly authorized the execution and delivery of this Indenture.

Braskem has authorized Guarantees (as hereinafter defined) of the Notes, and to provide therefor Braskem has duly authorized the execution and delivery of this Indenture.

All things necessary have been done to make the Notes, when executed and authenticated and delivered hereunder and duly issued, and the Guarantees, when executed and delivered hereunder and duly issued, the respective valid obligations of the Company and Braskem, and to make this Indenture a valid agreement of the Company and Braskem.

NOW, THEREFORE, THIS INDENTURE WITNESSETH:

For and in consideration of the premises and the purchase of the Notes by the Holders thereof, it is mutually covenanted and agreed, for the equal and proportionate benefit of all Holders, as follows:

ARTICLE I

DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

Section 1.01. **Definitions**.

"**Act**", when used with respect to any Holder, has the meaning specified in Section 1.05.

"**Additional Amounts**" has the meaning specified in Section 4.05(a).

"**Advance Transaction**" means an advance from a financial institution involving either (i) a foreign exchange contract (ACC - *Adiantamento sobre Contrato de Câmbio*) or (ii) an export contract (ACE – *Adiantamento sobre Contrato de Exportação*).

"**Affiliate**" means, with respect to any specified Person, (i) any other Person which, directly or indirectly, is in control of, is controlled by or is under common control with such specified Person or (ii) any other Person who is a director or officer (a) of such specified Person, (b) of any subsidiary of such specified Person or (c) of any Person described in clause (i) above. For purposes of this definition, control of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"**Applicable Procedures**" means the applicable procedures of DTC, Euroclear and Clearstream, in each case to the extent applicable.

"**Authenticating Agent**" has the meaning specified in Section 2.02(b).

"**Authorized Denomination**" has the meaning specified in Section 2.02(a)(v).

"**Bankruptcy Law**" means (i) Title 11, United States Code or any similar U.S. federal or state law for the relief of debtors or the administration or liquidation of debtors' estates for the benefit of their creditors and (ii) the Brazilian Federal Law No. 11,101, of February 9, 2005, as amended, or any similar Brazilian federal or state law for the relief of debtors or the administration or liquidation of debtors' estates for the benefit of their creditors.

"**Board of Directors**" means, as the case may be, the Board of Directors of the Company or the Board of Directors of Braskem (*Conselho de Administração*) or any committee thereof duly authorized to act on behalf of such Board of Directors.

"**Board Resolution**" means a copy of a resolution certified by the Secretary (*Secretário*), the Assistant Secretary or another Person performing corporate secretarial functions of the Company or Braskem, as applicable, to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification and delivered to the Trustee.

"**Braskem**" means the corporation named as such in the first paragraph of this Indenture and any successor thereof.

"**Brazil**" means the Federative Republic of Brazil.

"**Brazilian Taxes**" means any present or future taxes, duties, assessments, fees or other governmental charges of whatever nature (and any fines, penalties or interest related thereto) imposed or levied by or on behalf of Brazil or any political subdivision or authority of or in Brazil having power to tax.

"**Business Day**" means any day other than a Saturday, a Sunday or a legal holiday or a day on which banking institutions or trust companies are authorized or obligated by law to close in The City of New York or São Paulo, Brazil.

"**Capital Lease Obligations**" means, with respect to any Person, any obligation which is required to be classified and accounted for as a capital lease on the face of a balance sheet of such Person prepared in accordance with GAAP; the amount of such obligation shall be the capitalized amount thereof, determined in accordance with GAAP; and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a penalty.

"**Capital Stock**" means, with respect to any Person, any and all shares of stock, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated, whether voting or non-voting), such person's equity including any

preferred stock, but excluding any debt securities convertible into or exchangeable for such equity.

"**Certificated Note**" has the meaning specified in Section 2.01.

"**Change of Control**" means:

(i) any "person" or "group" (as such terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act), other than one or more Permitted Holders or a group that includes one or more Permitted Holders in which such Permitted Holder or Permitted Holders hold and have voting power over at least a majority of the Voting Stock of Braskem held by such group, is or becomes the "beneficial owner" (as such term is used in Rule 13d-3 under the Exchange Act), directly or indirectly, of more than 50% of the total voting power of the Voting Stock of Braskem, including as a result of any merger or consolidation transaction including Braskem; or

(ii) the Permitted Holders, directly or indirectly, cease to have the power to direct or cause the direction of the management and policies of Braskem, whether through the ownership of voting securities, by contract or otherwise.

"**Clearstream**" means Clearstream Banking, société anonyme.

"**Closing Date**" means July 22, 2011 or such later date on which the Notes are initially issued hereunder.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company**" means Braskem Finance Limited and any successor thereof.

"**Company Order**" means a written order signed in the name of the Company by an Officer.

"**Consolidated Total Assets**" means the total amount of assets of Braskem and its Subsidiaries as set forth in the most recent financial statements delivered by Braskem to the Trustee in accordance with Section 4.06, after giving *pro forma* effect to any acquisition or disposition of companies, divisions, lines of businesses, operations or assets by Braskem and its Subsidiaries subsequent to such date and on or prior to the date of determination.

"**Corporate Trust Office**" means the office of the Trustee at which at any particular time its corporate trust business shall be principally administered, which office as of the date of this Indenture is located at 101 Barclay Street, Floor 4E, New York, New York 10286.

"**covenant defeasance option**" has the meaning specified in Section 8.01(b).

"**Custodian**" means any receiver, trustee, assignee, liquidator, custodian or similar official under any Bankruptcy Law.

"**CVM**" means the Brazilian Securities Commission (*Comissão de Valores Mobiliários*).

"**Debt**" means, with respect to any Person (a "**Debtor**"), without duplication:

(i) the principal of and premium, if any, in respect of (a) indebtedness of such Person for money borrowed and (b) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable (but excluding trade accounts payable or other short-term obligations to suppliers or customers payable within 360 days, in each case arising in the ordinary course of business);

(ii) all Capital Lease Obligations of such Person;

(iii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable or other short term obligations to suppliers or customers payable within 360 days, in each case arising in the ordinary course of business);

(iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction (other than obligations with respect to letters of credit securing obligations (other than obligations described in clauses (i) through (iii) above) entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the tenth Business Day following receipt by such Person of a demand for reimbursement following payment on the letter of credit);

(v) all Hedging Obligations;

(vi) all obligations of the type referred to in clauses (i) through (iv) of other Persons and all dividends of other Persons for the payment of which, in either case, such Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise, including by means of any guarantee (other than obligations of other Persons that are customers or suppliers of such Person for which such Person is or becomes so responsible or liable in the ordinary course of business to (but only to) the extent that such Person does not, or is not required to, make payment in respect thereof); and

(vii) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Lien on any property or asset of such Debtor other than the Capital Stock of such other Person (whether or not such obligation is assumed by such Debtor), the amount of such obligation being deemed to be the lesser of the value of such property or assets or the amount of the obligation so secured;

if and to the extent any of the preceding items (other than letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet of the specified Person prepared in accordance with GAAP.

"**Default**" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"**defeasance trust**" has the meaning specified in Section 8.02(a).

"**Depositary**" means DTC or any successor depositary for the Notes.

"**Designated Affiliate**" means, at any time, one or more Persons designated by Braskem to be the purchaser of Notes under an Offer to Purchase.

"**DTC**" means The Depository Trust Company.

"**Euroclear**" means Euroclear Bank S.A./N.V., as operator of the Euroclear System.

"**Event of Default**" has the meaning specified in Section 6.01.

"**Exchange Act**" means the U.S. Securities Exchange Act of 1934, as amended.

"**Expiration Date**" has the meaning specified in Section 3.08(a)(iv).

"**Fitch**" means Fitch, Inc. and its successors.

"**GAAP**" means, as elected from time to time by Braskem, (i) collectively, the accounting principles prescribed by Brazilian Corporate Law, the rules and regulations issued by the applicable regulators, including the CVM, as well as technical releases issued by the Brazilian Institute of Accountants (*Instituto Brasileiro de Contadores*), (ii) International Financial Reporting Standards, or (iii) accounting practices generally accepted in the United States, in each case, as in effect from time to time.

"**Global Note**" means a global note representing the Notes substantially in the form attached hereto as Exhibit A.

"**guarantee**" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Debt or other obligation of any Person and any obligation, direct or indirect, contingent or otherwise, of such Person (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation of such Person (whether arising by virtue of partnership arrangements, or by agreement to keep well, to purchase assets, goods, securities or services, to take or pay, or to maintain financial statement conditions or otherwise) or (ii) entered into for purposes of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); **provided**, **however**, **that** the term "guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The term "guarantee" used as a verb has a corresponding meaning.

"**Guarantees**" has the meaning specified in Section 10.01.

"**Hedging Obligations**" means, with respect to any Person, the obligations of such Person pursuant to any interest rate swap agreement, foreign currency exchange agreement, interest rate collar agreement, option, forward or futures contract or other similar agreement or arrangement designed to protect such Person against changes in interest rates or foreign exchange rates.

"**Holder**" means the Person in whose name a Note is registered in the Register.

"**Indenture**" means this Indenture, as amended or supplemented from time to time in accordance with the provisions hereof.

"**interest**" means, when used with respect to a Note, the interest on such Note (including any Additional Amounts payable by the Company in respect of such interest).

"**Interest Payment Date**" means the Payment Date of an installment of interest on the Notes.

"**Investment**" means, with respect to any Person, any loan or advance to, any acquisition of Capital Stock, equity interest, obligation or other security of, or capital contribution or other investment in, such Person.

"**Investment Grade**" means BBB- or higher by S&P, Baa3 or higher by Moody's or BBB- or higher by Fitch, or the equivalent of such global ratings by S&P, Moody's or Fitch, or the equivalent of such global ratings by S&P, Moody's or Fitch.

"**Issuer Substitution Documents**" has the meaning specified in Section 11.01(a).

"**legal defeasance option**" has the meaning specified in Section 8.01(b).

"**Lien**" means any mortgage, pledge, security interest, conditional sale or other title retention agreement or other similar lien.

"**Maturity**" means, when used with respect to any Note, the date on which the outstanding principal of and premium, if any, and interest on such Note becomes due and payable as therein or herein provided, whether upon Stated Maturity, redemption, declaration of acceleration or otherwise.

"**Moody's**" means Moody's Investors Service and its successors.

"**Non-Recourse Debt**" means Debt (or any portion thereof) of a Subsidiary of Braskem (the "**Non-Recourse Debtor**") used to finance (i) the creation, development, construction, improvement or acquisition of projects, properties or assets and any increases in or extensions, renewals or refinancings of such Debt or (ii) the operations of projects, properties or assets of such Non-Recourse Debtor or its Subsidiaries; **provided that** the recourse of the lender thereof (including any agent, trustee, receiver or other person acting on behalf of such entity) in respect of such Debt is limited (other than in respect of the Braskem Recourse Amount (as defined below)) to the Non-Recourse Debtor, any debt securities issued by the Non-Recourse Debtor, the Capital Stock of the Non-Recourse Debtor, and any assets, receivables, inventory, equipment, chattels, contracts, intangibles, rights and any other assets of such Non-Recourse Debtor and its Subsidiaries connected with the projects, properties or assets created, developed, constructed, improved, acquired or operated, as the case may be, in respect of which such Debt has been incurred; **provided**, **further**, **that** if such lender additionally has contractual recourse to Braskem or to any Subsidiary of Braskem (other than the Non-Recourse Debtor and its Subsidiaries) for the repayment of any portion of such Debt (such portion, the "**Braskem Recourse Amount**"),

then the Braskem Recourse Amount will not constitute Non-Recourse Debt and Braskem will be deemed to have incurred Debt in an aggregate principal amount equal to the Braskem Recourse Amount.

"**Notes**" has the meaning specified in the first paragraph of the Recitals of this Indenture and shall be substantially in the form set forth in Exhibit A.

"**Offer to Purchase**" has the meaning specified in Section 3.08(a).

"**Offer to Purchase Payment**" has the meaning specified in Section 3.08(a).

"**Offer to Purchase Payment Date**" has the meaning specified in Section 3.08(a)(iv).

"**Officer**" means, with respect to a corporation, the President, Chief Executive Officer, Chief Financial Officer or any other executive or senior officer performing decision-making functions for such corporation (including, in the case of Braskem, any member of its *Diretoria* (Board of Executive Officers), and, in the case of the Company, any director thereof).

"**Officer's Certificate**" means a certificate signed by any Officer of the Company or any two Officers of Braskem, as the case may be, and delivered to the Trustee.

"**Opinion of Counsel**" means a written opinion of legal counsel of recognized standing (who may be an employee of or counsel to the Company) and who shall be reasonably acceptable to the Trustee, which opinion is reasonably satisfactory to the Trustee.

"**Outstanding**" means, when used with respect to the Notes, as of the date of determination, all Notes theretofore authenticated and delivered under this Indenture, except:

(i) Notes theretofore cancelled by the Trustee or delivered to the Trustee for cancellation;

(ii) Notes for whose payment or redemption money in the necessary amount has been theretofore deposited with the Trustee or any Paying Agent (other than the Company) in trust or set aside and segregated in trust by the Company (if the Company shall act as its own Paying Agent) for the Holders of such Notes; **provided that**, if such Notes are to be redeemed pursuant to Section 3.01(b), notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made;

(iii) Notes, except to the extent provided in Sections 8.01 and 8.02, with respect to which the Company has effected legal defeasance and/or covenant defeasance as provided in Article VIII; and

(iv) Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture, other than any such Notes in respect of which there shall have been presented to the Trustee proof satisfactory to it that such Notes are held by a protected purchaser (within the meaning of the New York

Uniform Commercial Code) in whose hands such Notes are valid obligations of the Company;

**provided**, **however**, **that** in determining whether the Holders of the requisite principal amount of Outstanding Notes have given any request, demand, authorization, direction, consent, notice or waiver hereunder, Notes owned by Braskem or any of its Affiliates shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, consent, notice or waiver, only Notes which a Responsible Officer of the Trustee has received written notice at its address specified herein of being so owned shall be so disregarded. Notes so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such Notes and that the pledgee is not the Company, Braskem, or any other obligor upon the Notes or any of their respective Affiliates.

"**Paying Agent**" means any Person authorized by the Company to pay the principal of and premium, if any, or interest on any Notes on behalf of the Company hereunder, including The Bank of New York Mellon in its capacity as a Paying Agent.

"**Payment Date**" means the date on which payment of interest and premium, if any, on and/or principal of the Notes is due.

"**Payment Default**" has the meaning specified in Section 6.01.

"**Permitted Holder**" means each of (1) Odebrecht S.A. and its Affiliates and (2) Petróleo Brasileiro S.A. – Petrobras and its Subsidiaries.

"**Person**" means any individual, corporation, limited liability company, partnership, joint venture, trust, unincorporated organization or government or any agency, department or political subdivision thereof; **provided that**, for purposes of the definitions of "Designated Affiliate" and "Ratings Decline," the term "Person" means, any corporation, partnership, joint venture, trust, limited liability company or unincorporated organization.

"**premium**" means, when used with respect to a Note, the amount payable on such Note, in addition to the principal amount thereof upon any redemption of such Note (including any Additional Amounts payable by the Company in respect of such premium).

"**principal**" means, when used with respect to a Note, the principal amount of such Note (including any Additional Amounts payable by the Company in respect of such principal).

"**Proceeding**" has the meaning specified in Section 13.10(a).

"**Process Agent**" has the meaning specified in Section 13.10(a).

"**Rating Agency**" means each of (1) S&P, (2) Moody's and (3) Fitch.

"**Ratings Decline**" means that at any time within 90 days after the earlier of the date of public notice of a Change of Control and the date on which Braskem or any other Person

publicly declares its intention to effect a Change of Control, (i) in the event the Notes are assigned an Investment Grade rating by at least two of the Rating Agencies prior to such public notice or declaration, the rating assigned to the Notes by at least two of the Rating Agencies is below an Investment Grade rating; or (ii) in the event the ratings assigned to the Notes by at least two of the Rating Agencies prior to such public notice or declaration are below an Investment Grade rating, the rating assigned to the Notes by at least two of the Rating Agencies is decreased by one or more categories (i.e., notches); **provided that**, in each case, any such Ratings Decline is expressly stated by the applicable Rating Agencies to have been the result of the Change of Control.

"**Record Date**" means, when used with respect to the interest on the Notes payable on any Interest Payment Date, the January 7 or July 7 (whether or not a Business Day), as the case may be, next preceding such Interest Payment Date.

"**Redemption Date**" means, when used with respect to any Note to be redeemed pursuant to Section 3.01(b), Section 3.01(c) or Section 3.01(d), the date fixed for such redemption by or pursuant to this Indenture.

"**Redemption Price**" means, when used with respect to any Note to be redeemed pursuant to Section 3.01(b), Section 3.01(c) or Section 3.01(d), the price at which it is to be redeemed pursuant to this Indenture.

"**Register**" has the meaning specified in Section 2.03(a).

"**Registrar**" means The Bank of New York Mellon, until a successor Registrar shall have become such pursuant to the applicable provisions of this Indenture, and, thereafter, "Registrar" shall mean such successor Registrar.

"**Regulation S**" means Regulation S under the Securities Act, as in effect from time to time.

"**Regulation S Global Note**" means one or more permanent Global Notes in definitive fully registered form without interest coupons representing Notes initially sold outside of the United States pursuant to Regulation S.

"**Relevant Withholding Taxes**" has the meaning specified in Section 4.05(e).

"**Responsible Officer**" means any officer or agent of the Trustee or any Paying Agent in Corporate Trust Administration with direct responsibility for the administration of this Indenture.

"**Restricted Global Note**" means one or more permanent Global Notes in definitive fully registered form without interest coupons initially sold to "qualified institutional buyers" (as such term is defined in Rule 144A) pursuant to Rule 144A.

"**Restricted Subsidiary**" means any Subsidiary that is not an Unrestricted Subsidiary.

"**Rule 144A**" means Rule 144A under the Securities Act, as in effect from time to time.

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and its successors.

"**Securities Act**" means the U.S. Securities Act of 1933, as amended.

"**Securities Act Legend**" means the following legend, printed in capital letters:

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY OTHER SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, AGREES FOR THE BENEFIT OF BRASKEM FINANCE LIMITED AND BRASKEM S.A. THAT THIS NOTE OR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (I) TO BRASKEM FINANCE LIMITED OR BRASKEM S.A., (II) SO LONG AS THIS NOTE IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT ("RULE 144A"), TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A) IN ACCORDANCE WITH RULE 144A, (III) IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR 904 OF REGULATION S UNDER THE SECURITIES ACT, (IV) PURSUANT TO ANOTHER APPLICABLE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT (IF AVAILABLE) OR (V) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, AND IN EACH OF SUCH CASES, IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER APPLICABLE JURISDICTION. AS A CONDITION TO THE REGISTRATION OF TRANSFER OF THIS NOTE PURSUANT TO CLAUSE (IV) ABOVE, BRASKEM FINANCE LIMITED, BRASKEM S.A. OR THE TRUSTEE MAY REQUIRE DELIVERY OF ANY DOCUMENTATION OR OTHER EVIDENCE THAT IT, IN ITS SOLE DISCRETION, DEEMS NECESSARY OR APPROPRIATE TO EVIDENCE COMPLIANCE WITH THE EXEMPTION REFERRED TO IN SUCH CLAUSE (IV) AND, IN EACH CASE, IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER APPLICABLE JURISDICTION. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, REPRESENTS AND AGREES THAT IT SHALL NOTIFY ANY PURCHASER OF THIS NOTE FROM IT OF THE RESALE RESTRICTIONS REFERRED TO ABOVE.

THIS LEGEND MAY BE REMOVED SOLELY IN THE DISCRETION AND AT THE DIRECTION OF BRASKEM FINANCE LIMITED OR BRASKEM S.A.

"**Significant Subsidiary**" means any Restricted Subsidiary of Braskem which at the time of determination either (i) had assets which, as of the date of Braskem's most recent quarterly consolidated balance sheet, constituted at least 10% of Braskem's total assets on a consolidated basis as of such date or (ii) had revenues for the 12 month period ending on the date of Braskem's most recent quarterly consolidated statement of operations which constituted at least 10% of Braskem's total revenues on a consolidated basis for such period.

"**Singapore Stock Exchange**" means Singapore Exchange Securities Trading Limited.

"**Stated Maturity**" means, with respect to any security, the date specified in such security as the fixed date on which the principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the Holder thereof upon the happening of any contingency unless such contingency has occurred).

"**Subsidiary**" means any corporation, association, partnership or other business entity of which more than 50% of the total voting power of shares of Capital Stock or other interests (including partnership interests) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by (i) Braskem, (ii) Braskem and one or more of its Subsidiaries or (iii) one or more Subsidiaries of Braskem; **provided that**, for purposes of the definition of "Permitted Holders," the term "Subsidiary" means any corporation, association, partnership or other business entity of which more than 50% of the total voting power of shares of Capital Stock or other interests (including partnership interests) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by (a) Petróleo Brasileiro S.A. – Petrobras, (b) Petróleo Brasileiro S.A. – Petrobras and one or more of its Subsidiaries or (c) one or more Subsidiaries of Petróleo Brasileiro S.A. – Petrobras.

"**Substitute Guarantee**" has the meaning specified in Section 11.01(a).

"**Substituted Issuer**" has the meaning specified in Section 11.01(a).

"**Transfer Agent**" means The Bank of New York Mellon and any other Person authorized by the Company to effectuate the exchange or registration of transfer of any Note on behalf of the Company hereunder.

"**Trustee**" means The Bank of New York Mellon, until a successor Trustee shall have become such pursuant to the applicable provisions of this Indenture and, thereafter, "Trustee" shall mean such successor Trustee.

"**United States**" and "**U.S.**" mean the United States of America (including the states thereof and the District of Columbia) and its territories, its possessions and other areas subject to its jurisdiction.

"**Unrestricted Subsidiary**" means (i) Polietilenos de America, S.A., Polipropileno de Sur, S.A. and any Subsidiary which as of the date of this Indenture has consolidated assets not exceeding 1% of Braskem's Consolidated Total Assets, and (ii) any corporation, association, partnership or other business entity that is not a Subsidiary as of the date of the indenture but which (a) becomes a Subsidiary following the date of the indenture and (b) at any time of determination has no Debt other than (x) Non-Recourse Debt, and (y) Braskem Recourse Amounts.

"**U.S. Dollars**" and "**U.S.$**" mean such coin or currency of the United States as at the time of payment will be legal tender for the payment of public and private debts.

"**U.S. Government Obligations**" means direct obligations (or certificates representing an ownership interest in such obligations) of the United States (including any agency or instrumentality thereof) for the payment of which the full faith and credit of the United States is pledged and which are not callable at the issuer's option.

"**U.S. Taxes**" means any present or future taxes, duties, assessments, fees or other governmental charges of whatever nature (and any fines, penalties or interest related thereto) imposed or levied by or on behalf of the United States or any political subdivision or authority of or in the United States having power to tax.

"**Voting Stock**" means, with respect to Braskem as of any date, the Capital Stock of Braskem that is at the time entitled to vote generally in the election of the Board of Directors of Braskem and in respect of other matters presented a shareholders' meetings of Braskem.

"**Wholly-Owned Subsidiary**" means a Subsidiary of which at least 95% of the Capital Stock (other than directors' qualifying shares) is owned by Braskem or another Wholly-Owned Subsidiary.

Section 1.02. **Rules of Construction**.

(a) For all purposes of this Indenture, except as otherwise expressly provided or unless the context otherwise requires:

(i) the terms defined in this Article have the meanings assigned to them in this Article and include the plural as well as the singular;

(ii) the words "herein", "hereof" and "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision;

(iii) "or" is not exclusive;

(iv) "including" means including, without limitation; and

(v) unless the context otherwise requires, any reference to an "Article", a "Section" or an "Exhibit" refers to an Article, a Section or an Exhibit, as the case may be, of this Indenture.

(b) All accounting terms not otherwise defined herein shall have the meanings assigned to them in accordance with GAAP.

(c) For purposes of the definitions set forth in Article I and this Indenture generally, all calculations and determinations shall be made in accordance with GAAP and shall be based upon the consolidated financial statements of Braskem and its Subsidiaries prepared in accordance with GAAP.

Section 1.03. **Table of Contents; Headings**. The table of contents and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are

not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

Section 1.04. **Form of Documents Delivered to Trustee**. In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any Officer's Certificate may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless the Officer or Officers executing such Officer's Certificate know, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which the certificate or opinion is based are erroneous. Any Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Officer or Officers of the Company or Braskem stating that the information with respect to such factual matters is in the possession of the Company or Braskem, unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Section 1.05. **Acts of Holders**.

(a) Any request, demand, authorization, direction, consent, notice, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by agents duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee and, where it is hereby expressly required, to the Company or Braskem. Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Holders signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Company, if made in the manner provided in this Section 1.05.

(b) The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by a certificate of a notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him the execution thereof. Where such execution is by a signer acting in a capacity other than his individual capacity, such certificate or affidavit shall also constitute sufficient proof of his authority. The fact and date of the execution of any such instrument or writing, or the authority of the Person executing the

same, may also be proved in any other manner that the Trustee reviewing such instrument or writing deems sufficient.

(c) The principal amount and serial numbers of Notes held by any Person, and the date of holding the same, shall be proved by the Register.

(d) If the Company solicits from the Holders of Notes any request, demand, authorization, direction, consent, notice, waiver or other Act, the Company may, at its option, by or pursuant to a Board Resolution, fix in advance a record date for the determination of Holders entitled to give such request, demand, authorization, direction, consent, notice, waiver or other Act, but the Company shall not have any obligation to do so. Such record date shall be the record date specified in or pursuant to such Board Resolution, which shall be a date not earlier than the date 30 days prior to the first solicitation of Holders generally in connection therewith and not later than the date such solicitation is completed. If such a record date is fixed, such request, demand, authorization, direction, consent, notice, waiver or other Act may be given before or after such record date, but only the Holders of record at the close of business on such record date shall be deemed to be Holders for the purposes of determining whether Holders of the requisite proportion of Outstanding Notes have authorized or agreed or consented to such request, demand, authorization, direction, consent, notice, waiver or other Act, and for that purpose the Outstanding Notes shall be computed as of such record date; **provided that** no such authorization, agreement or consent by the Holders on such record date shall be deemed effective unless it shall become effective pursuant to the provisions of this Indenture not later than eleven months after the record date.

(e) Any request, demand, authorization, direction, consent, notice, waiver or other Act of the Holder of any Note shall bind every future Holder of the same Note and the Holder of every Note issued upon the registration or registration of transfer thereof or in exchange therefor or in lieu thereof in respect of anything done, omitted or suffered to be done by the Trustee, the Company or Braskem in reliance thereon, whether or not notation of such action is made upon such Note.

## ARTICLE II

## THE NOTES

Section 2.01. **Form and Dating**. The Notes and the Trustee's certificate of authentication shall be substantially in the form set forth in Exhibit A, which is hereby incorporated in and expressly made a part of this Indenture. The Notes may have such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and may have such letters, numbers or other marks of identification and such notations, legends or endorsements as may be required to comply with any law, stock exchange rule, agreement to which the Company is subject, if any, or usage; **provided that** any such notation, legend or endorsement is in a form acceptable to the Company.

Each Global Note and each definitive certificated note ("**Certificated Note**") shall be dated the date of its authentication.

The Notes shall be printed, lithographed or engraved or produced by any combination of these methods or may be produced in any other manner permitted by the rules of any stock exchange on which the Notes may be listed, if any, all as determined by the Officers executing such Notes, as evidenced by their execution of such Notes.

Section 2.02. **Execution, Authentication and Delivery**.

(a) An Officer of the Company shall sign the Notes for the Company by manual or facsimile signature.

(i) If an Officer whose signature is on a Note no longer holds that office at the time the Trustee authenticates the Note, the Note shall be valid nevertheless.

(ii) A Note shall not be valid until an authorized signatory of the Trustee or an authenticating agent manually signs the certificate of authentication on the Note upon Company Order. Such signature shall be conclusive evidence that the Note has been authenticated under this Indenture. Such Company Order shall specify the amount of the Notes to be authenticated and the date on which the original issue of Notes is to be authenticated.

(iii) The Trustee or an authenticating agent shall initially authenticate and deliver Notes in an aggregate principal amount of up to U.S.$500,000,000.

(iv) The Company may from time to time, without notice to or the consent of the Holders of the Notes, create and issue an unlimited principal amount of additional Notes having the same terms and conditions as the original Notes in all respects, except that issue date, issue price and the first payment of interest thereon may differ; *provided, however*, that such additional Notes will either be (i) fungible with the original Notes for U.S. federal income tax purposes (including with respect to Sections 1471 and 1472 of the Code) or (ii) are issued under a separate CUSIP number. Any such additional Notes shall form a single series and vote together with the previously outstanding Notes for all purposes hereunder.

(v) The Notes shall be issued in fully registered form without coupons attached in minimum denominations of U.S.$200,000 and integral multiples of U.S.$1,000 in excess thereof (each, an "Authorized Denomination").

(b) The Trustee may appoint an authenticating agent reasonably acceptable to the Company to authenticate the Notes (the "Authenticating Agent"). Unless limited by the terms of such appointment, an Authenticating Agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by an Authenticating Agent. An Authenticating Agent has the same rights as the Registrar or any Transfer Agent or Paying Agent.

(i) Any corporation into which any Authenticating Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, consolidation or conversion to which any Authenticating Agent shall be a party, or any corporation succeeding to the corporate trust business of any Authenticating Agent, shall be the successor of such Authenticating Agent hereunder, without the execution or filing of any further act on the part of the parties hereto or such Authenticating Agent or such successor corporation.

(ii) Any Authenticating Agent may at any time resign by giving written notice of resignation to the Trustee and the Company. The Trustee may at any time terminate the agency of any Authenticating Agent by giving written notice of termination to such Authenticating Agent and the Company. Upon receiving such notice of resignation or upon such a termination, the Trustee may appoint a successor Authenticating Agent reasonably acceptable to the Company and shall give written notice of such appointment to the Company.

(iii) The Company agrees to pay to each Authenticating Agent from time to time reasonable compensation for its services and reimbursement for its reasonable expenses relating thereto.

Section 2.03. **Transfer Agent, Registrar and Paying Agent**.

(a) Subject to such reasonable regulations as the Company may prescribe, the books of the Company for the exchange, registration and registration of transfer of Notes shall be kept at the office of the Registrar (such books maintained in such office and in any other office or agency designated for such purpose being herein referred to as the "Register"). The Company shall also cause the Trustee to maintain books for the exchange, registration and registration of transfer of Notes. The Trustee shall notify the Registrar and the Registrar shall notify the Trustee, when necessary, upon any exchange, registration or registration of transfer of any Notes and shall cause their respective books to be amended accordingly. The Company may have one or more co-registrars and one or more additional Transfer Agents or Paying Agents. The term "Registrar" includes any co-registrar.

(i) Upon the issue of Certificated Notes, the Company will appoint and maintain a Paying Agent in Singapore for so long as the Notes are listed on the Singapore Stock Exchange and the rules of such exchange so require. In such event, an announcement shall be made through the Singapore Stock Exchange and shall include all material information with respect to the delivery of the Certificated Notes, including details of the Paying Agent in Singapore. Upon any change in the Paying Agent or Registrar, the Company shall publish a notice in a leading daily newspaper of general circulation in Singapore (which is expected to be *The Business Times (Singapore Edition)*), for so long as the Notes are listed on the Singapore Stock Exchange and the rules of such exchange so require.

(ii) The Company shall enter into any appropriate agency agreements with any Registrar, Transfer Agent or Paying Agent not a party to this Indenture, which shall implement the provisions of this Indenture that relate to such agent. The Company shall notify the Trustee of the name and address of any such agent. If the Company fails to maintain a Registrar or Paying Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 7.06. The Company initially appoints the Trustee as Registrar, Transfer Agent and Paying Agent.

(b) The Trustee shall keep a record of all the Notes and shall make such record available during regular business hours for inspection upon the request of the Company provided to the Trustee a reasonable amount of time prior to such inspection. Such books and records shall include notations as to whether such Notes have been redeemed, or otherwise paid or cancelled, and, in the case of mutilated, destroyed, defaced, stolen or lost Notes, whether such

Notes have been replaced. In the case of the replacement of any of the Notes, the Trustee shall keep a record of the Note so replaced, and the Notes issued in replacement thereof. In the case of the cancellation of any of the Notes, the Trustee shall keep a record of the Note so cancelled and the date on which such Note was cancelled. Each Transfer Agent shall notify the Trustee of any transfers or exchanges of Notes effected by it. The Trustee shall not be required to register the transfer of or exchange Certificated Notes for a period of 15 days preceding any date of selection of Notes for redemption, or register the transfer of or exchange any Certificated Notes previously called for redemption.

(c) All Notes surrendered for payment, redemption, exchange or registration of transfer shall be cancelled by the relevant Transfer Agent or Paying Agent or the Trustee, as the case may be. Each Transfer Agent and Paying Agent shall notify the Trustee of the surrender and cancellation of such Notes and shall deliver such Notes to the Trustee. The Trustee may destroy or cause to be destroyed in accordance with its customary procedures all such Notes surrendered for payment, redemption, exchange or registration of transfer and, if so destroyed, shall promptly deliver a certificate of destruction to the Company.

(d) Each Paying Agent shall comply with applicable backup withholding tax and information reporting requirements under the Code and U.S. Treasury Regulations promulgated thereunder with respect to payments made under the Notes and the Guarantees (including, to the extent required, the collection of Internal Revenue Service Forms W-8 and W-9 and the filing of U.S. Internal Revenue Service Forms 1099 and 1096).

Section 2.04. **Paying Agent to Hold Money in Trust**. By 10:00 a.m. (New York City time), no later than one Business Day prior to each Payment Date, the Company shall deposit with a Paying Agent in immediately available funds a sum sufficient to pay such principal, premium, if any, and interest when due on such Payment Date (including any Additional Amounts). The Company shall request that the bank through which such deposit is to be made agree to supply to a Paying Agent by 10:00 a.m. (New York City time) two Business Days prior to such Payment Date an irrevocable confirmation (by tested telex) of its intention to make such deposit. Each Paying Agent shall hold in trust all money held by such Paying Agent for the payment of principal of or premium, if any, or interest on the Notes and shall notify the Trustee of any default by the Company in making such payments. The Company at any time may require a Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed by it. Upon complying with this Section 2.04, such Paying Agent shall have no further liability for the money delivered to the Trustee. As of the date hereof and until such time as it has been notified in writing to the contrary, The Bank of New York Mellon shall be the Paying Agent receiving the funds as described in this section.

Payment on the due date therefor by the Company of any amount payable under the Notes to a Paying Agent in accordance with the terms of the Notes and this Indenture shall satisfy the obligation of the Company to make such payment; **provided**, **however**, **that** the liability of a Paying Agent hereunder shall not exceed any amounts paid to it by the Company, or held by it, on behalf of the Holders under this Indenture. Notwithstanding the preceding sentence or any other provision of this Indenture, the Company shall indemnify the Holders in the event that there is subsequent failure by the Trustee or any Paying Agent to pay any amount

due in respect of the Notes in accordance with the Notes and this Indenture in amounts equal to such amounts as would have been received by them had no such failure occurred.

In the event that Braskem becomes obligated to make payments under the Guarantees, then Braskem shall make such payments in accordance with the foregoing provisions of this Section 2.04 to the fullest extent applicable.

Section 2.05. **Payment of Principal and Interest; Principal and Interest Rights Preserved**.

(a) Except as otherwise provided herein for the redemption of the Notes, the payment of principal of or premium, if any, or interest on the Notes shall be allocated on a *pro rata* basis among all Outstanding Notes, without preference or priority of any kind among the Notes.

(b) Final payments in respect of any Note (whether upon Stated Maturity, redemption, declaration of acceleration or otherwise) shall be made only against presentation and surrender of such Note at the Corporate Trust Office, at the offices of the Trustee and, subject to any fiscal or other laws and regulations applicable thereto, at the specified offices of any other Paying Agent appointed by the Company.

(c) Payment of principal and premium, if any, in respect of each Note on the Maturity date thereof shall be made to the Person in whose name such Note is registered in the Register at the close of business on the fifth day (whether or not a Business Day) immediately preceding such Maturity date, by U.S. Dollar check drawn on a bank in The City of New York and mailed to the Person entitled thereto at its address as it appears in the Register. Upon written notice from a Holder received by any Paying Agent at least 15 Business Days prior to any Maturity date of a Note, such payment may be made by wire transfer to a U.S. Dollar account maintained by the payee with a bank in The City of New York.

(d) Payment of interest in respect of each Note shall be made on each Interest Payment Date to the Person in whose name such Note is registered in the Register at the close of business on the Record Date next preceding such Interest Payment Date by U.S. Dollar check drawn on a bank in The City of New York and mailed to the Person entitled thereto at its address as it appears on the Register. Upon written notice from a Holder received by any Paying Agent at least 15 Business Days prior to any Interest Payment Date, such payment may be made by wire transfer to a U.S. Dollar account maintained by the payee with a bank in The City of New York. Unless such designation is revoked, any such designation made by such Holder with respect to such Note shall remain in effect with respect to any future payments with respect to such Note payable to such Holder. The Company shall pay any administrative costs imposed by banks in connection with making payments by wire transfer.

If the Payment Date in respect of any Note is not a business day at the place in which it is presented for payment, the Holder thereof shall not be entitled to payment of the amount due until the next succeeding business day at such place and shall not be entitled to any further interest or other payment in respect of any such delay.

Notwithstanding the provisions of this Section 2.05, payments on Notes registered in the name of DTC or its nominee shall be effected in accordance with the Applicable Procedures.

Section 2.06. **Holder Lists**. The Trustee shall preserve in as current a form as is reasonably practicable, the most recent list available to it of the names and addresses of Holders. If the Trustee is not the Registrar, the Company shall furnish to the Trustee in writing, at least 10 Business Days before each Interest Payment Date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of Holders.

Section 2.07. **Transfer and Exchange**.

(a) Interests in the Regulation S Global Note and the Restricted Global Note shall be exchangeable or transferable, as the case may be, for physical delivery of Certificated Notes if (i) DTC notifies the Company that it is unwilling or unable to continue as depositary for such Global Note, or DTC ceases to be a "clearing agency" registered under the Exchange Act, and a successor Depositary is not appointed by the Company within 90 days, or (ii) an Event of Default has occurred and is continuing with respect to the Notes; **provided that** such transfer or exchange is made in accordance with the provisions of this Indenture and the Applicable Procedures.

Upon receipt of notice by DTC or the Trustee, as the case may be, regarding the occurrence of any of the events described in the preceding paragraph, the Company shall use its best efforts to make arrangements with DTC for the exchange of interests in the Global Notes for individual Certificated Notes, and cause the requested individual Certificated Notes to be executed and delivered to the Trustee in sufficient quantities and authenticated by the Trustee for delivery to Holders. In the case of Certificated Notes issued in exchange for the Restricted Global Note, such Certificated Notes shall bear the Securities Act Legend. Upon the registration of transfer, exchange or replacement of Notes bearing such Securities Act Legend, or upon specific request for removal of the Securities Act Legend on a Note, the Company shall deliver only Notes that bear such Securities Act Legend, or shall refuse to remove such Securities Act Legend, as the case may be, unless there is delivered to the Company a certificate in the form of Exhibit D or Exhibit F, as the case may be, or such satisfactory evidence as may reasonably be required by the Company, which may include an opinion of counsel, that neither the Securities Act Legend nor the restrictions on transfer set forth therein are required to ensure compliance with the provisions of the Securities Act. The Trustee shall exchange a Note bearing the Securities Act Legend for a Note not bearing such Securities Act Legend only if it has been directed to do so in writing by the Company, upon which direction it may conclusively rely.

(b) A beneficial interest in the Regulation S Global Note may be transferred to a transferee who takes delivery of such interest in the form of an interest in the Restricted Global Note only in Authorized Denominations in accordance with the Applicable Procedures and upon receipt by the Trustee or Transfer Agent of a written certification from the transferor of the beneficial interest in the form of Exhibit E to the effect that such transfer is being made to a Person who the transferor reasonably believes is a "qualified institutional buyer" within the meaning of Rule 144A in a transaction meeting the requirements of Rule 144A and in

accordance with any applicable securities laws of any state of the United States or any other jurisdiction.

(c) Transfers by an owner of a Certificated Note bearing the Securities Act Legend or of a beneficial interest in the Restricted Global Note to a transferee who takes delivery of such interest through the Regulation S Global Note or in the form of a Certificated Note not bearing the Securities Act Legend shall be made only in Authorized Denominations upon receipt by the Trustee or Transfer Agent of a written certification from the transferor in the form of Exhibit D to the effect that such transfer is being made in accordance with Regulation S.

Beneficial interests in the Global Notes shall be shown on, and transfers thereof shall be effected only through records maintained by DTC and its direct and indirect participants, including the depositaries for Euroclear and Clearstream.

Transfers between DTC Participants shall be effected in accordance with DTC's procedures, and will be settled in same-day funds. Transfers between accountholders in Euroclear and Clearstream shall be effected in the ordinary way in accordance with their respective rules and operating procedures.

(d) Certificated Notes may be exchanged or transferred in whole or in part in the principal amount of Authorized Denominations by surrendering such Certificated Notes at the office of the Trustee or any Transfer Agent with a written instrument of transfer as provided in this Indenture in the form of Exhibit C hereto duly executed by the Holder thereof or his attorney duly authorized in writing.

In exchange for any Certificated Note properly presented for transfer, the Trustee shall within three Business Days of the receipt of a written instrument of transfer as provided in this Indenture in the form of Exhibit C, authenticate and deliver or cause to be authenticated and delivered to the transferee at the Corporate Trust Office or by mail (at the risk of the transferee) to such address as the transferee may request, a Certificated Note or Notes, as the case may require, registered in the name of such transferee, for the same aggregate principal amount as was transferred. In the case of the transfer of any Certificated Note in part, the Trustee shall within three Business Days of the receipt of a written instrument of transfer as provided in this Indenture in the form of Exhibit C, authenticate and deliver or cause to be authenticated and delivered to the transferor at the Corporate Trust Office or by mail (at the risk of the transferor) to such address as the transferor may request, a Certificated Note or Notes, as the case may require, registered in the name of such transferor, for the aggregate principal amount that was not transferred. No transfer of any Notes shall be made unless the request for such transfer is made by the registered Holder or his attorney duly authorized in writing at the Corporate Trust Office and is accompanied by a completed instrument of transfer in the form of Exhibit C attached to the Note presented for transfer.

(e) Exchanges and registrations of transfers of any Note or Notes shall be permitted and executed as provided in this Section 2.07 without any charge to the Holder of any such Note or Notes by or on behalf of the Company, the Registrar or the Transfer Agent other than payment, or the giving of such indemnity as the Registrar or the Transfer Agent may require, in respect of any taxes or other governmental charges which may be imposed in relation to it or

insurance charges that may be imposed in relation thereto or any expenses of delivery by other than regular mail, but subject to such reasonable regulations as the Company, the Registrar and the Trustee may prescribe.

The costs and expenses of effecting any exchange or registration of transfer pursuant to the foregoing provisions, except for the expense of delivery by other than regular mail (if any) and except for the payment of a sum sufficient to cover any tax or other governmental charges or insurance charges that may be imposed in relation thereto, shall be borne by the Company.

All Certificated Notes issued upon any exchange or registration of transfer of Notes shall be valid obligations of the Company, evidencing the same debt, and entitled to the same benefits, as the Notes surrendered upon exchange or registration of transfer.

(f) The Trustee or the Transfer Agent shall effect transfers of Global Notes and Certificated Notes. In addition, the Registrar shall keep the Register of the ownership, exchange and transfer of any Notes. The Transfer Agent shall give prompt notice to the Registrar and the Registrar shall likewise give prompt notice to the Trustee of any exchange or transfer of such Notes. Neither the Trustee nor any Transfer Agent shall register the exchange or the transfer of interests for a period of 15 days preceding any Payment Date or Redemption Date. The Trustee shall give prompt notice to the Company of any replacement, transfer, cancellation or destruction of the Notes.

(g) Upon any exchange of all or a portion of any Global Note for a Certificated Note or an interest in either the Restricted Global Note or the Regulation S Global Note, the Global Note to be so exchanged shall be marked to reflect the reduction of its principal amount by the aggregate principal amount of such Certificated Note or the interest to be so exchanged for an interest in a Regulation S Global Note or a Restricted Global Note, as the case may be. Until so exchanged in full, such Global Note shall in all respects be entitled to the same benefits under this Indenture as the Notes authenticated and delivered hereunder.

Section 2.08. **Replacement Notes**. If any Note at any time becomes mutilated, defaced, destroyed, stolen or lost, such Note may be replaced at the cost of the applicant (including reasonable legal fees of the Company, the Trustee, the Transfer Agents, the Registrar and the Paying Agents) at the office of the Trustee or any Transfer Agent, upon provision of, in the case of destroyed, stolen or lost Notes, evidence satisfactory to the Trustee and the Company that such Note was destroyed, stolen or lost, together with such indemnity as the Trustee and the Company may require. Mutilated or defaced Notes must be surrendered before replacements shall be issued.

Each Note authenticated and delivered in exchange for or in lieu of any such Note shall carry rights to accrued and unpaid interest and to interest to accrue equivalent to the rights that were carried by such Note before such Note was mutilated, defaced, destroyed, stolen or lost.

Every replacement Note is an additional obligation of the Company and shall be entitled to the benefits under this Indenture.

Section 2.09. **Temporary Notes**. Subject to the provisions of Section 2.07(a), until Certificated Notes are ready for delivery, the Company may prepare and the Trustee shall

authenticate temporary Notes. Temporary Notes shall be substantially in the form of Certificated Notes but may have variations that the Company considers appropriate for temporary Notes. Without unreasonable delay, the Company shall prepare and the Trustee shall authenticate Certificated Notes and deliver them in exchange for temporary Notes at the office or agency of the Company or the Trustee, without charge to the Holder. Until so exchanged, the temporary Notes shall be entitled to the same benefits under this Indenture as Certificated Notes.

Section 2.10. **Persons Deemed Owners**. Prior to the presentment of a Note for registration of transfer, the Company, Braskem, the Trustee and any agent of the Company, Braskem or the Trustee may treat the Person in whose name such Note is registered as the owner of such Note for the purpose of receiving payment of principal of and premium, if any, and, subject to Section 2.12, interest on such Notes and for all other purposes whatsoever, whether or not such Note be overdue and regardless of any notice of ownership, trust or any interest in it, writing on, or theft or loss of, the definitive Note issued in respect of it, and none of the Company, Braskem, the Trustee or any agent of the Company, Braskem or the Trustee shall be affected by notice to the contrary.

Section 2.11. **Cancellation**. The Company at any time may deliver Notes to the Trustee for cancellation. The Transfer Agents and the Paying Agents shall forward to the Trustee any Notes surrendered to them for transfer, exchange or payment. The Trustee or any Paying Agent and no one else shall cancel and the Trustee shall destroy in accordance with its customary procedures (subject to the record-retention requirements of the Exchange Act) all Notes surrendered for transfer, exchange, payment or cancellation and, if so requested by the Company in writing, deliver a certificate of such destruction to the Company, unless the Company directs the Trustee in writing to deliver cancelled Notes to the Company. The Company may not issue new Notes to replace Notes it has redeemed, paid or delivered to the Trustee for cancellation.

Section 2.12. **Defaulted Interest**. If the Company defaults in a payment of interest on the Notes, the Company shall pay the defaulted interest (plus interest on such defaulted interest at the rate specified in Section 4.01 to the extent lawful) in any lawful manner not inconsistent with the requirements of any stock exchange on which the Notes may be listed, and upon such notice as may be required by such exchange, if, after written notice given by the Company to the Trustee of the proposed payment pursuant to this Section 2.12, such manner of payment shall be deemed practicable by the Trustee.

The Company may pay the defaulted interest to the Persons who are Holders on a subsequent special record date, which date shall be at least five Business Days prior to the payment date of such defaulted interest. The Company shall fix or cause to be fixed any such special record date and payment date, and, at least 15 days before any such special record date, the Company shall deliver to each Holder, with a copy to the Trustee, a notice that states the special record date, the payment date and the amount of defaulted interest to be paid.

Section 2.13. **CUSIP and ISIN Numbers**. The Company in issuing the Notes may use CUSIP and ISIN numbers (if then generally in use) and, if so, the Trustee shall use CUSIP and ISIN numbers in notices as a convenience to Holders; **provided**, **however**, **that** any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice and that reliance may be placed only on the other

identification numbers printed on the Notes, and any such notice shall not be affected by any defect in or omission of such numbers. The Company shall promptly notify the Trustee in writing of any change in CUSIP and ISIN numbers.

Section 2.14. **Open Market Purchases**. The Company, Braskem or any of their Affiliates may at any time purchase Notes in the open market or otherwise at any price. All Notes so purchased may not be resold, except in compliance with applicable requirements or exemptions under any relevant securities and other laws.

ARTICLE III

REDEMPTION

Section 3.01. **Right of Redemption**.

(a) Except as described in this Section 3.01, Section 3.08 and Paragraph 10 of the Notes, the Notes may not be redeemed prior to their Stated Maturity.

(b) The Notes shall be redeemable, at the option of the Company, Braskem or any successor, in whole, but not in part, upon giving not less than five Business Days' nor more than 60 days' notice to the Holders (which notice shall be irrevocable), at 100% of the principal amount thereof, plus accrued and unpaid interest thereon and Additional Amounts, if any, to, but excluding, the Redemption Date, only if (i) the Company, Braskem or any successor has or will become obligated to pay Additional Amounts with respect to the Notes or the Guarantees (x) in excess of the Additional Amounts that the Company, Braskem or any successor would pay if payments in respect of the Notes or the Guarantees were subject to deduction or withholding for Brazilian Taxes at a rate of (A) 15% generally in case of any taxes imposed by Brazil or (B) 25% in case of taxes imposed by Brazil on amounts paid to residents of countries which do not impose any income tax or which impose it at a maximum rate lower than 20% or where the laws of that country or location impose restrictions on the disclosure of (1) shareholding composition; (2) the ownership of the investment; or (3) the beneficial ownership of income paid to non-resident persons, pursuant to Law No. 9,779, dated January 19, 1999, as a result of any change in, or amendment to, the laws or regulations of Brazil (or the jurisdiction of any successor) or any political subdivision or governmental authority thereof or therein having power to tax, or any change in the application or official interpretation of such laws or regulations, which change or amendment occurs after the date of this Indenture (or date of succession) and (ii) the Company has or will become obligated to pay Additional Amounts with respect to U.S. Taxes as a result of any changes in, or amendments to, the laws or regulations of the United States or any change in the application or official interpretation of such laws or regulations, which change or amendment occurs after the date of this Indenture, **provided** in all cases such obligation cannot be avoided by the Company, Braskem or any successor taking reasonable measures available to it; **provided**, **however**, **that** for this purpose reasonable measures shall not include any change in the Company's, Braskem's or any successor's jurisdiction of incorporation or organization or location of its principal executive office or registered office. No such notice of redemption shall be given earlier than 60 days prior to the earliest date on which the Company, Braskem or any successor, as the case may be, would be obligated to pay such Additional Amounts if a payment in respect of such Notes or the Guarantees were then due.

Prior to the publication or mailing of any notice of redemption pursuant to the preceding paragraph, the Company, Braskem or any successor shall deliver to the Trustee an Officer's Certificate to the effect that the obligation of the Company, Braskem or any successor, as the case may be, to pay Additional Amounts cannot be avoided by the Company, Braskem or any successor taking reasonable measures available to it. The Company, Braskem or any successor, as the case may be, shall also deliver to the Trustee an Opinion of Counsel stating that the Company, Braskem or any successor, as the case may be, would be obligated to pay Additional Amounts due to the changes in tax laws or regulations. The Trustee shall accept such certificate and opinion as sufficient evidence of the satisfaction of the conditions precedent set forth in clauses (i) and (ii) of the preceding paragraph of this Section 3.01(b), in which event it shall be conclusive and binding on the Holders.

(c) Prior to January 22, 2041, the Notes shall be redeemable, at the option of the Company or Braskem, in whole or in part, at any time, upon giving not less than five Business Days' nor more than 60 days' notice to the Holders (which notice shall be irrevocable), at the Redemption Price and on the terms and conditions, described in Paragraph 10(c) of the Notes.

(d) On January 22, 2041 or thereafter, the Notes shall be redeemable, at the option of the Company or Braskem, in whole or in part, at any time, upon giving not less than five Business Days' nor more than 60 days' notice to the Holders (which notice shall be irrevocable), at the Redemption Price and on the terms and conditions described in Paragraph 10(d) of the Notes.

(e) The Company or Braskem may enter into an arrangement under which Braskem or a subsidiary of Braskem may, in lieu of redemption by the Company or Braskem, purchase for a purchase price equal to the full Redemption Price any Note to be redeemed pursuant to this Section 3.01 or Paragraph 10 of the Notes.

Section 3.02. **Applicability of Article**. Redemption of Notes at the option of the Company, as permitted by Section 3.01 or required by any provision of this Indenture, shall be made in accordance with such provision and this Article III.

Section 3.03. **Election to Redeem; Notice to Trustee**. The election of the Company to redeem the Notes pursuant to Section 3.01(b), Section 3.01(c) or Section 3.01(d) shall be evidenced by a Board Resolution. In case of any redemption of Notes at the election of the Company, the Company shall notify the Trustee in writing of such Redemption Date and the aggregate principal amount of Notes to be redeemed at least 20 days prior to the Redemption Date fixed by the Company (unless a shorter notice period shall be satisfactory to the Trustee), which notice shall be revocable at any time prior to the date on which the notice to the Holders referred to in Section 3.01(b), Section 3.01(c) or Section 3.01(d) has been given.

Section 3.04. **Notice of Redemption by the Company**. The Company or Braskem shall mail a notice of redemption to each Holder of any Note to be redeemed by first-class mail, postage prepaid, at its address as it appears in the Register at least five Business Days but not more than 60 days before the Redemption Date. So long as the Notes continue to be listed on the Singapore Stock Exchange and the rules of such exchange so require, notices will also be

published in a leading English language newspaper having general circulation in Singapore (which is expected to be *The Business Times* (Singapore Edition)).

The notice shall state:

(i) the Redemption Date;

(ii) the Redemption Price;

(iii) the name and address of each Paying Agent;

(iv) that Notes called for redemption must be surrendered to a Paying Agent to collect the Redemption Price;

(v) that, unless the Company defaults in making such redemption payment or any Paying Agent is prohibited from making such payment pursuant to the terms of this Indenture, interest on Notes called for redemption will cease to accrue on and after the Redemption Date;

(vi) the paragraph of the Notes pursuant to which the Notes called for redemption are being redeemed;

(vii) the CUSIP or ISIN number of the Notes, if any; and

(viii) that no representation is made as to the correctness or accuracy of the CUSIP or ISIN number, if any, listed in such notice or printed on the Notes.

At the Company's election and at its request, made in writing to the Trustee at least five Business Days before notice is to be mailed to the Holders, the Trustee shall give the notice of redemption in the Company's name and at the Company's expense; **provided that** the Company shall deliver to the Trustee, at least five Business Days prior to the date in which notice is to be mailed to the Holders, an Officer's Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in the preceding paragraph; **provided further that** if the Company revokes the notice to the Trustee required by Section 3.03 in accordance with Section 3.03 prior to the Trustee's delivering of notice to the Holders, the Trustee will not deliver such notice of redemption.

Section 3.05. **Selection of Notes to Be Redeemed in Part**.

(a) In the event that less than all of the Notes are to be redeemed at any time, selection of Notes for redemption will be made by the Trustee in compliance with the requirements governing redemptions of the principal securities exchange, if any, on which Notes are listed or if such securities exchange has no requirement governing redemption or the Notes are not then listed on a securities exchange, on a *pro rata* basis or by lot (or, in the event that the Notes are represented by Global Notes as of the Redemption Date, based on DTC's Applicable Procedures). If Notes are redeemed in part, the remaining outstanding amount of any Note must be at least equal to U.S.$200,000 and be an integral multiple of U.S.$1,000. The Trustee shall make the selection from the Outstanding Notes not previously called for redemption. The

Trustee shall promptly notify the Company in writing of the Notes selected for redemption and, in the case of any Notes selected for partial redemption, the principal amount of the Notes to be redeemed. In the event of a partial redemption by lot, the Trustee shall select the particular Notes to be redeemed not less than five Business Days nor more than 60 days prior to the relevant Redemption Date from the Outstanding Notes not previously called for redemption. The Trustee may select for redemption portions (equal to U.S.$200,000 or integral multiples of U.S.$1,000 in excess thereof) of the principal of Notes that have denominations larger than U.S.$1,000.

(b) For all purposes of this Indenture, unless the context otherwise requires, all provisions relating to redemption of Notes shall relate, in the case of any Note redeemed or to be redeemed only in part, to the portion of the principal amount of that Note which has been or is to be redeemed.

Section 3.06. **Deposit of Redemption Price**. By 10:00 a.m. (New York City time), no later than one Business Day prior to the Redemption Date, the Company shall deposit with a Paying Agent money sufficient to pay the Redemption Price of and accrued and unpaid interest on the Notes to be redeemed other than Notes that have been delivered by the Company to the Trustee at least five Business Days prior to the Redemption Date for cancellation. The Company shall request that the bank through which such deposit is to be made agree to supply to such Paying Agent by 10:00 a.m. (New York City time) two Business Days prior to such Redemption Date an irrevocable confirmation (by tested telex) of its intention to make such deposit.

Section 3.07. **Effect of Notice of Redemption**. Notice of redemption having been given as aforesaid, the Notes to be redeemed shall, on the Redemption Date, become due and payable at the applicable Redemption Price (together with accrued and unpaid interest, if any, to the Redemption Date), and from and after such date (except in the event of a default in the payment of the Redemption Price and accrued and unpaid interest) such Notes shall cease to bear interest. Upon surrender of any such Note to a Paying Agent for redemption in accordance with such notice, such Note shall be paid by the Company at the Redemption Price, plus accrued and unpaid interest, if any, to the Redemption Date; **provided**, **however**, **that** installments of interest whose Payment Date is on or prior to the Redemption Date shall be payable to the Holders of such Notes registered as such at the close of business on the relevant Record Dates according to their terms.

If any Note to be redeemed shall not be so paid upon surrender thereof in accordance with the Company's instructions for redemption, the principal shall, until paid, bear interest from the Redemption Date at the rate borne by the Notes.

Section 3.08. **Change of Control**.

(a) If a Change of Control that results in a Ratings Decline occurs, unless the Company has exercised its option to redeem the Notes under Section 3.01 or Paragraph 10 of the Notes, Braskem, acting on behalf of the Company, shall make, directly or through a Designated Affiliate, an offer to purchase all of the Notes pursuant to the offer described below (the "Offer to Purchase") at a price in cash (the "Offer to Purchase Payment") equal to 101% of the principal amount thereof plus accrued and unpaid interest thereon and Additional Amounts, if any, to, but

excluding, the Offer to Purchase Payment Date. Not later than 30 days after the occurrence of a Change of Control that results in a Ratings Decline, Braskem or a Designated Affiliate shall send notice of such Offer to Purchase, together with a letter of transmittal, by first class mail, with a copy to the Trustee, to each Holder at the address of such Holder appearing in the Register or otherwise in accordance with the procedures of the Depositary with the following information:

(i) information concerning the business of Braskem and its Subsidiaries which Braskem believes will enable the Holders to make an informed decision with respect to the Offer to Purchase;

(ii) that an Offer to Purchase is being made pursuant to this Section 3.08 and that all Notes properly tendered pursuant to such Offer to Purchase will be accepted for payment;

(iii) that a Holder may tender all or any portion of its Notes pursuant to such Offer to Purchase, subject to the requirement if a Holder tenders only a portion of its Notes, the remaining Notes must be no less than U.S.$200,000 in principal amount and integral multiples of U.S.$1,000 in excess thereof;

(iv) the purchase price, the expiration date (the "Expiration Date") of the Offer to Purchase, which will be no less than 30 days nor more than 60 days after the date such notice is mailed, and the purchase date, which will be no less than five Business Days after the Expiration Date (the "Offer to Purchase Payment Date");

(v) any Note not properly tendered will remain outstanding and continue to accrue interest;

(vi) unless Braskem or its Designated Affiliate defaults in the payment of the Offer to Purchase Payment, all Notes accepted for payment pursuant to the Offer to Purchase will cease to accrue interest on the Offer to Purchase Payment Date;

(vii) Holders electing to have any Notes purchased pursuant to an Offer to Purchase will be required to surrender the Notes, together with a duly executed letter of transmittal properly completed in accordance with the instructions thereto, to the Paying Agent specified in such notice at the address specified in such notice prior to the close of business on the Expiration Date;

(viii) Holders shall be entitled to withdraw their tendered Notes and their election to require Braskem or a Designated Affiliate to purchase such Notes; **provided that** such Paying Agent receives, not later than the close of business on the Expiration Date, a telegram, facsimile transmission or letter setting forth the name of the Holder of the Notes, the principal amount of Notes tendered for purchase, and a statement that such Holder is withdrawing its tendered Notes and its election to have such Notes purchased; and

(ix) that Holders whose Notes are being purchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered; **provided that** each such new Note will be in a principal amount of U.S.$200,000 or an integral multiple of U.S.$1,000 in excess thereof.

If (a) notice is mailed in a manner provided in this Section 3.08 and (b) any Holder fails to receive such notice or a Holder receives such notice but it is defective, such Holder's failure to receive such notice or such defect shall not affect the validity of the Offer to Purchase as to all other Holders that properly received such notice without defect.

(b) On or before the Offer to Purchase Payment Date, Braskem or a Designated Affiliate shall, to the extent lawful:

(i) accept for payment for all Notes properly tendered and not withdrawn pursuant to the Offer to Purchase;

(ii) deposit with such Paying Agent an amount equal to the aggregate Offer to Purchase Payment in respect of all Notes or portions thereof so tendered; and

(iii) deliver, or cause to be delivered, to the Trustee for cancellation the Notes so accepted together with an Officer's Certificate stating that such Notes or portions thereof have been tendered to and purchased by Braskem or a Designated Affiliate.

(c) The Paying Agent shall promptly mail to each Holder the Offer to Purchase Payment for its Notes that have been accepted for payment in the Offer to Purchase, and the Trustee shall promptly authenticate and mail (or cause to be transferred by book entry) to each Holder a new Note equal in principal amount to any unpurchased portion of the Notes surrendered, if any; **provided that** each such new Note will be in a principal amount of U.S.$200,000 or an integral multiple of U.S.$1,000 in excess thereof.

(d) Notwithstanding Section 3.08(a) or Paragraph 10(e) of the Notes, Braskem shall not be required to make an Offer to Purchase upon a Change of Control that results in a Ratings Decline if (i) a third party makes an offer to purchase Notes in the manner, at the times and otherwise in compliance with the requirements set forth in this Section 3.08 applicable to an Offer to Purchase made by Braskem and such third party purchases all Notes properly tendered and not withdrawn under such offer, or (ii) a notice of redemption for all Outstanding Notes has been given pursuant to Section 3.01 and Paragraph 10 of the Notes, unless and until there is a default in payment of the applicable Redemption Price. Notwithstanding anything to the contrary contained herein or in the Notes, an Offer to Purchase may be made in advance of a Change of Control, conditioned upon the consummation of such Change of Control, if a definitive agreement is in place for the Change of Control at the time the Offer to Purchase is made.

(e) Braskem shall not purchase any of the Notes if there has occurred and is continuing on the Offer to Purchase Payment Date an Event of Default, other than an Event of Default resulting from the failure to make a Offer to Purchase Payment when due.

(f) Braskem and any Designated Affiliate will comply with Rule 14e-1 under the Exchange Act (to the extent applicable) and all other applicable laws in making any Offer to Purchase. To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Indenture, the provisions of this Indenture and Paragraph 10(e) of the Notes shall be deemed to be modified to the extent necessary to permit such compliance. If the provisions of such securities laws or regulations cannot be complied with as a result of such

deemed modifications, Braskem shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section 3.08 or Paragraph 10(e) of the Notes by virtue thereof.

(g) In the event that the Holders of not less than 90% of the aggregate principal amount of the outstanding Notes accept an Offer to Purchase and Braskem or a third party purchases all the notes held by such Holders, the Company and Braskem will have the right, on not less than 30 nor more than 60 days' prior notice (with a copy to the Trustee), given not more than 30 days following the purchase pursuant to the Offer to Purchase described above, to redeem all of the Notes that remain outstanding following such purchase at the purchase price equal to that in the Offer to Purchase plus, to the extent not included in the Offer to Purchase payment, accrued and unpaid interest and Additional Amounts, if any, on the Notes that remain outstanding, to the date of redemption.

## ARTICLE IV

## COVENANTS

Section 4.01. **Payment of Principal, Premium and Interest Under the Notes**. The Company shall punctually pay the principal of and premium, if any, and interest on the Notes on the dates and in the manner provided in the Notes. By 10:00 a.m. (New York City time), no later than one Business Day prior to any Payment Date, the Company shall irrevocably deposit with a Paying Agent in immediately available funds a sum sufficient to pay the principal, premium, if any, and interest becoming due on such Payment Date.

The Company shall pay interest on overdue principal and premium, if any, at the rate borne by the Notes plus 1% per annum, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

No interest shall be payable hereunder in excess of the maximum rate permitted by applicable law.

Section 4.02. **Maintenance of Office or Agency**. The Company shall maintain in each place of payment for the Notes an office or agency where Notes may be presented or surrendered for payment and where notices and demands to or upon the Company in respect of the Notes and this Indenture may be served. The Corporate Trust Office of the Trustee shall be such office or agency of the Company, unless the Company shall designate and maintain some other office or agency for one or more of such purposes. The Company shall give prompt written notice to the Trustee of any change in the location of any such office or agency. If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office of the Trustee, and the Company hereby appoints the Trustee as its agent to receive all such presentations, surrenders, notices and demands.

Section 4.03. **Money for Note Payments to Be Held in Trust**. If the Company shall at any time act as its own Paying Agent, it shall, on or before each due date of the principal of or premium, if any, or interest on any of the Notes, segregate and hold in trust for the benefit of the

Persons entitled thereto a sum sufficient to pay the principal or premium, if any, or interest so becoming due until such sums shall be paid to such Persons or otherwise disposed of as herein provided and shall promptly notify the Trustee of its action or failure so to act.

Whenever the Company shall have one or more Paying Agents for the Notes, it shall, on or before each due date of the principal of or premium, if any, or interest on any Notes, irrevocably deposit with a Paying Agent a sum sufficient to pay such principal, premium, if any, or interest so becoming due, such sum to be held in trust for the benefit of the Persons entitled to such principal, premium, if any, or interest, and (unless such Paying Agent is the Trustee) the Company shall promptly notify the Trustee in writing of such action or any failure so to act.

Each Paying Agent, subject to the provisions of this Section 4.03, shall:

(i) hold all sums held by it for the payment of the principal of or premium, if any, or interest on Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein; **provided**, **however**, such sums need not be segregated from other funds held by it, except as required by law;

(ii) give the Trustee written notice of any default by the Company (or any other obligor upon the Notes) in the making of any payment of principal, premium, if any, or interest; and

(iii) at any time during the continuance of any such default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such Paying Agent.

The Company shall cause each Paying Agent (other than the Trustee) to execute and deliver an instrument in which such Paying Agent shall agree with the Trustee to act as a Paying Agent in accordance with this Section 4.03.

The Company may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, pay, or by Company Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Company or such Paying Agent, such sums to be held by the Trustee upon the same trusts as those upon which such sums were held by the Company or such Paying Agent; and, upon such payment by any Paying Agent to the Trustee, such Paying Agent shall be released from all further liability with respect to such sums.

Subject to applicable law, any money deposited with the Trustee or any Paying Agent, or then held by the Company, in trust for the payment of the principal of or premium, if any, or interest on any Note and remaining unclaimed for two years after such principal, premium, if any, or interest has become due and payable shall be paid to the Company or Braskem, as the case may be, at the written request of the Company or Braskem and subject to any relevant unclaimed property laws and regulations, or (if then held by the Company) shall be discharged from such trust; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to the Company or Braskem, as the case may be, for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Company as trustee thereof, shall thereupon cease; **provided**, **however**, **that** the Trustee or such Paying Agent, before being required to make any such repayment, shall, upon written request and at the expense of the Company, cause to be published once, in a newspaper published in the

English language, customarily published at least five days a week and of general circulation in (i) the Borough of Manhattan in The City of New York and (ii) so long as the Notes continue to be listed on the Singapore Stock Exchange, Singapore, notice that such money remains unclaimed and that, after a date specified therein, which shall not be less than 30 days from the date of such publication, any unclaimed balance of such money then remaining shall be repaid to the Company.

In the event that Braskem becomes obligated to make payments under the Guarantees, then Braskem shall make such payments in accordance with the foregoing provisions of this Section 4.03 to the fullest extent applicable.

Section 4.04. **Maintenance of Corporate Existence**. Braskem shall, and shall cause each of its Significant Subsidiaries to, (i) maintain in effect its corporate existence and all registrations necessary therefor; **provided that** these restrictions shall not prohibit any transactions permitted by Article V or the merger of any Significant Subsidiary with or into Braskem or with or into any other Wholly-Owned Subsidiary of Braskem; (ii) take all reasonable actions to maintain all rights, privileges, titles to property, franchises and the like necessary or desirable in the normal conduct of its business, activities or operations; and (iii) maintain or cause to be maintained in good repair, working order and condition (normal wear and tear excepted) all properties used or useful in their business; **provided**, **however**, **that** neither Braskem nor its Subsidiaries shall be prevented from dissolving one or more Subsidiaries, discontinuing those operations or suspending the maintenance of those properties which, in the reasonable judgment of Braskem as evidenced by a Board Resolution, are no longer necessary or useful in the conduct of Braskem's business, or that of its Subsidiaries; and **provided**, **further**, **that** such dissolution or discontinuation of operations or maintenance shall not be materially disadvantageous to the Holders of the Notes.

Section 4.05. **Payment of Additional Amounts**.

(a) All payments by the Company or Braskem in respect of the Notes or the Guarantees, as the case may be, shall be made without withholding or deduction for or on account of, Brazilian Taxes or U.S. Taxes, unless such withholding or deduction is required by law. In that event, the Company or Braskem, as the case may be, shall pay to each Holder such additional amounts ("**Additional Amounts**") as may be necessary in order that the net amount received by each holder of Notes (excluding such Additional Amounts) after such withholding or deduction will equal the amount the holder would have received if such Brazilian Taxes or U.S. Taxes had not been withheld or deducted. The foregoing obligation to pay Additional Amounts shall not apply to or in respect of:

(i) any tax, assessment or other governmental charge which would not have been imposed but for the existence of any present or former connection between a Holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such Holder, if such Holder is an estate, a trust, a partnership or a corporation), on the one hand, and the United States or Brazil, on the other hand (including such Holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or having been engaged in a trade or business or present therein or having, or having had, a permanent

establishment therein), other than the mere receipt of such payment or the ownership or holding of a Note or the Guarantees;

(ii) any tax, assessment or other governmental charge which would not have been so imposed but for the presentation by a Holder for payment on a date more than 30 days after the date on which such payment became due and payable or the date on which payment thereof is duly provided for, whichever occurs later;

(iii) any tax, duty, assessment or other governmental charge to the extent that such tax, duty, assessment or other governmental charge would not have been imposed but for the failure of a Holder or beneficial owner to comply with any certification, identification or other reporting requirements concerning the nationality, residence, identity or connection with Brazil or the United States of such Holder if, in the case of Brazilian Taxes (A) such compliance is required or imposed by law as a precondition to exemption from all or a part of such tax, duty, assessment or other governmental charge and (B) at least 30 days prior to the date on which the Company or Braskem, as the case may be, shall apply this clause (iii), the Company or Braskem, as the case may be, shall have notified all Holders of Notes that some or all Holders of Notes shall be required to comply with such requirement;

(iv) any estate, inheritance, gift, sales, transfer, excise or personal property or similar tax, assessment or governmental charge;

(v) any withholding or deduction imposed on a payment to an individual and that is required to be made pursuant to any law implementing or complying with, or introduced in order to conform to, any European Union Directive on the taxation of savings;

(vi) any tax, assessment or other governmental charge which would have been avoided by such Holder presenting the relevant Note (if presentation is required) or requesting that such payment be made to another Paying Agent in a member state of the European Union;

(vii) any tax, assessment or other governmental charge which is payable other than by deduction or withholding from payments of principal of, premium, if any, or interest on a Note;

(viii) any tax, assessment or other governmental charge imposed by reason of such Holder's past or present status as the actual or constructive owner of 10% or more of the total combined voting power of all classes of stock of the Company entitled to vote;

(ix) any tax, assessment or other governmental charge imposed on interest received by a bank or a controlled foreign corporation, as defined for U.S. federal income tax purposes, each as described in Section 881(c)(3) of the Code (or any successor provision thereto);

(x) any tax, assessment or other governmental charge which is imposed by the United States pursuant to (a) section 1471(a) of the Code as a result of (I) the failure of a Holder or beneficial owner that is a "foreign financial institution" within the meaning of section 1471(d)(4) of the Code to comply with the requirements of section 1471(b) of the

Code, or (2) any note being held by a "recalcitrant account holder" of a foreign financial institution within the meaning of section 1471(d)(6) of the Code that otherwise complies with the requirements of section 1471(b) of the Code, or (b) section 1472(a) of the Code as a result of the failure of a Holder or beneficial owner that is a "non-financial foreign entity" within the meaning of section 1472(d) of the Code to comply with the requirements of section 1472(b) of the Code; or

(xi) any combination of the above.

(b) The Company or Braskem, as the case may be, shall pay any present or future stamp, court or documentary taxes or any other excise or property taxes, charges or similar levies which arise in any jurisdiction from the execution, delivery, registration or the making of payments in respect of the Notes and the Guarantees, excluding any such taxes, charges or similar levies imposed by any jurisdiction outside of Brazil other than those resulting from, or required to be paid in connection with, the enforcement of the Notes and the Guarantees following the occurrence of any Default or Event of Default.

(c) No Additional Amounts shall be paid with respect to a payment on any Note or the Guarantees to a Holder that is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent a beneficiary or settlor with respect to such fiduciary or a member of such partnership or beneficial owner would not have been entitled to receive payment of the Additional Amounts had the beneficiary, settlor, member or beneficial owner been the Holder of the Note or the Guarantees.

(d) The Company or Braskem, as applicable, shall provide the Trustee with the official acknowledgment of the relevant taxing authority (or, if such acknowledgment is not available, other reasonable documentation) evidencing any payment of U.S. Taxes or Brazilian Taxes in respect of which the Company or Braskem has paid any Additional Amounts. Copies of such documentation shall be made available to the Holders of the Notes or the Paying Agents, as applicable, upon request therefor.

(e) The Company shall:

(i) at least 10 Business Days prior to the first Payment Date (and at least 10 Business Days prior to each succeeding Payment Date or any Redemption Date or Maturity date if there has been any change with respect to the matters set forth in the below-mentioned Officer's Certificate), deliver to the Trustee and each Paying Agent an Officer's Certificate (A) specifying the amount, if any, of taxes described in this Section 4.05 (the "Relevant Withholding Taxes") required to be deducted or withheld on the payment of principal of or premium, if any, or interest on the Notes to Holders and the Additional Amounts, if any, due to Holders in connection with such payment, and (B) certifying that the Company shall pay such deduction or withholding;

(ii) prior to the due date for the payment thereof, pay any such Relevant Withholding Taxes, together with any penalties or interest applicable thereto;

(iii) within 15 days after paying such Relevant Withholding Taxes, deliver to the Trustee and each Paying Agent evidence of such payment and of the remittance thereof to the relevant taxing or other authority as described in this Section 4.05; and

(iv) pay any Additional Amounts due to Holders on any Interest Payment Date, Redemption Date or Maturity date to the Trustee in accordance with the provisions of this Section 4.05.

(f) The Company and Braskem shall indemnify the Trustee and each Paying Agent for, and hold each harmless against, any loss, liability or expense reasonably incurred without gross negligence, bad faith or willful misconduct on such Person's part, arising out of or in connection with actions taken or omitted by any of them in reliance on any Officer's Certificate furnished pursuant to this Section 4.05 or the failure of the Trustee or any Paying Agent for any reason (other than its own gross negligence, bad faith or willful misconduct) to receive on a timely basis any such Officer's Certificate or any information or documentation requested by it or otherwise required by applicable law or regulations to be obtained, furnished or filed in respect of such Relevant Withholding Taxes. The Company or Braskem, as the case may be, shall make available to any Holder requesting the same, evidence that the applicable Relevant Withholding Taxes have been paid.

(g) Any Officer's Certificate required by this Section 4.05 to be provided to the Trustee and each Paying Agent shall be deemed to be duly provided if sent by facsimile to the Trustee and each Paying Agent.

Section 4.06. **Reporting Requirements**.

(a) Braskem shall provide the Trustee with the following reports for delivery to all Holders upon their written request thereof:

(i) an English language version of its annual audited consolidated financial statements prepared in accordance with GAAP within 120 days after the close of its fiscal year;

(ii) an English language version of its unaudited quarterly financial statements prepared in accordance with GAAP within 60 days after the close of each fiscal quarter (other than the last fiscal quarter of its fiscal year);

(iii) simultaneously with the delivery of each set of financial statements referred to in Section 4.06(a)(i), an Officer's Certificate stating whether, to the knowledge of the Officer or Officers executing such Officer's Certificate, a Default or Event of Default exists on the date of such certificate and, if a Default or Event of Default exists, setting forth the details thereof and the action which the Company or Braskem, as the case may be, is taking or proposes to take with respect thereto; and

(iv) within five Business Days after any director or executive officer of the Company or Braskem, as the case may be, becomes aware of the existence of a Default or Event of Default, an Officer's Certificate setting forth the details thereof and the action which the Company or Braskem, as the case may be, is taking or proposes to take with respect thereto.

The above reports may be delivered by Braskem to the Trustee in physical or electronic form, as determined by Braskem. If Braskem files the reports described in clauses (i) or (ii) with the U.S. Securities and Exchange Commission or makes such reports available on its website, it will be deemed to have satisfied the reporting requirement set forth in such applicable clause. The Trustee shall have no obligation to determine if and when the Company's information is available on the SEC's (EDGAR) or any other website. The Company shall either (i) provide the Trustee with prompt written notification at such time that the Company ceases to be a reporting company or (ii) continue to provide the Trustee the information as set forth in this Section.

Delivery of the above reports to the Trustee is for informational purposes only and the Trustee's receipt of such reports shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the compliance of the Company or Braskem, as the case may be, with any of its covenants in this Indenture (as to which the Trustee is entitled to rely exclusively on Officer's Certificates).

(b) Within 60 days of the close of each of the first three fiscal quarters and within 90 days of the close of each fiscal year, for so long as any of the Notes remain outstanding, (i) the Company shall request from DTC, a current list of the names and addresses of each DTC participant which is a Holder of an interest in a Global Note and (ii) at the Company's written request, the Trustee shall provide the Company with the names and addresses of each Holder of a Certificated Note, if any.

Section 4.07. **Available Information**. The Company shall take all action necessary to provide information to permit resales of the Notes pursuant to Rule 144A, including furnishing to any Holder of a Note or owner of a beneficial interest in a Global Note, or to any prospective purchaser designated by such a Holder or beneficial owner, upon request to such Holder or beneficial owner, financial and other information required to be delivered under paragraph (d)(4) of Rule 144A (as amended from time to time and including any successor provision) unless, at the time of such request, Braskem is subject to the reporting requirements of Section 13 or Section 15(d) of the Exchange Act or is exempt from such requirements pursuant to Rule 12g3-2(b) under the Exchange Act (as amended from time to time and including any successor provision).

Section 4.08. **Limitation on Liens**. Braskem shall not, and shall not permit any Significant Subsidiary to, create or suffer to exist any Lien upon any of its property or assets now owned or hereafter acquired by it or on any Capital Stock of any Significant Subsidiary, securing any Debt of Braskem or any Significant Subsidiary unless contemporaneously therewith effective provision is made to secure the Notes equally and ratably with such obligation for so long as such obligation is so secured. The preceding sentence shall not require Braskem or any Subsidiary to equally and ratably secure the Notes if the Lien consists of the following:

(i) any Lien existing on the date of this Indenture, and any extension, renewal or replacement thereof or of any Lien referred to in clauses (ii), (iii), (iv) or (xi) below; **provided**, **however**, **that** the aggregate principal amount of Debt so secured is not increased, other than any increase reflecting premiums, fees and expenses in connection with such extension, renewal or replacement;

(ii) any Lien on any property or assets (including Capital Stock of any Person) securing Debt incurred for purposes of financing the acquisition, construction or improvement of such property or assets including related transaction fees and expenses (or securing Debt incurred to refinance a bridge or other interim financing that is initially incurred for the purpose of financing such acquisition, construction or improvement of such property or assets including related transaction fees and expenses) after the date of this Indenture; **provided that** (A) the aggregate principal amount of Debt secured by the Liens shall not exceed (but may be less than) the cost (*i.e.*, purchase price) of the property or assets so acquired, constructed or improved and (B) the Lien is incurred before, or within 365 days after the completion of, such acquisition, construction or improvement and does not encumber any other property or assets of Braskem or any Significant Subsidiary; **provided**, **further**, **that** any Lien is permitted to be incurred on the Capital Stock of any Person securing any Debt of that Person that is (a) Non-Recourse Debt and (b) incurred for purposes of financing the acquisition, construction or improvement of any property or assets of such Person;

(iii) any Lien securing Debt for the purpose of financing all or part of the cost of the acquisition, construction or development of a project; **provided that** (A) the Lien in respect of such Debt is limited to assets (including Capital Stock of the project entity), rights and/or revenues of such project, (B) the aggregate principal amount of Debt secured by the Liens will not exceed (but may be less than) the cost (*i.e.*, purchase price) of the project; and (C) the Lien is incurred before, or within 365 days after the completion of, that acquisition, construction or development and does not apply to any other property or assets of Braskem or any Significant Subsidiary;

(iv) any Lien existing on any property or assets of any Person before that Person's acquisition by, merger into or consolidation with Braskem or any Subsidiary after the date of this Indenture; **provided that** (A) the Lien is not created in contemplation of or in connection with such acquisition, merger or consolidation, (B) the Debt secured by the Liens may not exceed the Debt secured on the date of such acquisition, merger or consolidation, in each case, taking into account any accrued interest or monetary variation, (C) the Lien shall not apply to any other property or assets of Braskem or any of its Subsidiaries and (D) the Lien shall secure only the Debt that it secures on the date of such acquisition, merger or consolidation;

(v) any Lien imposed by law that was incurred in the ordinary course of business, including carriers', warehousemen's and mechanics' liens and other similar encumbrances arising in the ordinary course of business, in each case for sums not yet due or being contested in good faith by appropriate proceedings;

(vi) any pledge or deposit made in connection with workers' compensation, unemployment insurance or other similar social security legislation, any deposit to secure appeal bonds in proceedings being contested in good faith to which Braskem or any Subsidiary is a party, good faith deposits in connection with bids, tenders, contracts (other than for the payment of Debt) or leases to which Braskem or any Subsidiary is a party or deposits for the payment of rent, in each case made in the ordinary course of business;

(vii) any Lien in favor of issuers of surety bonds or letters of credit issued pursuant to the request of and for the account of Braskem or any Subsidiary in the ordinary course of business;

(viii) any Lien securing taxes, assessments and other governmental charges, the payment of which are not yet due or are being contested in good faith by appropriate proceedings and for which such reserves or other appropriate provisions, if any, have been established as required by GAAP;

(ix) minor defects, easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business and encumbrances consisting of zoning restrictions, licenses, restrictions on the use of property or assets or minor imperfections in title that do not materially impair the value or use of the property or assets affected thereby, and any leases and subleases of real property that do not interfere with the ordinary conduct of the business of Braskem or any Subsidiary, and which are made on customary and usual terms applicable to similar properties;

(x) any rights of set-off of any Person with respect to any deposit account of Braskem or any Subsidiary arising in the ordinary course of business and not constituting a financing transaction;

(xi) any Lien granted to secure borrowings from, directly or indirectly, (A) Banco Nacional de Desenvolvimento Econômico e Social–BNDES, Banco de Nordeste do Brasil S.A, or any other Brazilian governmental development bank or credit agency or (B) any international or multilateral development bank, government-sponsored agency, export-import bank or agency, or official export-import credit insurer;

(xii) any Lien securing obligations under hedging agreements not for speculative purposes;

(xiii) any Lien on the inventory or receivables and related assets of Braskem or any Subsidiary securing the obligations of such Person under any lines of credit or working capital facility or in connection with any structured export or import financing or other trade transaction; **provided that** the aggregate amount of receivables securing Debt shall not exceed (A) with respect to transactions secured by receivables from export sales, 80% of Braskem's consolidated gross revenues from export sales for the most recently concluded period of four consecutive fiscal quarters; or (B) with respect to transactions secured by receivables from domestic sales, 80% of such Person's consolidated gross revenues from sales for the most recently concluded period of four consecutive fiscal quarters; **provided**, **further**, **that** Advance Transactions shall not be deemed transactions secured by receivables for purpose of the above calculation;

(xiv) Liens securing obligations owed by any Restricted Subsidiary of Braskem to Braskem or one or more Restricted Subsidiaries of Braskem and/or by Braskem to one or more such Restricted Subsidiaries; and

(xv) in addition to the foregoing Liens set forth in clauses (i) through (xiv) above or otherwise permitted by this Section 4.8, Liens securing Debt of Braskem or any

Subsidiary (including guarantees of Braskem or any Subsidiary) which do not in aggregate principal amount, at any time of determination, exceed 15.0% of Consolidated Total Assets.

Solely for purposes of this Section 4.08 (but not the definition of "Consolidated Total Assets"), and notwithstanding the definition of "Subsidiary," a corporation, association, partnership or other business entity that constitutes a joint venture or similar entity between Braskem and/or one or more of its Subsidiaries, on the one hand, and one or more persons, on the other, and that would otherwise be a Subsidiary will not be deemed to be a Subsidiary (and, therefore, not subject to this covenant); **provided that** such joint venture or similar entity is not fully consolidated in the financial statements of Braskem (and instead is proportionately consolidated under Brazilian Securities Commission Instruction No. 247, as amended, or any successor provision because it is jointly controlled by Braskem and/or its Subsidiaries, on the one hand, and such other persons, on the other); and **provided**, **further**, **that** the Debt secured or to be secured by Liens is incurred to finance the business of such joint venture or similar entity or property or assets owned or hereafter acquired, directly or indirectly, by it.

For the avoidance of doubt, a Lien permitted by this Section 4.08 need not be permitted solely by reference to a single clause permitting such Lien, but may be permitted in part by such clause and in part by one or more other clauses of this covenant otherwise permitting such Lien.

Section 4.09. **Waiver of Certain Covenants**. Braskem may omit in any particular instance to comply with any term, provision or condition set forth in Section 5.03 or Sections 4.06 or 4.08, if before or after the time for such compliance the Holders of at least a majority in principal amount of the Outstanding Notes, by Act of such Holders, waive such compliance in such instance with such term, provision or condition, or generally waive compliance with such term, provision or condition, but no such waiver shall extend to or affect such term, provision or condition except to the extent so expressly waived, and, until such waiver shall become effective, the obligations of Braskem and the duties of the Trustee in respect of any such term, provisions or condition shall remain in full force and effect. Braskem will promptly notify the Trustee in writing of any such waiver or the revocation of any such waiver.

Section 4.10. **Additional Limitations on the Company**.

(a) For so long as any of the Notes is outstanding:

(i) the Company shall not engage in any business, or conduct any operations, other than to finance the operations of Braskem and its Subsidiaries and activities that are reasonably ancillary thereto (including on-lending of funds, repurchases of Debt not prohibited by this Indenture, entering into transactions involving Hedging Obligations relating to such Debt and Investments not prohibited by this Indenture);

(ii) the Company shall not incur any Debt other than (1) the Notes and (2) any other indebtedness which (i) ranks equally with the Notes or (ii) is subordinated to the Notes;

(iii) the Company will not redeem any shares of its Capital Stock; and

(iv) the Company shall not incur any Liens on any of its assets, except for any Liens imposed by operation of law.

(b) For so long as any of the Notes is outstanding, neither the Company nor Braskem shall take any corporate action with respect to:

(i) the consolidation or merger of the Company with or into any other Person, except that the Company may merge with Braskem or a Wholly-Owned Subsidiary;

(ii) the voluntary liquidation, wind-up or dissolution of the Company while the Company is the issuer of the Notes, unless Braskem fully and unconditionally assumes all of the obligations of the Company, including the Notes; or

(iii) the transfer or disposition by Braskem of the Company to any Person other than a Wholly-Owned Subsidiary, except as permitted under Article V.

## ARTICLE V

## CONSOLIDATION, MERGER, CONVEYANCE, TRANSFER OR LEASE

Section 5.01. **Limitation on Consolidation, Merger or Transfer of Assets**. Braskem shall not consolidate with or merge with or into, or convey, transfer or lease all or substantially all of its assets to, any Person, unless:

(i) the resulting, surviving or transferee Person (if not Braskem) shall be a Person organized and existing under the laws of Brazil, the United States of America, any state thereof or the District of Columbia, any other country that is a member country of the European Union or of the Organisation for Economic Co-operation and Development on the date of this Indenture, or any other country whose long-term foreign currency-denominated debt has an Investment Grade rating from either S&P or Moody's as of the effective date of such transaction, and such Person expressly assumes, by an indenture supplemental to this Indenture, executed and delivered to the Trustee, all the obligations of Braskem under this Indenture, the Notes and the Guarantees, as applicable;

(ii) the resulting, surviving or transferee Person (if not Braskem), if not organized and existing under the laws of Brazil, undertakes, in such supplemental indenture, to pay such Additional Amounts in respect of principal and premium, if any, and interest as may be necessary in order that every net payment made in respect of the Guarantees after deduction or withholding for or on account of any present or future tax, penalty, fine, duty, assessment or other governmental charge imposed by such other country or any political subdivision or taxing authority thereof or therein shall not be less than the amount of principal and premium, if any, and interest then due and payable on the Guarantees, subject to the same exceptions set forth under Sections 4.05(a)(i) through (xi), but replacing existing references in such clauses to Brazil and the United States with references to such other country;

(iii) immediately after giving effect to such transaction, no Event of Default shall have occurred and be continuing; and

(iv) Braskem shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, merger or transfer and such supplemental indenture, if any, comply with this Indenture.

The Trustee shall be entitled to conclusively rely on and shall accept such Officer's Certificate and Opinion of Counsel as sufficient evidence of the satisfaction of the conditions precedent set forth in this Section 5.01, in which event it shall be conclusive and binding on the Holders.

Section 5.02. **Successor Substituted**. Upon any consolidation or merger, or any sale, assignment, conveyance, transfer, lease or disposition of all or substantially all of the properties and assets of Braskem in accordance with Section 5.01 in which Braskem is not the continuing obligor under this Indenture, the surviving or transferor Person shall succeed to, and be substituted for, and may exercise every right and power of, Braskem under this Indenture with the same effect as if such successor had been named as Braskem therein. When a successor assumes all the obligations of its predecessor under this Indenture, the Notes and the Guarantees, the predecessor shall be released from those obligations; **provided that** in the case of a transfer by lease, the predecessor shall not be released from the payment of principal of and premium, if any, and interest on the Notes.

Section 5.03. **Notes to Be Secured in Certain Events**. If, upon any such consolidation of Braskem with or merger of Braskem into any other corporation, or upon any conveyance, lease or transfer of the property of Braskem substantially as an entirety to any other Person, any property or assets of Braskem would thereupon become subject to any Lien, then unless such Lien could be created pursuant to Section 4.08 without equally and ratably securing the Notes, Braskem, prior to or simultaneously with such consolidation, merger, conveyance, lease or transfer, shall as to such property or assets, secure the Outstanding Notes (together with, if Braskem so determines, any other Debt of Braskem now existing or hereinafter created which is not subordinate in right of payment to the Notes) equally and ratably with or prior to the Debt which upon such consolidation, merger, conveyance, lease or transfer is to become secured as to such property or assets by such Lien, or shall cause such Notes to be so secured.

## ARTICLE VI

## EVENTS OF DEFAULT AND REMEDIES

Section 6.01. **Events of Default**. The term "Event of Default" means, when used herein, any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to, or as a result of any failure to obtain, any authorization, order, rule, regulation, judgment or decree of any governmental or administrative body or court):

(1) The Company or Braskem defaults in any payment of interest (including any related Additional Amounts) on any Note when the same becomes due and payable, and such Default continues for a period of 30 days;

(2) The Company or Braskem defaults in the payment of the principal (including premium, if any, and any related Additional Amounts) of any Note when the same becomes due and payable upon its Stated Maturity, redemption or otherwise;

(3) The Company or Braskem fails to comply with any of its covenants or agreements in the Notes or this Indenture (other than those referred to in Sections 6.01 (1) and 6.01(2)), and such failure continues for 60 days after the notice specified below;

(4) Braskem or any Significant Subsidiary defaults under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Debt for money borrowed by Braskem or any such Significant Subsidiary (or the payment of which is guaranteed by Braskem or any such Significant Subsidiary) whether such Debt or guarantee now exists, or is created after the date of this Indenture, which default (a) is caused by failure to pay principal of or premium, if any, or interest on such Debt after giving effect to any grace period provided in such Debt on the date of such default ("Payment Default") or (b) results in the acceleration of such Debt prior to its express maturity and, in each case, the principal amount of any such Debt or Guarantee, as applicable, together with the principal amount of any other such Debt or Guarantee under which there has been a Payment Default or the maturity of which has been so accelerated, totals U.S.$100,000,000 (or the equivalent thereof at the time of determination) or more in the aggregate;

(5) One or more final judgments or decrees for the payment of money of U.S.$100,000,000 (or the equivalent thereof at the time of determination) or more in the aggregate are rendered against Braskem or any Significant Subsidiary and are not paid (whether in full or in installments in accordance with the terms of the judgment) or otherwise discharged (and otherwise not covered by an insurance policy or policies issued by reputable and credit-worthy insurance companies) and, in the case of each such judgment or decree, either (a) an enforcement proceeding has been commenced by any creditor upon such judgment or decree and is not dismissed within 90 days following commencement of such enforcement proceedings or (b) there is a period of 90 days following such judgment during which such judgment or decree is not discharged, waived or the execution thereof stayed; or

(6) (a) Braskem or any Significant Subsidiary pursuant to or within the meaning of any Bankruptcy Law:

(i) commences a voluntary case or files a request or petition for a writ of execution to initiate bankruptcy proceedings or have itself adjudicated as bankrupt;

(ii) applies for or consents to the entry of an order for relief against it in an involuntary case;

(iii) applies for or consents to the appointment of a Custodian of it or for any substantial part of its property;

(iv) makes a general assignment for the benefit of its creditors;

(v) proposes or agrees to an accord or composition in bankruptcy between itself and its creditors; or

(vi) files for a reorganization of its debts (judicial or extrajudicial recovery); or

(b) A court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(i) is for relief against Braskem or any Significant Subsidiary in an involuntary case;

(ii) appoints a Custodian of Braskem or any Significant Subsidiary or for any substantial part of the property of Braskem or any Significant Subsidiary;

(iii) orders the winding up or liquidation of Braskem or any Significant Subsidiary;

(iv) adjudicates Braskem or a Significant Subsidiary as bankrupt or insolvent;

(v) ratifies an accord or composition in bankruptcy between Braskem or a Significant Subsidiary and the respective creditors thereof; or

(vi) grants a judicial or extrajudicial recovery to Braskem or a Significant Subsidiary;

and the order or decree remains unstayed and in effect for 45 days.

A Default under Section 6.01(3) is not an Event of Default until the Trustee or the Holders of at least 25% in principal amount of the Outstanding Notes notify Braskem of the Default and Braskem does not cure such Default within the time specified after receipt of such notice.

Section 6.02. **Acceleration of Maturity, Rescission and Amendment**. If an Event of Default (other than an Event of Default specified in Section 6.01(6)) occurs and is continuing, the Trustee or the Holders of not less than 25% in principal amount of the Outstanding Notes may declare all unpaid principal of and premium, if any, and accrued and unpaid interest on all Notes to be due and payable immediately, by a notice in writing to the Company (and to the Trustee, if the notice is given by the Holders), stating that such notice is an "acceleration notice," and upon any such declaration such amounts shall become due and payable immediately. If an Event of Default specified in Section 6.01(6) occurs and is continuing, then the principal of and premium, if any, and accrued and unpaid interest on all Notes shall become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

At any time after a declaration of acceleration has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee as hereinafter provided in

this Article, the Holders of a majority in principal amount of the Notes by written notice to the Company and the Trustee may rescind or annul such declaration if:

(i) the Company has paid or deposited with the Trustee a sum sufficient to pay (a) all overdue interest on Outstanding Notes, (b) all unpaid principal of and premium, if any, on the Notes that have become due otherwise than by such declaration of acceleration, (c) to the extent that payment of such interest on the Notes is lawful, interest on such overdue interest (including any Additional Amounts) as provided herein and (d) all sums paid or advanced by the Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel; and

(ii) all Events of Default have been cured or waived as provided in Section 6.13 other than the nonpayment of principal that has become due solely because of acceleration.

In the case of any Event of Default referred to in Section 6.01(4)(a) and/or 6.1(4)(b), such Event of Default will be automatically rescinded or annulled if the Payment Default and/or the acceleration of the Debt referred to therein is remedied or cured by Braskem or such Significant Subsidiary or waived by the holders of such Debt within 60 days after the Payment Default and/or acceleration in respect of such Debt.

No such rescission or annulment referred to in either of the two preceding paragraphs of this Section 6.02 shall affect any subsequent Default or Event of Default or impair any right consequent thereto.

Section 6.03. **Collection Suit by Trustee**. If an Event of Default specified in Section 6.01(1) or 6.1(2) occurs, the Trustee, in its own name as trustee of an express trust, (i) may institute a judicial proceeding for the collection of the whole amount then due and payable on such Notes for principal and premium, if any, and interest (including Additional Amounts), and interest on any overdue principal and premium, if any, and, to the extent that payment of such interest (including Additional Amounts) shall be legally enforceable, upon any overdue installment of interest (including Additional Amounts), at the rate borne by the Notes, and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, (ii) may prosecute such proceeding to judgment or final decree and (iii) may enforce the same against the Company or any other obligor upon the Notes and collect the moneys adjudged or decreed to be payable in the manner provided by law out of the property of the Company or any other obligor upon the Notes, wherever situated.

If an Event of Default occurs and is continuing, the Trustee may in its discretion proceed to protect and enforce its rights and the rights of the Holders by any available proceeding at law or in equity, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy.

Section 6.04. **Other Remedies**. If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal of or premium, if

any, or interest (including Additional Amounts) on the Notes or to enforce the performance of any provision of the Notes or this Indenture.

Section 6.05. **Trustee May Enforce Claims Without Possession of Notes**. All rights of action and claims under this Indenture or the Notes may be prosecuted and enforced by the Trustee without the possession of any of the Notes or the production thereof in any proceeding relating thereto, and any such proceeding instituted by the Trustee shall be brought in its own name and as trustee of an express trust, and any recovery of judgment shall, after provision for the payment of the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Holders of the Notes in respect of which such judgment has been recovered.

Section 6.06. **Application of Money Collected**. Any money collected by the Trustee pursuant to this Article VI shall be applied in the following order:

FIRST: to the Trustee for amounts due to it hereunder (including under Section 7.06);

SECOND: to Holders for amounts due and unpaid on the Notes for principal and premium, if any, and interest (including Additional Amounts), ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal, premium, if any, and interest (including Additional Amounts), respectively; and

THIRD: to the Company.

The Trustee may fix a record date and payment date for any payment to Holders pursuant to this Section 6.06. At least 15 days before such record date, the Trustee shall mail to each Holder and the Company a notice that states the record date, the payment date and amount to be paid.

Section 6.07. **Limitation on Suits**. A Holder may not pursue any remedy with respect to this Indenture or the Notes unless:

(i) the Holder has previously given to the Trustee written notice stating that an Event of Default has occurred and is continuing;

(ii) the Holders of at least 25% in principal amount of the Notes have made a written request to the Trustee to pursue the remedy in respect of such Event of Default;

(iii) such Holder or Holders have offered and provided to the Trustee security or indemnity reasonably satisfactory to the Trustee against any cost, loss, liability or expense to be incurred in compliance with such request;

(iv) the Trustee does not comply with the request within 60 days after receipt of the request and the offer and provision of security or indemnity; and

(v) no direction inconsistent with such written request has been given to the Trustee during such 60-day period by the Holders of a majority in principal amount of the Notes outstanding.

A Holder may not use this Indenture to prejudice the rights of another Holder or to obtain a preference or priority over another Holder.

Section 6.08. **Rights of Holders to Receive Principal, Premium and Interest**. Notwithstanding any other provision of this Indenture, the right of any Holder to receive payment of principal of and premium, if any, and interest on the Notes held by such Holder, on or after the respective Payment Dates expressed in the Notes, or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder.

Section 6.09. **Restoration of Rights and Remedies**. If the Trustee or any Holder has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Holder, then and in every such case, subject to any determination in such proceeding, the Company, Braskem, the Trustee and the Holders shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Trustee and the Holders shall continue as though no such proceeding had been instituted.

Section 6.10. **Trustee May File Proofs of Claim**. The Trustee may file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due to the trustee hereunder) and the Holders allowed in any judicial proceedings relative to the Company or Braskem, their respective creditors or their respective properties and, unless prohibited by law or applicable regulations, may vote on behalf of the Holders in any election of a trustee in bankruptcy or other Person performing similar functions, and any Custodian in any such judicial proceeding is hereby authorized by each Holder to make payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and its counsel, and any other amounts due the Trustee under Section 7.06. Nothing herein shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.11. **Delay or Omission Not Waiver**. No delay or omission of the Trustee or of any Holder of any Note to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Every right and remedy given by this Article VI or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be.

Section 6.12. **Control by Holders**. The Holders of a majority in aggregate principal amount of the Outstanding Notes may direct in writing the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. However, the Trustee shall be under no obligation to exercise any of

its rights or powers under this Indenture at the request or direction of the Holders if such request or direction conflicts with any law or with this Indenture or, subject to Section 7.01, if the Trustee determines it is unduly prejudicial to the rights of other Holders (it being understood that, subject to Sections 7.01 and 7.02, the Trustee shall have no duty to ascertain whether or not such actions or forbearance are unduly prejudicial to such Holders) or would involve the Trustee in personal liability or expense; **provided**, **however**, **that** the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such request or direction. Prior to taking any action hereunder, the Trustee shall be entitled to indemnification satisfactory to it in its sole discretion against all costs, losses, liabilities and expenses caused by taking or not taking such action.

Section 6.13. **Waiver of Past Defaults and Events of Default**. Subject to Section 6.02, the Holders of a majority in principal amount of the Outstanding Notes by notice to the Trustee may waive an existing Default or Event of Default and its consequences except (i) a Default or Event of Default in the payment of the principal of or premium, if any, or interest on a Note or (ii) a Default or Event of Default in respect of a provision that under Section 9.02 cannot be amended without the consent of each Holder affected. The Holders of all Outstanding Notes by notice to the Trustee may waive any Default or Event of Default in respect of a provision that under Section 9.02 cannot be amended without the consent of each Holder affected. When a Default or Event of Default is waived, it is deemed cured, but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any consequent right.

Section 6.14. **Rights and Remedies Cumulative**. Except as otherwise provided with respect to the replacement of mutilated, defaced, destroyed, lost or stolen Notes in Section 2.08, no right or remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 6.15. **Waiver of Stay or Extension Laws**. Each of the Company and Braskem covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Indenture or the Notes; and each of the Company and Braskem (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and shall not hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law had been enacted.

## ARTICLE VII

## TRUSTEE AND PAYING AGENTS

Section 7.01. **Duties of Trustee and Paying Agents**.

(a) If an Event of Default has occurred and is continuing and a Responsible Officer has actual knowledge thereof, the Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in its exercise as a prudent Person would exercise or use under the circumstances in the conduct of such Person's own affairs.

(b) Except during the continuance of an Event of Default, (i) the Trustee and each Paying Agent undertake to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee or any Paying Agent; and (ii) in the absence of bad faith on the part of the Trustee or any Paying Agent, the Trustee or any Paying Agent may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee or any Paying Agent and conforming to the requirements of this Indenture. However, in the case of any certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee or any Paying Agent, the Trustee and such Paying Agent shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of the mathematical calculations or other facts stated therein).

(c) The Trustee may not be relieved from liability for its own gross negligence, bad faith or willful misconduct, except that:

(i) this Section 7.01(c) does not limit the effect of Section 7.01(b);

(ii) neither the Trustee nor any Paying Agent shall be liable for any error of judgment made in good faith by a Responsible Officer unless it is proved that the Trustee or the Paying Agent was grossly negligent in ascertaining the pertinent facts; and

(iii) neither the Trustee nor any Paying Agent shall be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.07 or exercising any trust or power conferred upon the Trustee or any Paying Agent under this Indenture.

(d) Neither the Trustee nor any Paying Agent shall be liable for interest on any money received by it except as the Trustee or such Paying Agent may agree in writing with the Company.

(e) Money held in trust by the Trustee or any Paying Agent need not be segregated from other funds except to the extent required by law.

(f) No provision of this Indenture shall require the Trustee or any Paying Agent to expend or risk its own funds or otherwise incur personal financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers if it shall have reasonable grounds to believe that repayment of such funds and/or adequate indemnity against such risk or liability is not satisfactorily assured to it.

(g) Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee and any Paying Agent shall be subject to the provisions of this Section 7.01.

Section 7.02. **Rights of Trustee**.

(a) The Trustee and any Paying Agent may rely upon, and shall be protected in acting or refraining from acting based upon, any document believed by it to be genuine and to have been signed or presented by the proper Person. Neither the Trustee nor any Paying Agent need investigate any fact or matter stated in any such document.

(b) Before the Trustee acts or refrains from acting, it may require an Officer's Certificate, the written advice of a qualified tax expert or an Opinion of Counsel. The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on the Officer's Certificate, the qualified tax expert's written advice or the Opinion of Counsel.

(c) The Trustee may act through agents and shall not be responsible for the willful misconduct or gross negligence of any agent appointed with due care.

(d) Any request, direction, order or demand of the Company or Braskem mentioned herein shall be sufficiently evidenced by an Officer's Certificate of the Company or Braskem, as the case may be (unless other evidence in respect thereof be herein specifically prescribed); and any resolution of the Board of Directors of the Company or Braskem may be evidenced to the Trustee or any Paying Agent by copies thereof certified by the Secretary or an Assistant Secretary (or equivalent officer) of the Company or Braskem, as the case may be.

(e) Neither the Trustee nor any Paying Agent shall be under any obligation to exercise any of the trusts or powers vested in it by this Indenture at the request, order or direction of any of the Holders pursuant to the provisions of this Indenture, unless such Holders shall have offered to the Trustee or any Paying Agent security or indemnity reasonably satisfactory to the Trustee against the costs, expenses and liabilities that might be incurred thereby.

(f) Neither the Trustee nor any Paying Agent shall be liable for any action taken or omitted by it in good faith and believed by it to be authorized or within the discretion, rights or powers conferred upon it by this Indenture; **provided that** the conduct of the Trustee or the Paying Agent does not constitute gross negligence, bad faith or willful misconduct.

(g) The Trustee and any Paying Agent may consult with counsel, and the advice or opinion of counsel with respect to legal matters relating to this Indenture and the Notes shall be full and complete authorization and protection from liability in respect to any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or opinion of such counsel.

(h) Neither the Trustee nor any Paying Agent shall be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document unless requested in writing by the Holders of not less than a majority in aggregate principal amount of the Notes Outstanding; **provided that** if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not satisfactorily assured to the Trustee by the security afforded to it by the terms of this Indenture, the Trustee may require from the Holders indemnity satisfactory to the Trustee against such

expenses or liabilities as a condition to proceeding; the reasonable expenses of every such investigation shall be paid by the Company or, if paid by the Trustee, shall be reimbursed by the Company upon demand.

(i) Neither the Trustee nor any Paying Agent shall be required to invest, or shall be under any liability for interest, on any moneys at any time received by it pursuant to any of the provisions of this Indenture or the Notes except as the Trustee or any Paying Agent may otherwise agree with the Company. Such moneys need not be segregated from other funds except to the extent required by mandatory provisions of law.

(j) In no event shall the Trustee or any Paying Agent be liable for special, indirect or consequential loss or damage of any kind whatsoever (including, but not limited to, lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(k) The permissive rights of the Trustee enumerated herein shall not be construed as duties of the Trustee.

(l) The Trustee may request that the Company or Braskem deliver an Officer's Certificate setting forth the names and/or titles of Officers authorized at such time to take specified actions pursuant to this Indenture, which Officer's Certificate may be signed by any Officer authorized to sign an Officer's Certificate, including any Officer specified as so authorized in any such certificate previously delivered and not superseded.

(m) The rights, privileges, protections, immunities and benefits given to the Trustee, including its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and to each agent, custodian and other Person employed to act hereunder.

(n) The Trustee shall not be deemed to have notice of any Default or Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a default is received by a Responsible Officer of the Trustee at the Corporate Trust Office of the Trustee, and any such notice references the Notes or this Indenture.

(o) The Trustee shall not be responsible for delays or failures in performance resulting from acts beyond its control. Such acts shall include but not be limited to acts of God, strikes, lockouts, riots, acts of war, epidemics, governmental regulations superimposed after the fact, fire, communication line failures, computer viruses, power failures, earthquakes, terrorist attacks or other disasters.

(p) Notwithstanding anything contained herein to the contrary, the Trustee shall have no duty or responsibility to monitor the ratings of the Notes or to determine if a Ratings Decline has occurred.

Section 7.03. **Individual Rights of Trustee**. The Trustee and any Paying Agent, Registrar or co-registrar or any other agent of the Company or of the Trustee, in its individual or

any other capacity, may deal with the Company, Braskem or their respective Affiliates with the same rights it would have if it were not Trustee, Paying Agent, Registrar or such other agent.

Section 7.04. **Trustee's Disclaimer**. The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes, it shall not be accountable for the Company's use of the proceeds from the Notes, and it shall not be responsible for any statement of the Company or Braskem in this Indenture or in any document issued in connection with the sale of the Notes or in the Notes other than the Trustee's certificate of authentication.

Section 7.05. **Notice of Defaults and Events of Default**. If a Default or Event of Default occurs and is continuing, and if it is known to a Responsible Officer, the Trustee shall mail to each Holder notice of the Default or Event of Default within 90 days after a Responsible Officer acquires actual knowledge of such Default or Event of Default. Except in the case of a Default or Event of Default in payment of principal of or premium, if any, or interest on any Note, the Trustee may withhold the notice and shall be protected from withholding the notice if and so long as a committee of Responsible Officers of the Trustee in good faith determines that withholding the notice is in the interests of Holders. For all purposes of this Indenture and the Notes, the Trustee shall not be deemed to have knowledge of a Default or Event of Default unless (i) a Responsible Officer of the Trustee has actual knowledge thereof, or (ii) written notice of such Default or Event of Default has been given to the Trustee by the Company or any Holder and received by the Trustee.

Section 7.06. **Compensation and Indemnity**. Braskem and the Company, jointly and severally, agree to pay to the Trustee and any Paying Agent from time to time such compensation as shall be agreed upon in writing for its services. The Trustee's compensation shall not be limited by any law regarding compensation of a trustee of an express trust. Braskem and the Company, jointly and severally, agree to reimburse promptly the Trustee and any Paying Agent upon request for all reasonable out-of-pocket expenses incurred or made by it, including costs of collection, in addition to the compensation for its services. Such expenses shall include the reasonable compensation and expenses, disbursements and advances of the Trustee's and any Paying Agent's agents, counsel, accountants and experts. Payments of any such expenses by Braskem or the Company to the Trustee or any Paying Agent, as the case may be, shall be made free and clear of and without withholding or deduction for or on account of any Brazilian Taxes or U.S. Taxes, unless such withholding or deduction is required by law. In that event, Braskem or the Company shall pay to the Trustee or any Paying Agent, as the case may be, such additional amounts as may be necessary in order that every net payment made by Braskem or the Company to the Trustee and any Paying Agent, as the case may be, after deducting or withholding for or on account of any Brazilian Taxes or U.S. Taxes shall not be less than the amount then due and payable to the Trustee or any Paying Agent, as the case may be; **provided**, **however**, **that** the foregoing obligation to pay additional amounts shall not apply to or in respect of (i) any tax, assessment or other governmental charge which would not have been imposed but for the existence of any present or former connection between the Trustee or such Paying Agent, on the one hand, and Brazil or the United States, on the other hand, other than the mere receipt of payments of such expenses; (ii) any tax, duty, assessment or other governmental charge to the extent that such tax, duty, assessment or other governmental charge would not have been imposed but for the failure of the Trustee or such Paying Agent to comply with any certification,

identification or other reporting requirements concerning the nationality, residence, identity or connection with Brazil or the United States of the Trustee or such Paying Agent if such compliance is required or imposed by law as a precondition to exemption from all or a part of such tax, duty, assessment or other governmental charge; (iii) any tax, assessment or other governmental charge which is payable other than by deduction or withholding from payments of any such expenses; or (iv) any combination of the above. The Company and Braskem, jointly and severally, shall indemnify each of the Trustee and any Paying Agent against any and all loss, liability or expense (including reasonable attorneys' fees and expenses) incurred by it without gross negligence, bad faith or willful misconduct on its part arising out of and in connection with the administration of this Indenture and the performance of its respective duties hereunder, including the costs and expenses of defending itself against any claim or liability and of complying with any process served upon it or any of its officers in connection with the exercise or performance of any of its powers or duties under this Indenture. The Company and Braskem, jointly and severally, undertake to indemnify each Paying Agent and their affiliates against all losses, liabilities, including any and all tax liabilities, which, for the avoidance of doubt, shall include Brazilian taxes and associated penalties, costs, claims, actions, damages, expenses or demands, which any of them may incur or which may be made against any of them as a result of or in connection with the appointment of or the exercise of the powers and duties by any Paying Agent or its affiliates under this Indenture except as may result from its own gross negligence, bad faith or willful misconduct or that of its directors, officers or employees or any of them. For the avoidance of doubt, the obligation in the preceding two sentences to indemnify the Trustee and the Paying Agents shall not apply to or in respect of taxes incurred as a result of the receipt by the Trustee or the Paying Agents of compensation for their services. The Trustee shall notify the Company or Braskem, as the case may be, promptly of any claim for which it may seek indemnity. Failure by the Trustee to so notify the Company or Braskem shall not relieve the Company or Braskem of its obligations hereunder. The Company or Braskem, as the case may be, shall defend the claim and the Trustee may have separate counsel and the Company or Braskem, as the case may be, shall pay the reasonable fees and expenses of such counsel.

To secure the payment obligations of the Company and Braskem in this Section 7.06, the Trustee shall have a lien prior to the Notes on all money or property held or collected by the Trustee or any Paying Agent, except that held in trust to pay principal of and premium, if any, and interest on particular Notes.

The obligations of the Company and Braskem pursuant to this Section 7.06 shall survive the resignation or removal of the Trustee and the satisfaction and discharge of this Indenture. When the Trustee or any Paying Agent incurs expenses after the occurrence of a Default or Event of Default specified in Section 6.01(7), the expenses are intended to constitute expenses of administration under the Bankruptcy Law.

The Company and Braskem acknowledge that the Trustee and the Paying Agent make no representations as to the interpretation or characterization of the transactions herein undertaken for tax or any other purpose, in any jurisdiction. The Company and Braskem represent that they have fully satisfied themselves as to any tax impact of this Indenture before agreeing to the terms herein, and are responsible for any and all federal, state, local, income, franchise, withholding, value added, sales, use, transfer, stamp or other taxes imposed by any jurisdiction in respect of this Indenture.

The Company and Braskem agree to pay any and all stamp and other documentary taxes or duties which may be payable in connection with the execution, delivery, performance and enforcement of this Indenture by the Paying Agents.

Section 7.07. **Replacement of Trustee**. The Trustee may resign at any time by so notifying the Company in writing. The Holders of a majority in principal amount of the Notes may remove the Trustee by so notifying the Trustee in writing and may appoint a successor Trustee. The Company shall remove the Trustee if:

(i) the Trustee fails to comply with Section 7.09;

(ii) the Trustee is adjudged a bankrupt or insolvent;

(iii) a receiver or other public officer takes charge of the Trustee or its property; or

(iv) the Trustee otherwise becomes incapable of acting.

If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason (the Trustee in such event being referred to herein as the retiring Trustee) the Company shall promptly appoint a successor Trustee.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Company. Thereupon the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture. The successor Trustee shall mail a notice of its succession to Holders. The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee, subject to the lien provided for in Section 7.06.

If a successor Trustee does not take office within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee, the Company or the Holders of a majority in principal amount of the Notes may, at the expense of the Company, petition any court of competent jurisdiction for the appointment of a successor Trustee.

If the Trustee fails to comply with Section 7.09, any Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

Notwithstanding the replacement of the Trustee pursuant to this Section 7.07, the Company's and Braskem's obligations under Section 7.06 shall continue for the benefit of the retiring Trustee.

Section 7.08. **Successor Trustee by Merger**. Any corporation or banking association into which the Trustee may be merged or converted or with which it may be consolidated, or any corporation or banking association resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any corporation or banking association to which all or substantially all of the corporate trust business of the Trustee may be sold or otherwise transferred, shall be the successor trustee hereunder without any further act.

In case at the time such successor or successors by merger, conversion or consolidation to the Trustee shall succeed to the trusts created by this Indenture any of the Notes shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Trustee may authenticate such Notes either in the name of any predecessor hereunder or in the name of the successor to the Trustee; and in all such cases such adopted certificates shall have the full force of all provisions within the Notes or in this Indenture relating to the certificate of the Trustee.

Section 7.09. **Eligibility; Disqualification**. The Trustee hereunder shall at all times be a corporation, bank or trust company organized and doing business under the laws of the United States or any state thereof (i) which is authorized under such laws to exercise corporate trust power, (ii) is subject to supervision or examination by governmental authorities, (iii) shall have at all times a combined capital and surplus of at least U.S.$50,000,000 as set forth in its most recent published annual report of condition and (iv) shall have its Corporate Trust Office in The City of New York. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section 7.09, it shall resign immediately in the manner and with the effect specified in Section 7.07.

Section 7.10. **Resignation of a Paying Agent**. Any Paying Agent may resign at any time by so notifying the Trustee and the Company in writing at least 30 days prior to the effectiveness of such resignation.

If a Paying Agent resigns, the Company shall promptly appoint a successor Paying Agent.

Any successor Paying Agent shall have all the rights, powers and duties of its predecessor Paying Agent under this Indenture. The Trustee shall mail a notice of any resignation or succession to Holders.

Notwithstanding the replacement of any Paying Agent pursuant to this Section 7.10, the Company's and Braskem's obligations under Section 7.06 shall continue for the benefit of the resigning Paying Agent.

ARTICLE VIII

DISCHARGE OF INDENTURE; DEFEASANCE

Section 8.01. **Discharge of Liability on Notes**.

(a) When (i) the Company delivers to the Trustee all Outstanding Notes (other than Notes replaced pursuant to Section 2.08) for cancellation or (ii) all Outstanding Notes have become due and payable, whether on a Redemption Date as a result of the mailing of a notice of redemption pursuant to Article III or at Stated Maturity of the Notes, and the Company deposits in trust, for the benefit of the Holders, with the Trustee funds sufficient to pay at Maturity all Outstanding Notes and interest thereon (other than Notes replaced pursuant to Section 2.08), and if in either case the Company pays all other sums payable hereunder by the Company, then this Indenture, and the obligations of the Company pursuant hereto, shall, subject to Sections 8.01(c)

and 8.06, cease to be of further effect. The Trustee shall acknowledge satisfaction and discharge of this Indenture on demand of the Company accompanied by an Officer's Certificate and an Opinion of Counsel (each stating that all conditions precedent herein provided relating to the satisfaction and discharge of this Indenture have been complied with) and at the cost and expense of the Company.

(b) Subject to Sections 8.01(c), 8.02 and 8.06, the Company and Braskem at any time may terminate (i) all their respective obligations under this Indenture, the Notes and the Guarantees ("legal defeasance option") or (ii) their respective obligations under Sections 4.04, 4.06, 4.07, 4.08, 4.10, 5.01(iii) and 5.03 and the operation of Sections 6.01(1), 6.01(2), 6.01(3), 6.01(4), 6.01(5) or 6.01(6) ("covenant defeasance option"). The legal defeasance option may be exercised notwithstanding any prior exercise of the covenant defeasance option.

If the legal defeasance option is exercised, payment of the Notes may not be accelerated because of an Event of Default with respect thereto. If the covenant defeasance option is exercised, payment of the Notes may not be accelerated because of an Event of Default specified in Section 6.01(1), 6.01(2), 6.01(3), 6.01(4) or 6.01(5).

Upon satisfaction of the conditions set forth herein and upon request of the Company, the Trustee shall acknowledge in writing the discharge of the obligations of the Company and Braskem hereunder except those specified in Section 8.01(c).

(c) Notwithstanding Section 8.01(b), the Company's or Braskem's obligations, as the case may be, pursuant to Sections 2.03, 2.04, 2.05, 2.06, 2.07, 2.08, 4.05, 7.06, 7.07, 8.04, 8.05 and 8.06 shall survive until the Notes have been paid in full. Thereafter, the obligations of the Company or Braskem, as the case may be, pursuant to Sections 7.06, 7.07, 8.04 and 8.05 shall survive.

Section 8.02. **Conditions to Defeasance**. The Company or Braskem may exercise the legal defeasance option or the covenant defeasance option only if:

(a) The Company or Braskem irrevocably deposits or causes to be deposited with the Trustee as trust funds in trust, specifically pledged as security for, and dedicated solely to, the benefit of the Holders (the "defeasance trust") pursuant to an irrevocable trust and security agreement in form and substance satisfactory to the Trustee, money or U.S. Government Obligations, or a combination thereof, sufficient for the payment of principal of and premium, if any, and interest on all the Notes to Maturity;

(b) The Company or Braskem delivers to the Trustee a certificate from an internationally recognized firm of independent accountants or investment bank expressing their opinion that the payments of principal of and premium, if any, and interest on the Notes when due and without reinvestment on the deposited U.S. Government Obligations plus any deposited money without investment and after payment of all federal, state and local taxes or other charges or assessments in respect thereof payable by the Trustee shall provide cash at such times and in such amounts as shall be sufficient to pay principal of and premium, if any, and interest on all the Notes when due at Maturity;

(c) In the case of the legal defeasance option, 123 days pass after the deposit is made in accordance with the terms of Section 8.02(a) and during such 123-day period no Default or Event of Default specified in Section 6.01(6) occurs which is continuing at the end of the period;

(d) No Default or Event of Default has occurred and is continuing on the date of such deposit and after giving effect thereto;

(e) The deposit does not constitute a default or event of default under any other material agreement binding on the Company or Braskem, as the case may be;

(f) The trust resulting from the deposit does not constitute, or is not qualified as, a regulated investment company under the U.S. Investment Company Act of 1940, as amended;

(g) In the case of the legal defeasance option, the Company or Braskem delivers to the Trustee an Opinion of Counsel stating that (i) the Company or Braskem, as the case may be, has received from, or there has been published by, the U.S. Internal Revenue Service a ruling, or (ii) since the date of this Indenture there has been a change in the applicable U.S. federal income tax law, in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, the Holders shall not recognize income, gain or loss for U.S. federal income tax purposes as a result of such deposit and defeasance and shall be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred;

(h) In the case of the covenant defeasance option, the Company or Braskem delivers to the Trustee an Opinion of Counsel to the effect that the Holders shall not recognize income, gain or loss for U.S. federal income tax purposes as a result of such covenant defeasance and shall be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such covenant defeasance had not occurred; and

(i) The Company or Braskem delivers to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent to the defeasance and discharge of the Notes as contemplated by this Article VIII have been complied with.

Before or after a deposit, the Company or Braskem may make arrangements satisfactory to the Trustee for the redemption of Notes at a future date in accordance with Article III.

Section 8.03. **Application of Trust Money**. The Trustee shall hold in trust money or U.S. Government Obligations deposited with it pursuant to Section 8.02. It shall apply the deposited money and the money from U.S. Government Obligations through any Paying Agent and in accordance with this Indenture to the payment of principal of and premium, if any, and interest on the Notes.

Section 8.04. **Repayment to Company**. Upon termination of the trust established pursuant to Section 8.02, the Trustee and each Paying Agent shall promptly pay to the Company or Braskem, as the case may be, upon request, any excess cash or U.S. Government Obligations held by them.

Subject to any applicable abandoned property law, the Trustee and each Paying Agent shall pay to the Company, upon request, any money held by them for the payment of principal of or premium, if any, or interest on the Notes that remains unclaimed for two years after the due date for such payment of principal or premium, if any, or interest, and, thereafter, the Trustee and each Paying Agent, as the case may be, shall not be liable for payment of such amounts hereunder and the Holders shall be entitled to such recovery of such amounts only from the Company.

Section 8.05. **Indemnity for U.S. Governmental Obligations**. The Company shall pay and shall indemnify the Trustee against any tax, fee or other charge imposed on or assessed against deposited U.S. Government Obligations or the principal and interest received on such U.S. Government Obligations.

Section 8.06. **Reinstatement**. If the Trustee or any Paying Agent is unable to apply any money or U.S. Government Obligations in accordance with this Article VIII by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the obligations of the Company or Braskem, as the case may be, under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to this Article VIII until such time as the Trustee or such Paying Agent is permitted to apply all such money or U.S. Government Obligations in accordance with this Article VIII; **provided**, **however**, **that**, if the Company or Braskem, as the case may be, has made any payment of principal of or premium, if any, or interest on any Notes because of the reinstatement of its obligations, the Company or Braskem, as the case may be, shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or U.S. Government Obligations held by the Trustee or such Paying Agent.

## ARTICLE IX

## AMENDMENTS

Section 9.01. **Without Consent of Holders**. The Company, when authorized by a Board Resolution, and the Trustee may amend or supplement this Indenture, the Notes or the Guarantees, without notice to or the consent or vote of any Holder, for the following purposes:

(i) to cure any ambiguity, omission, defect or inconsistency (including any inconsistency between the text of this Indenture, the Notes or the Guarantees and the description of this Indenture, the Notes or the Guarantees contained in the final Offering Memorandum relating to the Notes dated July 19, 2011);

(ii) to comply with Article V or Article XI;

(iii) to add guarantees or collateral with respect to the Notes;

(iv) to add to the covenants of the Company or Braskem for the benefit of the Holders;

(v) to surrender any right herein conferred upon the Company or Braskem;

(vi) to evidence and provide for the acceptance of an appointment by a successor Trustee;

(vii) to comply with any requirements of the U.S. Securities and Exchange Commission in connection with any qualification of this Indenture under the U.S. Trust Indenture Act of 1939, as amended;

(viii) to provide for the issuance of additional Notes; or

(ix) to make any other change that does not materially and adversely affect the rights of any Holder;

**provided that**, in the case of clause (i) or (ii) above, the Company has delivered to the Trustee an Opinion of Counsel and an Officer's Certificate, each stating that such amendment or supplement complies with the provisions of this Section 9.01.

Upon the written request of the Company, accompanied by a Board Resolution authorizing the execution of any supplemental indenture, and upon receipt by the Trustee of the documents described in Section 9.05, the Trustee shall join with the Company in the execution of any supplemental indenture authorized or permitted by the terms of this Indenture and to make any further appropriate agreements and stipulations which may be therein contained, but the Trustee shall not be obligated to enter into any such supplemental indenture which affects its own rights, duties or immunities under this Indenture or otherwise.

Section 9.02. **With Consent of Holders**. Except as specified in Section 9.01, the Company, when authorized by a Board Resolution, and the Trustee, together, may amend or supplement this Indenture, the Notes or the Guarantees with the written consent of the Holders of at least a majority in principal amount of the Outstanding Notes for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or modifying in any manner the rights of the Holders under this Indenture; **provided**, **however**, **that**, without the consent of each Holder affected thereby, an amendment may not:

(i) reduce the rate of or extend the time for payment of interest on any Note;

(ii) reduce the principal of or extend the Stated Maturity of any Note;

(iii) reduce the amount payable upon the redemption of any Note or upon an Offer to Purchase or change the time at which any Note may be redeemed or purchased upon an Offer to Purchase;

(iv) change the currency or place of payment of principal of or premium, if any, or interest on, any Note;

(v) impair the right to institute suit for the enforcement of any payment on or with respect to any Note;

(vi) waive a Default or Event of Default in payment of principal of and premium, if any, and interest on the Notes;

(vii) amend or modify any provisions of the payment obligations under Guarantees in a manner that would materially and adversely affect the Holders;

(viii) reduce the principal amount of Notes whose Holders must consent to any amendment, supplement or waiver; or

(ix) make any change in this first paragraph of this Section 9.02.

Upon the written request of the Company, accompanied by a Board Resolution authorizing the execution of any such supplemental indenture, and upon the filing with the Trustee of evidence of the consent of the Holders as aforesaid, and upon receipt by the Trustee of the documents described in Section 9.05, the Trustee shall join with the Company in the execution of such supplemental indenture but the Trustee shall not be obligated to enter into any such supplemental indenture which affects its own rights, duties or immunities under this Indenture or otherwise.

The Company shall mail to Holders (with a copy to the Trustee) prior written notice of any amendment proposed to be adopted under this Section 9.02.

It shall not be necessary for the consent of the Holders under this Section 9.02 to approve the particular form of any proposed amendment, but it shall be sufficient if such consent approves the substance thereof.

After an amendment under this Section 9.02 becomes effective, the Company or Braskem shall mail to Holders a notice briefly describing such amendment. The failure to give such notice to all Holders, or any defect therein, shall not impair or affect the validity of an amendment under this Section 9.02.

Section 9.03. **Revocation and Effect of Consents and Waivers**.

(a) A consent to an amendment or a waiver by a Holder of Notes shall bind the Holder and every subsequent Holder of that Note or portion of the Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent or waiver is not made on the Note. However, any such Holder or subsequent Holder may revoke the consent or waiver as to such Holder's Note or portion of the Note if the Trustee receives the written notice of revocation at least one Business Day prior to the date the amendment or waiver becomes effective. After it becomes effective, an amendment or waiver shall bind every Holder.

(b) The Company may, but shall not be obligated to, fix a record date for the purpose of determining the Holders entitled to give their consent or take any other action described above. If a record date is fixed, then, notwithstanding Section 9.03(a), those Persons who were Holders at such record date (or their duly designated proxies), and only those Persons,

shall be entitled to give such consent or to revoke any consent previously given or to take any such action, whether or not such Persons continue to be Holders after such record date. No such consent shall be valid or effective for more than 120 days after such record date.

Section 9.04. **Notation on or Exchange of Notes**. If an amendment changes the terms of a Note, the Company may require the Holder to deliver the Note to the Trustee. If so instructed by the Company, the Trustee may place an appropriate notation on the Note regarding the changed terms and return it to the Holder. Alternatively, if the Company so determines, the Company in exchange for the Note shall issue and the Trustee shall authenticate a new Note that reflects the changed terms. Failure to make the appropriate notation or to issue a new Note shall not affect the validity of such amendment.

Section 9.05. **Trustee to Sign Amendments**. The Trustee shall sign any amendment authorized pursuant to this Article IX if the amendment, waiver or supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee. In signing such amendment, waiver or supplement, the Trustee shall be entitled to receive indemnity satisfactory to the Trustee and, subject to Section 7.01, shall be fully protected in relying upon an Officer's Certificate and an Opinion of Counsel provided pursuant to Section 13.3, each of which shall state, in addition to the statements required by Section 13.4, that such amendment, waiver or supplemental indenture is authorized or permitted by this Indenture and that it shall be valid and binding upon the Company and Braskem in accordance with its terms, as conclusive evidence of the foregoing.

Section 9.06. **Payment for Consent**. Neither Braskem nor any of its Affiliates shall, directly or indirectly, pay or cause to be paid any consideration, whether by way of interest, fee or otherwise, to any Holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Indenture, the Notes or the Guarantees unless such consideration is offered to be paid or agreed to be paid to all Holders which so consent, waive or agree to amend in the time frame set forth in solicitation documents relating to such consent, waiver or agreement.

## ARTICLE X

## GUARANTEES

Section 10.01. **Unconditional Guarantees**. Braskem hereby unconditionally guarantees to each Holder of a Note authenticated and delivered by the Trustee, and to the Trustee on behalf of such Holder, the full and punctual payment of the principal of and premium, if any, and interest (including any Additional Amount in respect of any thereof) on such Note when and as the same shall become due and payable, whether at Stated Maturity, upon declaration of acceleration, redemption or otherwise, in accordance with the terms of such Note and of this Indenture and all amounts payable by the Company under the Indenture (the "Guarantees"). In case of the failure of the Company punctually to make any such payment, Braskem hereby agrees to pay or cause such payment to be made punctually when and as the same shall become due and payable, whether at Stated Maturity, upon declaration of acceleration or redemption or otherwise, and as if such payment were made by the Company.

Braskem agrees that its obligations hereunder shall be unconditional, irrespective of the validity, regularity or enforceability of the Notes or this Indenture, the absence of any action to enforce the same, any exchange, or any release or amendment or waiver of any term of any Guarantee of all or any of the Notes, or any consent to departure from any requirement of any Guarantee of all or any of the Notes, the election by the Trustee or any of the Holders in any proceeding under any applicable Bankruptcy Law, the disallowance, under any applicable Bankruptcy Law, of all or any portion of the claims of the Trustee or any of the Holders for payment of any of the Notes (including any interest or Additional Amounts), any waiver or consent by the Holder of such Note or by the Trustee with respect to any provisions thereof or of this Indenture or with respect to the provisions of this Article X as they apply to Braskem, the obtaining of any judgment against the Company or any action to enforce the same or any other circumstances which might otherwise constitute a legal or equitable discharge or defense of Braskem. Braskem hereby waives the benefits of diligence, presentment, demand of payment, any requirement that the Trustee or any of the Holders protect, secure, perfect or insure any security interest in or other Lien on any property subject thereto or exhaust any right or take any action against the Company or any other Person, filing of claims with a court in the event of insolvency or bankruptcy of the Company, any right to require a proceeding first against the Company, protest or notice with respect to such Note or the Indebtedness evidenced thereby and all demands whatsoever, and covenants that its guarantee shall not be discharged in respect of such Note except by complete performance of the obligations contained in such Note and in such Guarantee. Braskem hereby agrees that, in the event of a Default in payment of principal or premium, if any, or interest (or Additional Amounts, if any) on such Note, whether at Stated Maturity, upon declaration of acceleration, redemption or otherwise, legal proceedings may be instituted by the Trustee on behalf of, or by, the Holder of such Note, subject to the terms and conditions set forth in this Indenture, directly against Braskem to enforce its Guarantees without first proceeding against the Company. Braskem agrees if, after the occurrence and during the continuance of an Event of Default, the Trustee or any of the Holders are prevented by applicable law from exercising their respective rights to accelerate the Stated Maturity of the Notes, to collect interest on the Notes, or to enforce or exercise any other right or remedy with respect to the Notes, to pay to the Trustee for the account of the Holders, upon demand thereof, the amount that would otherwise have been due and payable had such rights and remedies been permitted to be exercised by the Trustee or any of the Holders.

Braskem hereby waives any benefits to which it is entitled under Articles 333, 827, 828, 834, 835, 838 and 839 of the Brazilian Civil Code, and Article 595 of the Brazilian Code of Civil Procedure.

The Guarantees shall remain in full force and effect and continue to be effective should any petition be filed by or against the Company for liquidation or reorganization, should the Company become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of the Company's assets, and shall, to the fullest extent permitted by law, continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Notes is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by an obligee on the Notes whether as a "voidable preference," "fraudulent transfer," or otherwise, all as though such payment or performance has not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Notes shall, to the fullest extent permitted by law,

be reinstated and deemed reduced only by such amount paid and not so rescinded, restored or returned.

Rights of Holders to payment in full under the Notes pursuant to the Guarantees shall be equal in right of payment with all other existing and future senior unsecured obligations of Braskem, subject to certain statutory preferences under applicable law, and senior in right of payment to Braskem's subordinated debt.

Section 10.02. **Execution and Delivery of the Guarantees**. The form of Guarantee to be annexed to the Notes is set forth in Exhibit B. Braskem shall execute its Guarantee to be annexed to each Note authenticated and delivered by the Trustee.

The Guarantees shall be executed on behalf of Braskem by an Officer of Braskem. The signature of any Officer on the Guarantee may be manual or facsimile.

A Guarantee bearing the manual or facsimile signatures of individuals who were at any time the proper officers of Braskem shall bind Braskem, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of the Note to which such Guarantee is annexed or did not hold such offices at the date of such Guarantee.

The delivery of any Note by the Trustee, after the authentication thereof hereunder, shall constitute due delivery of the Guarantee annexed thereto on behalf of Braskem. Braskem agrees that its Guarantee set forth in Section 10.1 shall remain in full force and effect notwithstanding any failure to annex a Guarantee to any Note.

Section 10.03. **Release of Braskem**.

(a) Concurrently with any consolidation or merger of Braskem or conveyance, transfer or lease of all or substantially all of the assets of Braskem as permitted by Section 5.01, and upon delivery to the Trustee of an Officer's Certificate and an Opinion of Counsel to the effect that such consolidation, merger, sale, conveyance or lease was made in accordance with Section 5.01, the Trustee shall execute any documents reasonably required in order to evidence the release of Braskem from its obligations under the Guarantees and under this Article X.

(b) Concurrently with the legal defeasance of the Notes under Section 8.01 or the covenant defeasance of the Notes under Section 8.01, Braskem shall be released from all of its obligations under the Guarantees and under this Article X.

ARTICLE XI

SUBSTITUTION OF THE COMPANY AS ISSUER

Section 11.01. **Substitution of the Company as Issuer**.

(a) Notwithstanding any other provision contained in this Indenture, the Company may, without the consent of any Holder (and by purchasing any Notes, each Holder expressly consents to the provisions of this Article XI), be substituted by (i) Braskem or (ii) any

Wholly-Owned Subsidiary of Braskem as principal debtor (in such capacity, the "Substituted Issuer") in respect of the Notes; **provided that** the following conditions are satisfied:

(i) such documents shall be executed by the Substituted Issuer, the Company, Braskem and the Trustee as may be necessary to give full effect to such substitution, including a supplemental indenture to this Indenture pursuant to which the Substituted Issuer assumes all of the Company's obligations under this Indenture and the Notes (such documents collectively, the "Issuer Substitution Documents") and (without limiting the generality of the foregoing) pursuant to which the Substituted Issuer shall undertake in favor of each Holder to be bound by the terms and conditions of the Notes and the provisions of this Indenture as fully as if the Substituted Issuer had been named in the Notes and this Indenture as the principal debtor in respect of the Notes in place of the Company and, unless Braskem is the Substituted Issuer or Braskem's then existing Guarantee remains in full force and effect following such substitution, Braskem shall unconditionally and irrevocably guarantee (the "Substitute Guarantee") in favor of each Holder the payment of all sums payable by the Substituted Issuer as such principal debtor on the same terms *mutatis mutandis* as the Notes;

(ii) the Issuer Substitution Documents shall contain a covenant by the Substituted Issuer and/or such other provisions as may be necessary to indemnify each Holder and beneficial owner of the Notes against (I) all taxes or duties which arise by reason of a law or regulation in effect or contemplated on the effective date of such substitution, which may be incurred or levied against such Holder or beneficial owner of the Notes as a result of any substitution pursuant to the conditions set forth in this Article XI and which would not have been so incurred or levied had such substitution not been made, and (II) only if the Substituted Issuer is organized in a jurisdiction other than the United States of America, any State thereof or the District of Columbia, against all taxes or duties which are imposed on such Holder or beneficial owner of the Notes by any political subdivision or taxing authority of any country in which such Holder or beneficial owner of the Notes resides or is subject to any such tax or duty and which would not have been so imposed had such substitution not been made, in each case, subject to similar exceptions set forth under Section 4.05(a)(ii) through Section 4.05(a)(xi) *mutatis mutandis*; **provided**, **that** any Holder making a claim with respect to such tax indemnity shall provide the Company with notice of such claim, along with supporting documentation, within four weeks of the announcement of the substitution of the Company as issuer;

(iii) the Company shall have delivered, or caused the delivery, to the Trustee an Opinion of Counsel addressed to the Company, the Substituted Issuer and the Trustee from an internationally recognized firm of counsel in the jurisdiction of organization of the Substituted Issuer, to the effect that the Issuer Substitution Documents and the Notes constitute legal, valid and binding obligations of the Substituted Issuer, enforceable against the Substituted Issuer in accordance with their terms (subject, as to the enforcement of remedies, to applicable bankruptcy, reorganization, insolvency, fraudulent transfer, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general principles of equity), such Opinion of Counsel to be dated not more than five days prior to the date of substitution of the Substituted Issuer for the Company;

(iv) the Company shall have delivered, or caused the delivery, to the Trustee of an Opinion of Counsel addressed to the Company, the Substituted Issuer and the

Trustee from an internationally recognized firm of U.S. counsel, to the effect that (A) the Issuer Substitution Documents (including the Substitute Guarantee or the Guarantees of Braskem, as applicable) constitute legal, valid and binding obligations of the parties thereto under the law of the State of New York, enforceable against such parties in accordance with their terms (subject, as to the enforcement of remedies, to applicable bankruptcy, reorganization, insolvency, fraudulent transfer, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general principles of equity), and (B) no consent, approval, authorization or order of any U.S. federal or New York State court or governmental agency or regulatory body is required for the consummation of the transactions contemplated by the Issuer Substitution Documents (including the Substitute Guarantee or the Guarantees of Braskem, as applicable) and compliance with the terms thereof by each of the Substituted Issuer, the Company and Braskem, except as may be required by U.S. state securities laws, such Opinion of Counsel to be dated not more than five days prior to the date of substitution of the Substituted Issuer for the Company;

(v) the Substituted Issuer shall have appointed a process agent in the Borough of Manhattan in The City of New York to receive service of process on its behalf in relation to any legal action or proceedings arising out of or in connection with the Notes, the Indenture and the Issuer Substitution Documents, which appointment shall be consistent with the appointment by the Company of the Process Agent set forth in Section 13.10;

(vi) no Event of Default shall have occurred or be continuing; and

(vii) such substitution shall comply with all applicable requirements under the laws of the jurisdiction of organization of the Substitute Issuer, New York and Brazil.

(b) Upon compliance with the provisions of this Article XI and effectiveness of such substitution, the Substituted Issuer and the Company shall deliver to the Trustee an Officer's Certificate certifying that the terms of this Article XI have been complied with and attaching copies of all documents referenced in or contemplated by this Article XI.

(c) Upon the execution of the Issuer Substitution Documents and the Substitute Guarantee, if applicable, and compliance with the other conditions set forth in Section 11.1(a), the Substituted Issuer shall be deemed to be named in the Notes as the principal debtor in place of the Company and the Notes shall thereupon be deemed to be amended to give effect to such substitution, the Company will be released from all of its obligations in respect of the Notes and this Indenture, including, without limitation, compliance with the covenants contained in Section 4.10 and, in the event that Braskem is the Substituted Issuer, Section 4.10 shall not apply to the Substituted Issuer.

(d) The Issuer Substitution Documents shall be delivered to and held by the Trustee for so long as any Note remains outstanding and for so long as any claim may be made against the Substituted Issuer or the Company by any Holder in respect of the Notes or the Issuer Substitution Documents shall not have been finally adjudicated, settled or discharged. The Substituted Issuer and the Company shall acknowledge in the Issuer Substitution Documents the right of every Holder to the production of the Issuer Substitution Documents for the enforcement of any of the Notes, the Indenture or the Issuer Substitution Documents.

(e) Not later than 10 Business Days after the execution of the Issuer Substitution Documents, the Substituted Issuer shall give notice thereof to the Holders in accordance with Section 13.2.

(f) Notwithstanding any other provision of this Indenture, Braskem shall (unless it is the Substituted Issuer) do or cause to be done all acts and things and promptly execute and deliver any documents or instruments, including a Substitute Guarantee and a legal opinion of internationally recognized Brazilian counsel, that may be required, or that the Trustee may reasonably request, to ensure that the Guarantees or the Substitute Guarantee, as applicable, shall continue in full force and effect for the benefit of the Holders and beneficial owners of the Notes following the substitution pursuant to this Article XI.

## ARTICLE XII

## MEETINGS OF HOLDERS

Section 12.01. **Purposes for Which Meetings May Be Called**. A meeting of Holders may be called at any time and from time to time pursuant to the provisions of this Article XII for any of the following purposes:

(a) to give any notice to the Company, Braskem or the Trustee, or to give any directions to the Trustee, or to waive or to consent to the waiving of any Default or Event of Default hereunder and its consequences, or to take any other action authorized to be taken by Holders pursuant to any of the provisions of Article VI;

(b) to remove the Trustee or appoint a successor Trustee pursuant to the provisions of Article VII;

(c) to consent to an amendment, supplement or waiver pursuant to the provisions of Section 9.02; or

(d) to take any other action authorized to be taken by or on behalf of the Holders of any specified aggregate principal amount of the Notes under any other provision of this Indenture, or authorized or permitted by law.

Section 12.02. **Manner of Calling Meetings**. The Trustee may at any time call a meeting of Holders to take any action specified in Section 12.1, to be held at such time and at such place in The City of New York, New York or elsewhere as the Trustee shall determine. Notice of every meeting of Holders, setting forth the time and place of such meeting and in general terms the action proposed to be taken at such meeting, shall be mailed by the Trustee, first-class postage prepaid, to the Company, Braskem and the Holders at their last addresses as they shall appear on the registration books of the Registrar not less than 10 nor more than 60 days prior to the date fixed for a meeting.

Any meeting of Holders shall be valid without notice if the Holders of all Outstanding Notes are present in Person or by proxy, or if notice is waived before or after the meeting by the Holders of all Outstanding Notes, and if the Company, Braskem and the Trustee are either present by duly authorized representatives or have, before or after the meeting, waived notice.

Section 12.03. **Call of Meetings by Company, Braskem or Holders**. In case at any time the Company or Braskem, in each case pursuant to a Board Resolution, or the Holders of not less than 10% in aggregate principal amount of the Outstanding Notes shall have requested the Trustee to call a meeting of Holders to take any action specified in Section 12.1, by written request setting forth in reasonable detail the action proposed to be taken at the meeting, and the Trustee shall not have mailed the notice of such meeting within 20 days after receipt of such request, then the Company, Braskem or the Holders of Notes in the amount above specified may determine the time and place in The City of New York, New York or elsewhere for such meeting and may call such meeting for the purpose of taking such action, by mailing or causing to be mailed notice thereof as provided in Section 12.2, or by causing notice thereof to be published at least once in each of two successive calendar weeks (on any Business Day during such week) in a newspaper or newspapers published in the English language, customarily published at least five days a week and of general circulation in (i) The City of New York and (ii) so long as the Notes continue to be listed on the Singapore Stock Exchange, Singapore,, the first such publication to be not less than 10 nor more than 60 days prior to the date fixed for the meeting.

Section 12.04. **Who May Attend and Vote at Meetings**. To be entitled to vote at any meeting of Holders, a Person shall (i) be a registered Holder of one or more Notes, or (ii) be a Person appointed by an instrument in writing as proxy for the registered Holder or Holders of Notes. The only Persons who shall be entitled to be present or to speak at any meeting of Holders shall be the Persons entitled to vote at such meeting and their counsel and any representatives of the Trustee and its counsel and any representatives of the Company or Braskem and their respective counsel.

Section 12.05. **Regulations May Be Made by Trustee; Conduct of the Meeting; Voting Rights; Adjournment**. Notwithstanding any other provision of this Indenture, the Trustee may make such reasonable regulations as it may deem advisable for any action by or any meeting of Holders, in regard to proof of the holding of Notes and of the appointment of proxies, and in regard to the appointment and duties of inspectors of votes, and submission and examination of proxies, certificates and other evidence of the right to vote, and such other matters concerning the conduct of the meeting as it shall think appropriate. Such regulations may fix a record date and time for determining the Holders of record of Notes entitled to vote at such meeting, in which case those and only those Persons who are Holders of Notes at the record date and time so fixed, or their proxies, shall be entitled to vote at such meeting whether or not they shall be such Holders at the time of the meeting.

The Trustee shall, by an instrument in writing, appoint a temporary chairman of the meeting, unless the meeting shall have been called by the Company, Braskem or the Holders as provided in Section 12.3, in which case the Company, Braskem or the Holders calling the meeting, as the case may be, shall in like manner appoint a temporary chairman. A permanent chairman and a permanent secretary of the meeting shall be elected by vote of the Holders of a majority in principal amount of the Notes represented at the meeting and entitled to vote.

At any meeting each Holder or proxy shall, subject to the provisions of Section 12.4, be entitled to one vote for each U.S.$1,000 principal amount of Notes held or represented by him or her; **provided**, **however**, **that** no vote shall be cast or counted at any meeting in respect of any Notes challenged as not Outstanding and ruled by the chairman of the meeting to be not

Outstanding. The chairman may adjourn any such meeting if he is unable to determine whether any Holder or proxy shall be entitled to vote at such meeting. The chairman of the meeting shall have no right to vote other than by virtue of Notes held by him or instruments in writing as aforesaid duly designating him as the proxy to vote on behalf of other Holders. Any meeting of Holders duly called pursuant to the provisions of Section 12.2 or 12.3 may be adjourned from time to time by vote of the Holders of a majority in aggregate principal amount of the Notes represented at the meeting and entitled to vote, and the meeting may be held as so adjourned without further notice.

Section 12.06. **Voting at the Meeting and Record to Be Kept**. The vote upon any resolution submitted to any meeting of Holders shall be by written ballots on which shall be subscribed the signatures of the Holders of Notes or/of their representatives by proxy and the principal amount of the Notes voted by the ballot. The permanent chairman of the meeting shall appoint two inspectors of votes, who shall count all votes cast at the meeting for or against any resolution and shall make and file with the secretary of the meeting their verified written reports in duplicate of all votes cast at the meeting. A record in duplicate of the proceedings of each meeting of Holders shall be prepared by the secretary of the meeting and there shall be attached to such record the original reports of the inspectors of votes on any vote by ballot taken thereat and affidavits by one or more Persons having knowledge of the facts, setting forth a copy of the notice of the meeting and showing that such notice was mailed as provided in Section 12.2. The record shall be signed and verified by the affidavits of the permanent chairman and the secretary of the meeting and one of the duplicates shall be delivered to the Company (with a copy to Braskem) and the other to the Trustee to be preserved by the Trustee, the latter to have attached thereto the ballots voted at the meeting.

Any record so signed and verified shall be conclusive evidence of the matters therein stated.

Section 12.07. **Exercise of Rights of Trustee or Holders May Not Be Hindered or Delayed by Call of Meeting**. Nothing contained in this Article XII shall be deemed or construed to authorize or permit, by reason of any call of a meeting of Holders or any rights expressly or impliedly conferred hereunder to make such call, any hindrance or delay in the exercise of any right or rights conferred upon or reserved to the Trustee or to the Holders under any of the provisions of this Indenture or of the Notes.

Section 12.08. **Procedures Not Exclusive**. The procedures set forth in this Article XII are not exclusive and the rights and obligations of the Company, Braskem, the Trustee and the Holders under other Articles of this Indenture (including Articles VI, VII, VIII, IX and X) shall in no way be limited by the provisions of this Article XII.

## ARTICLE XIII

## MISCELLANEOUS

Section 13.01. **Provisions of Indenture and Notes for the Sole Benefit of Parties and Holders of Notes**. Nothing in this Indenture, the Notes or the Guarantees, expressed or implied, shall give to any Person other than the parties hereto and their successors hereunder and the

Holders of the Notes any benefit or any legal or equitable right, remedy or claim under this Indenture, the Notes or the Guarantees.

Section 13.02. **Notices**. Any request, demand, authorization, direction, consent, notice, waiver or other communication or document provided or permitted by this Indenture to be made upon, given, provided or furnished to, or filed with, any party to this Indenture shall, except as otherwise expressly provided herein, be deemed to have been received only upon actual receipt thereof by prepaid first class mail, courier or telecopier, addressed to the relevant party as follows:

To the Company:

Braskem America Finance Company
1735 Market Street
28th Floor
Philadelphia, PA 19013
USA
Attention: Chief Financial Officer
Telephone: 215-841-8133
Telecopy: 215-841-3104

To Braskem:

Braskem S.A.
Avenida das Nações Unidas, 8501
4th Floor
São Paulo, SP
CEP 05425-070
Brazil
Attention: Chief Financial Officer
Telephone: + 55-11-3576-9413
Telecopy: + 55-11-3576-9197

To the Trustee:

The Bank of New York Mellon, as Trustee
101 Barclay Street, 4E
Global Trust Services, Americas
New York, New York 10286
U.S.A.
Attention: Global Finance Americas
Telephone: 212-815-5537
Telecopy: 212-815-5802

Any party by notice to the other parties may designate additional or different addresses for subsequent notices or communications.

Where this Indenture provides for the giving of notice to Holders, such notice shall be deemed to have been given upon (i) the mailing of first class mail, postage prepaid, of such notice to Holders of the Notes at their address as it appears in the Register; **provided that** for so long as Global Notes are outstanding, notices to be given to Holders will be given to the Depositary, in accordance with its Applicable Procedures as in effect from time to time, and (ii) for so long as the Notes continue to be listed on the Singapore Stock Exchange and the rules of this stock exchange so require, publication of such notice to the Holders of the Notes in English in a leading newspaper having general circulation in Singapore (which is expected to be The Business Times, Singapore Edition) or, if such publication is not practicable, in one other leading English language daily newspaper with general circulation in Singapore, such newspaper being published on at least five days a week in morning editions, whether or not it shall be published in Saturday, Sunday or holiday editions. Any such notice shall be deemed to have been delivered on the date of first publication. All notices to the Holders shall be at the expense of the Issuer or Braskem.

The Trustee may rely upon and comply with instructions or directions sent via unsecured facsimile or email transmission and the Trustee shall not be liable for any loss, liability or expense of any kind incurred by the Issuer, Braskem or the Holders due to the Trustee's reliance upon and compliance with instructions or directions given by unsecured facsimile or email transmission; **provided**, **however**, **that** such losses have not arisen from the negligence or willful misconduct of the Trustee, it being understood that the failure of the Trustee to verify or confirm that the person providing the instructions or directions, is, in fact, an authorized person does not constitute negligence or willful misconduct.

The Company shall also cause all other such publications of such notices as may be required from time to time by applicable Brazilian law, including those required under the applicable regulations issued by the CVM.

Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders. If a notice or communication is mailed to a Holder in the manner provided above, it is duly given, whether or not the addressee receives it.

Section 13.03. **Officer's Certificate and Opinion of Counsel as to Conditions Precedent**. Upon any request or application by the Company or Braskem to the Trustee to take or refrain from taking any action under this Indenture, the Company or Braskem, respectively, shall furnish to the Trustee:

(i) an Officer's Certificate in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 13.4) stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(ii) an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 13.4) stating that, in the opinion of such counsel, all such conditions precedent have been complied with.

Section 13.04. **Statements Required in Officer's Certificate or Opinion of Counsel**. Each certificate or opinion with respect to compliance with a covenant or condition provided for in this Indenture shall include:

(i) a statement that each Person making or rendering such Officer's Certificate or Opinion of Counsel has read such covenant or condition and the related definitions;

(ii) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such Officer's Certificate or Opinion of Counsel are based;

(iii) a statement that, in the opinion of each such Person, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(iv) a statement as to whether or not, in the opinion of each such Person, such covenant or condition has been complied with.

Section 13.05. **Rules by Trustee, Registrar, Paying Agent and Transfer Agents**. The Trustee may make reasonable rules for action by or a meeting of Holders. The Registrar, the Paying Agents and the Transfer Agents may make reasonable rules for their functions.

Section 13.06. **Currency Indemnity**. U.S. Dollars are the sole currency of account and payment for all sums payable by the Company or Braskem under or in connection with the Notes, including damages. Any amount received or recovered in a currency other than U.S. Dollars (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding-up or dissolution of Braskem, the Company or otherwise) by any Holder of a Note in respect of any sum expressed to be due to it from the Company or Braskem shall only constitute a discharge of the Company or Braskem, as the case may be, to the extent of the U.S. Dollar amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so). If that U.S. Dollar amount is less than the U.S. Dollar amount expressed to be due to the recipient under any Notes, the Company or Braskem, as the case may be, shall indemnify such Holder against any loss sustained by it as a result; and if the amount of U.S. Dollars so purchased is greater than the sum originally due to such Holder, such Holder shall, by accepting Notes, be deemed to have agreed to repay such excess. In any event, the Company or Braskem, as the case may be, shall indemnify the recipient against the cost of making any such purchase. For the purposes of this Section 13.6, it shall be sufficient for the Holder of Notes to certify in a satisfactory manner (indicating the sources of information used) that it would have suffered a loss had an actual purchase of U.S. Dollars been made with the amount so received in that other currency on the date of receipt or recovery (or, if a purchase of U.S. Dollars on such date had not been practicable, on the first date on which it would have been practicable, it being required that the need for a change of date be certified in the manner mentioned above). These indemnities constitute a separate and independent obligation from the other obligations of the Company and Braskem, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by any Holder of Notes and shall continue in full force and effect despite

any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Notes.

Section 13.07. **No Recourse Against Others**. No director, officer, employee, direct or indirect shareholder or incorporator, as such, of the Company, Braskem or the Trustee shall have any liability for any obligations of the Company, Braskem or the Trustee, respectively, under this Indenture, the Notes or the Guarantees or for any claim based on, in respect of or by reason of such obligations or their creation. By accepting a Note, each Holder shall waive and release all such liability. The waiver and release shall be part of the consideration for the issue of the Notes.

Section 13.08. **Legal Holidays**. In any case where any Payment Date or Redemption Date of any Note shall not be a Business Day, then (notwithstanding any other provision of this Indenture or of the Notes) payment of interest or premium, if any, or principal need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on the Payment Date or Redemption Date, as the case may be; **provided that** no interest shall accrue for the period from and after such Payment Date or Redemption Date, as the case may be.

Section 13.09. **Governing Law; Waiver of Jury Trial**.

**THIS INDENTURE, THE NOTES AND THE GUARANTEES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

**EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING AMONG THE PARTIES HERETO ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES, THE GUARANTEES OR THE TRANSACTION CONTEMPLATED HEREBY OR THEREBY.**

**For the purposes of article 9, paragraph 2, of the Brazilian Decree-Law No. 4,657 dated September 4, 1942, as amended, and for no other purposes whatsoever, the transactions contemplated in this Indenture and the Notes has been proposed to the Trustee and Braskem by the Company.**

Section 13.10. **Consent to Jurisdiction; Waiver of Immunities**.

(a) Each of the parties hereto hereby irrevocably submits to the non-exclusive jurisdiction of any New York state or U.S. federal court sitting in the Borough of Manhattan in The City of New York, New York with respect to actions brought against it as a defendant in respect of any suit, action or proceeding or arbitral award arising out of or relating to this Indenture, the Notes or the Guarantees or any transaction contemplated hereby or thereby (a "Proceeding"), and irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts. Each of the parties hereto irrevocably waives, to the fullest extent it may do so under applicable law, any objection which it may now or hereafter have to the laying of the venue of any such Proceeding brought in any such court and any claim that any such Proceeding brought in any such court has been brought in an

inconvenient forum. Each of the Company and Braskem irrevocably appoints National Corporate Research, Ltd. (the "Process Agent"), with an office at 10 East 40th Street, 10th Floor, New York, New York 10016, as its authorized agent to receive on behalf of it and its property service of copies of the summons and complaint and any other process which may be served in any Proceeding. If for any reason such Person shall cease to be such agent for service of process, the Company or Braskem, as the case may be, shall forthwith appoint a new agent of recognized standing for service of process in the State of New York and deliver to the Trustee a copy of the new agent's acceptance of that appointment within 30 days. Nothing herein shall affect the right of the Trustee, any Paying Agent or any Holder to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against the Company or Braskem, as the case may be, in any other court of competent jurisdiction.

(b) Each of the Company and Braskem hereby irrevocably appoints the Process Agent as its agent to receive, on behalf of itself and its property, service of copies of the summons and complaint and any other process which may be served in any such suit, action or proceeding brought in such New York State or U.S. federal court sitting in the Borough of Manhattan in The City of New York, New York. Such service shall be made by delivering by hand a copy of such process to the Company or Braskem, as the case may be, in care of the Process Agent at the address specified above. Each of the Company and Braskem hereby irrevocably authorizes and directs the Process Agent to accept such service on its behalf. Failure of the Process Agent to give notice to the Company or Braskem, as the case may be, or failure of the Company or Braskem, as the case may be, to receive notice of such service of process shall not affect in any way the validity of such service on the Process Agent or the Company or Braskem. As an alternative method of service, each of the Company and Braskem also irrevocably consents to the service of any and all process in any such Proceeding by the delivery by hand of copies of such process to the Company or Braskem, as the case may be, at its address specified in Section 13.2 or at any other address previously furnished in writing by the Company or Braskem to the Trustee. Each of the Company and Braskem covenants and agrees that it shall take any and all reasonable action, including the execution and filing of any and all documents, that may be necessary to continue the designation of the Process Agent above in full force and effect during the term of the Notes, and to cause the Process Agent to continue to act as such.

(c) Nothing in this Section 13.10 shall affect the right of any party, including the Trustee, any Paying Agent, any Transfer Agent or any Holder, to serve legal process in any other manner permitted by law or affect the right of any party to bring any action or proceeding against any other party or its property in the courts of other competent jurisdictions.

(d) Each of the Company and Braskem irrevocably agrees that, in any proceedings anywhere (whether for an injunction, specific performance or otherwise), no immunity (to the extent that it may at any time exist, whether on the grounds of sovereignty or otherwise) from such proceedings, from attachment (whether in aid of execution, before judgment or otherwise) of its assets or from execution of judgment shall be claimed by it or on its behalf or with respect to its assets, except to the extent required by applicable law, any such immunity being irrevocably waived, to the fullest extent permitted by applicable law. Each of the Company and Braskem irrevocably agrees that, where permitted by applicable law, it and its assets are, and shall be, subject to such proceedings, attachment or execution in respect of its obligations under this Indenture, the Notes or the Guarantees.

Section 13.11. **Successors and Assigns**. All covenants and agreements of each of the Company and Braskem in this Indenture, the Notes and the Guarantees shall bind its respective successors and assigns, whether so expressed or not. All agreements of the Trustee in this Indenture shall bind its successors.

Section 13.12. **Multiple Originals**. The parties may sign any number of copies of this Indenture. Each signed copy shall be an original, but all of them together represent the same agreement. One signed copy is enough to prove this Indenture.

Section 13.13. **Severability Clause**. In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby. To the extent permitted by applicable law, the parties hereby waive any provision of law which renders any term or provision hereof invalid or unenforceable in any respect.

Section 13.14. **Tax Purposes**. The Company and Braskem agree to treat, and each Holder of a Note (or a beneficial ownership interest therein) by accepting a Note (or a beneficial ownership interest therein) shall be deemed to have agreed to treat, and all such parties shall treat, the Notes as debt for all U.S. federal, state and local income and franchise tax purposes.

Section 13.15. **Patriot Act**. The parties hereto acknowledge that, in accordance with Section 326 of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (as amended, modified or supplemented from time to time, the "**USA Patriot Act**"), the Trustee, like all financial institutions, is required to obtain, verify and record information that identifies each person or legal entity that opens an account. The parties to this Indenture agree that they will provide the Trustee with such information as the Trustee may request in order for the Trustee to satisfy the requirements of the USA Patriot Act.

[*Signature page follows*]

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed as of the date first written above.

BRASKEM AMERICA FINANCE COMPANY,
as Issuer

By: ______________________________
Name: Gustavo Sampaio Valverde
Title: Vice President and Secretary

By: ______________________________
Name: Renato Bruno dos S. Monteiro
Title: Vice President

BRASKEM S.A.,
as Guarantor

By: ______________________________
Name: Marcela Aparecida Drehmer Andrade
Title: Chief Financial Officer

By: ______________________________
Name: Décio Odone
Title: Executive Officer

THE BANK OF NEW YORK MELLON,
as Trustee, Registrar, Transfer Agent and
Paying Agent

By: ______________________________
Name:
Title:

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed as of the date first written above.

BRASKEM AMERICA FINANCE COMPANY,
as Issuer

By: ______________________________
Name: Gustavo Sampaio Valverde
Title: Vice President and Secretary

By: ______________________________
Name: Renato Bruno dos S. Monteiro
Title: Vice President

BRASKEM S.A.,
as Guarantor

By: ______________________________
Name: Marcela Aparecida Drehmer Andrade
Title: Chief Financial Officer

By: ______________________________
Name: Décio Odone
Title: Executive Officer

THE BANK OF NEW YORK MELLON,
as Trustee, Registrar, Transfer Agent and Paying Agent

By: ______________________________
Name:
Title:



BRASKEM S.A. JURÍDICO

Witnessed by:

Name: DANNIEL CARDOSO OLIVA

Name: Rodrigo O. A. Santos
OAB/SP 227.502



BRASKEM S.A.
JURÍDICO

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed as of the date first written above.

BRASKEM AMERICA FINANCE COMPANY,
as Issuer

By:________________________________
Name:
Title:

BRASKEM S.A.,
as Guarantor

By:________________________________
Name:
Title:

By:________________________________
Name:
Title:

THE BANK OF NEW YORK MELLON,
as Trustee, Registrar, Transfer Agent and Paying Agent

By: [signature]
Name: John T. Needham Jr
Title: Vice President

Witnesses:

By:________________________________
Name:

By:________________________________
Name:

# EXHIBIT A

## FORM OF NOTE

[FACE OF NOTE]

UNLESS THIS GLOBAL NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK LIMITED PURPOSE TRUST COMPANY ("**DTC**"), TO THE ISSUER NAMED HEREIN (THE "**COMPANY**") OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL NOTE IN WHOLE SHALL BE LIMITED TO TRANSFERS TO A NOMINEE OF DTC OR BY A NOMINEE OF DTC TO DTC OR ANOTHER NOMINEE OF DTC OR BY DTC OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY AND TRANSFERS OF THIS GLOBAL NOTE IN PART SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE AND REFERRED TO ON THE REVERSE HEREOF.

[***Include if Note is a Restricted Global Note, or a Note issued in exchange therefor, as required under this Indenture***: THIS NOTE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR ANY OTHER SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, AGREES FOR THE BENEFIT OF BRASKEM FINANCE LIMITED AND BRASKEM S.A. THAT THIS NOTE OR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (I) TO BRASKEM FINANCE LIMITED OR BRASKEM S.A., (II) SO LONG AS THIS NOTE IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT ("**RULE 144A**"), TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A) IN ACCORDANCE WITH RULE 144A, (III) IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR 904 OF REGULATION S UNDER THE SECURITIES ACT, (IV) PURSUANT TO ANOTHER APPLICABLE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT (IF AVAILABLE) OR (V) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, AND IN EACH OF SUCH CASES IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER APPLICABLE JURISDICTION. AS A CONDITION TO THE REGISTRATION OF TRANSFER OF THIS NOTE PURSUANT TO CLAUSE (IV) ABOVE, BRASKEM FINANCE LIMITED, BRASKEM S.A. OR THE TRUSTEE MAY REQUIRE DELIVERY OF ANY DOCUMENTATION OR OTHER

EVIDENCE THAT IT, IN ITS SOLE DISCRETION, DEEMS NECESSARY OR APPROPRIATE TO EVIDENCE COMPLIANCE WITH THE EXEMPTION REFERRED TO IN SUCH CLAUSE (IV) AND, IN EACH CASE, IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER APPLICABLE JURISDICTION. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, REPRESENTS AND AGREES THAT IT SHALL NOTIFY ANY PURCHASER OF THIS NOTE FROM IT OF THE RESALE RESTRICTIONS REFERRED TO ABOVE.

THIS LEGEND MAY BE REMOVED SOLELY IN THE DISCRETION AND AT THE DIRECTION OF BRASKEM FINANCE LIMITED OR BRASKEM S.A.]

[***Include if Note is Regulation S Global Note, or a Note issued in exchange therefor, in accordance with this Indenture:*** THIS NOTE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR ANY OTHER SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, AGREES THAT NEITHER THIS NOTE NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION.

**BRASKEM AMERICA FINANCE COMPANY**

U.S.$500,000,000 7.125% Notes due 2041

[RESTRICTED GLOBAL NOTE]
[REGULATION S GLOBAL NOTE]
[CERTIFICATED NOTE]

No. [R-1] [S-1]

| | |
|---|---|
| CUSIP No. [10554CAA0][ U1065PAA9] | Principal Amount |
| ISIN No. | U.S.$__________ |
| [US10554CAA09][USU1065PAA94] | |

Braskem America Finance Company, a corporation incorporated under the laws of the State of Delaware (the "**Company**," which term includes any successor corporation under the Indenture referred to on the reverse hereof), for value received, hereby promises to pay to CEDE & CO., or registered assigns, U.S.$_______, as adjusted in accordance with the Schedule of Increases and Decreases on the Reverse of this Note, on July 22, 2041 (the "**Principal Payment Date**") upon presentment and surrender of this Note, on such date or dates as the then relevant principal sum may become payable in accordance with the provisions hereof and in the Indenture.

Interest on the outstanding principal amount and premium, if any, shall be borne at the rate of 7.125% per annum payable semi-annually in arrears on each January 22 and July 22 of each year (each such date an "**Interest Payment Date**"), commencing on January 22, 2012 until payment of said principal amount and premium, if any, has been made or duly provided for in full together with such other amounts as may be payable, all subject to and in accordance with the terms and conditions set forth herein and in the Indenture; **provided**, **however**, **that** in the event that the Company shall at any time default on the payment of principal, premium, if any, interest or such other amounts as any may be payable in respect of the Notes, the Company shall pay interest on overdue principal and premium, if any, at the rate borne by the Notes plus 1% per annum, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

Reference is hereby made to the further provisions of this Note set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication herein has been executed by the Trustee or Authenticating Agent by the manual signature of one of its authorized signatories, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed.

Dated:

BRASKEM AMERICA FINANCE COMPANY

By:______________________________________
Name:
Title:

By:______________________________________
Name:
Title:

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This is one of the Notes referred to in the within mentioned Indenture.

THE BANK OF NEW YORK MELLON,
as Trustee

By:________________________________
Authorized Officer

STATE OF NEW YORK )
) ss:
COUNTY OF NEW YORK )

On the day of July 2011, before me personally came to me known, who, being by me duly sworn, did depose and say that he is the of The Bank of New York Mellon, one of the corporations described in and which executed the foregoing instrument; that he knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by authority of the Board of Directors of said corporation; and that he signed his name thereto by like authority.

[Notarial Seal]

Notary Public
COMMISSION EXPIRES

[FORM OF REVERSE SIDE OF NOTE]

U.S.$500,000,000 7.125% Notes due 2041

TERMS AND CONDITIONS OF THE NOTES

This Note is one of a duly authorized issue of 7.125% Notes due 2041 of the Company. The Notes constitute senior unsecured obligations of the Company, initially limited to an aggregate principal amount of U.S.$500,000,000, and mature at 100% of the principal amount on July 22, 2041, unless earlier redeemed.

1. **Indenture**. The Notes are, and shall be, issued under an Indenture, dated as of July 22, 2011 (the "**Indenture**"), among Braskem America Finance Company, Braskem S.A. and The Bank of New York Mellon, as Trustee, Registrar, Transfer Agent and Paying Agent (the "**Trustee**"). The terms of the Notes include those stated in the Indenture. The Holders of the Notes shall be entitled to the benefit of, be bound by and be deemed to have notice of, all provisions of the Indenture. Reference is hereby made to the Indenture and all supplemental indentures thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Company, the Trustee, any Paying Agent, any Transfer Agent and the Holders of the Notes and the terms upon which the Notes, are, and are to be, authenticated and delivered. All terms used in this Note that are defined in the Indenture shall have the meanings assigned to them in the Indenture. Copies of the Indenture and each Global Note shall be available for inspection during normal business hours at the offices of the Trustee and each Paying Agent.

The Company may from time to time, without the consent of the Holders of the Notes, create and issue additional Notes having the same terms and conditions as the Notes in all respects, except for issue date, issue price and the first payment of interest thereon. Additional Notes issued in this manner shall be consolidated with and shall form a single series with the previously outstanding Notes.

The Indenture imposes certain limitations on the creation of Liens by Braskem or its Subsidiaries and consolidation, merger and certain other transactions involving Braskem. In addition, the Indenture requires the maintenance of the existence of Braskem and its Subsidiaries and includes reporting requirements applicable to Braskem.

2. **Guarantees**. Braskem has unconditionally guaranteed, on a senior unsecured basis, the Company's payment obligations under the Notes and the Indenture. The obligations of Braskem under the Guarantees shall rank:

(i) equal in right of payment to all other existing and future senior unsecured debt of Braskem subject to certain statutory preferences under applicable law, including labor and tax claims;

(ii) senior in right of payment to Braskem's subordinated debt; and

(iii) effectively subordinated to the debt and other liabilities (including subordinated debt and trade payables) of Braskem's Subsidiaries (other than the Company)

and jointly controlled companies and to secured debt of Braskem to the extent of such security.

A Guarantee of Braskem is annexed to this Note.

3. **Interest**. The Notes bear interest at the rate per annum shown above from July 22, 2011, or from the most recent Interest Payment Date (as defined below) to which interest has been paid or provided for, payable semi-annually in arrears on January 22 and July 22 of each year (each such date, an "**Interest Payment Date**"), commencing on January 22, 2012. Interest on the Notes shall be computed on the basis of a 360-day year comprised of twelve 30-day months. The Company shall pay interest on overdue principal and premium, if any, at the rate borne by the Notes plus 1% per annum, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

4. **Principal**. Unless previously redeemed or purchased and cancelled, the Notes shall be repaid at 100% of the principal amount thereof on July 22, 2041.

5. **Method of Payment**. Payments of interest in respect of each Note shall be made on each Interest Payment Date to the Person in whose name such Note is registered in the Register at the close of business on January 7 or July 7 (whether or not a Business Day), as the case may be (each, a "**Record Date**"), next preceding such Interest Payment Date. Payment of principal and premium, if any, in respect of each Note on the Principal Payment Date shall be made to the Person in whose name such Note is registered in the Register at the close of business on the fifth day (whether or not a Business Day) immediately preceding the Principal Payment Date.

Payments of interest, as well as principal and premium, if any, in respect of each Note shall be made by U.S. Dollar check drawn on a bank in The City of New York and mailed to the Person entitled thereto at its address as it appears in the Register. Upon written notice from a Holder of such Note received by any Paying Agent at least 15 Business Days prior to an Interest Payment Date or the Principal Payment Date, as the case may be, such payment may be made by wire transfer to a U.S. Dollar account maintained by the payee with a bank in The City of New York.

All payments on this Note are subject in all cases to any applicable tax or other laws and regulations, but without prejudice to the provisions of Paragraph 7 hereof. Except as provided in Section 2.08 of the Indenture, no fees, commissions or expenses shall be charged to the Holders in respect of such payments.

If the Payment Date in respect of any Note is not a business day at the place in which it is presented for payment, the Holder thereof shall not be entitled to payment of the amount due until the next succeeding business day at such place and shall not be entitled to any further interest or other payment in respect of any such delay.

If the amount of principal or premium, if any, or interest which is due on the Notes is not paid in full, the Registrar shall annotate the Register with a record of the amount of principal, premium or interest, if any, in fact paid.

6. **Registrar, Paying Agent and Transfer Agent**. The Trustee shall act as Registrar, Transfer Agent and Paying Agent. The Company may appoint and change any Registrar, Paying Agent or Transfer Agent without notice. Upon the issue of Certificated Notes, the Company will appoint and maintain a Paying Agent in Singapore for so long as the Notes are listed on the Singapore Stock Exchange and the rules of such exchange so require. In such event, an announcement shall be made through the Singapore Stock Exchange and shall include all material information with respect to the delivery of the Certificated Notes, including details of the Paying Agent in Singapore. Upon any change in the Paying Agent or Registrar, the Company shall publish a notice in a leading daily newspaper of general circulation in Singapore (which is expected to be *The Business Times (Singapore Edition)*), for so long as the Notes are listed on the Singapore Stock Exchange and the rules of such exchange so require.

7. **Additional Amounts**. All payments by the Company or Braskem in respect of the Notes or the Guarantees, as the case may be, shall be made without withholding or deduction for or on account of, Brazilian Taxes or U.S. Taxes, unless such withholding or deduction is required by law. In that event, the Company or Braskem, as the case may be, shall pay to each Holder such Additional Amounts as may be necessary in order that the net amount received by each holder of Notes (excluding such Additional Amounts) after such withholding or deduction will equal the amount the holder would have received if such Brazilian Taxes or U.S. Taxes had not been withheld or deducted.

The foregoing obligation to pay Additional Amounts shall not apply to or in respect of:

(i) any tax, assessment or other governmental charge which would not have been imposed but for the existence of any present or former connection between a Holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such Holder, if such Holder is an estate, a trust, a partnership or a corporation), on the one hand, and the United States or Brazil, on the other hand (including such Holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein), other than the mere receipt of such payment or the ownership or holding of a Note or the Guarantees;

(ii) any tax, assessment or other governmental charge which would not have been so imposed but for the presentation by a Holder for payment on a date more than 30 days after the date on which such payment became due and payable or the date on which payment thereof is duly provided for, whichever occurs later;

(iii) any tax, duty, assessment or other governmental charge to the extent that such tax, duty, assessment or other governmental charge would not have been imposed but for the failure of a Holder or beneficial owner to comply with any certification, identification or other reporting requirements concerning the nationality, residence, identity or connection with Brazil or the United States of such Holder if, in the case of Brazilian Taxes (A) such compliance is required or imposed by law as a precondition to exemption from all or a part of such tax, duty, assessment or other governmental charge and (B) at least 30 days prior to the date on which the Company or Braskem, as the case may be, shall apply this clause (iii), the Company or Braskem, as the case may be, shall

have notified all Holders of Notes that some or all of the Holders of Notes shall be required to comply with such requirement;

(iv) any estate, inheritance, gift, sales, transfer, excise or personal property or similar tax, assessment or governmental charge;

(v) any withholding or deduction imposed on a payment to an individual and that is required to be made pursuant to any law implementing or complying with, or introduced in order to conform to, any European Union Directive on the taxation of savings;

(vi) any tax, assessment or other governmental charge which would have been avoided by such Holder presenting the relevant Note (if presentation is required) or requesting that such payment be made to another Paying Agent in a member state of the European Union;

(vii) any tax, assessment or other governmental charge which is payable other than by deduction or withholding from payments of principal of, premium, if any, or interest on a Note;

(viii) any tax, assessment or other governmental charge imposed by reason of such Holder's past or present status as the actual or constructive owner of 10% or more of the total combined voting power of all classes of stock of the Company entitled to vote;

(ix) any tax, assessment or other governmental charge imposed on interest received by a bank or a controlled foreign corporation, as defined for U.S. federal income tax purposes, each as described in Section 881(c)(3) of the Code (or any successor provision thereto);

(x) any tax, assessment or other governmental charge which is imposed by the United States pursuant to (a) section 1471(a) of the Code as a result of (I) the failure of a Holder or beneficial owner that is a "foreign financial institution" within the meaning of section 1471(d)(4) of the Code to comply with the requirements of section 1471(b) of the Code, or (2) any note being held by a "recalcitrant account holder" of a foreign financial institution within the meaning of section 1471(d)(6) of the Code that otherwise complies with the requirements of section 1471(b) of the Code, or (b) section 1472(a) of the Code as a result of the failure of a Holder or beneficial owner that is a "non-financial foreign entity" within the meaning of section 1472(d) of the Code to comply with the requirements of section 1472(b) of the Code; or

(xi) any combination of the above.

The Company or Braskem, as the case may be, shall pay any present or future stamp, court or documentary taxes or any other excise or property taxes, charges or similar levies which arise in any jurisdiction from the execution, delivery, registration or the making of payments in respect of the Notes and the Guarantees, excluding any such taxes, charges or similar levies imposed by any jurisdiction outside of Brazil other than those resulting from, or required to be

paid in connection with, the enforcement of the Notes and the Guarantees following the occurrence of any Default or Event of Default.

No Additional Amounts shall be paid with respect to a payment on any Note or the Guarantees to a Holder that is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent a beneficiary or settlor with respect to such fiduciary or a member of such partnership or beneficial owner would not have been entitled to receive payment of the Additional Amounts had the beneficiary, settlor, member or beneficial owner been the Holder of the Note or the Guarantees.

The Company or Braskem, as applicable, shall provide the Trustee with the official acknowledgment of the relevant taxing authority (or, if such acknowledgment is not available, other reasonable documentation) evidencing any payment of U.S. Taxes or Brazilian Taxes in respect of which the Company or Braskem has paid any Additional Amounts. Copies of such documentation shall be made available to the Holders of the Notes or the Paying Agents, as applicable, upon request therefor.

8. **No Conversion**. The Notes shall not be convertible into any securities of the Company, Braskem or any of their Affiliates.

9. **Open Market Purchases**. The Company, Braskem or any of their Affiliates may at any time purchase Notes in the open market or otherwise at any price. All Notes so purchased may not be resold, except in compliance with applicable requirements or exemptions under any relevant securities and other laws.

10. **Redemption**.

(a) Except as described in Section 3.01 and Section 3.08 of the Indenture and this Paragraph 10, the Notes may not be redeemed prior to their Stated Maturity.

(b) The Notes shall be redeemable, at the option of the Company, Braskem or any successor, in whole, but not in part, upon giving not less than five Business Days nor more than 60 days' notice to the Holders (which notice shall be irrevocable), at 100% of the principal amount thereof, plus accrued and unpaid interest thereon and Additional Amounts, if any, to, but excluding, the Redemption Date, only if (i) the Company, Braskem or any successor has or will become obligated to pay Additional Amounts with respect to the Notes or the Guarantees (x) in excess of the Additional Amounts that the Company, Braskem or any successor would pay if payments in respect of the Notes or the Guarantees were subject to deduction or withholding for Brazilian Taxes at a rate of (A) 15% generally in case of any taxes imposed by Brazil or (B) 25% in case of taxes imposed by Brazil on amounts paid to residents of countries which do not impose any income tax or which impose it at a maximum rate lower than 20% or where the laws of that country or location impose restrictions on the disclosure of (1) shareholding composition; (2) the ownership of the investment; or (3) the beneficial ownership of income paid to non-resident persons, pursuant to Law No. 9,779, dated January 19, 1999, as a result of any change in, or amendment to, the laws or regulations of Brazil (or the jurisdiction of any successor) or any political subdivision or governmental authority thereof or therein having power to tax, or any change in the application or official interpretation of such laws or regulations,

which change or amendment occurs after the date of the Indenture (or date of succession) (ii) the Company has or will become obligated to pay Additional Amounts with respect to U.S. Taxes as a result of any changes in, or amendments to, the laws or regulations of the United States or any change in the application or official interpretation of such laws or regulations, which change or amendment occurs after the date of this Indenture, **provided** in all cases such obligation cannot be avoided by the Company, Braskem or any successor taking reasonable measures available to it; **provided**, **however**, **that** for this purpose reasonable measures shall not include any change in the Company's, Braskem's or any successor's jurisdiction of incorporation or organization or location of its principal executive office or registered office. No such notice of redemption shall be given earlier than 60 days prior to the earliest date on which the Company, Braskem or any successor, as the case may be, would be obligated to pay such Additional Amounts if a payment in respect of such Notes or the Guarantees were then due.

Prior to the publication or mailing of any notice of redemption pursuant to the preceding paragraph, the Company, Braskem or any successor shall deliver to the Trustee an Officer's Certificate to the effect that the obligation of the Company, Braskem or any successor, as the case may be, to pay Additional Amounts cannot be avoided by the Company, Braskem or any successor taking reasonable measures available to it. The Company, Braskem or any successor, as the case may be, shall also deliver to the Trustee an Opinion of Counsel stating that the Company, Braskem or any successor, as the case may be, would be obligated to pay Additional Amounts due to the changes in tax laws or regulations. The Trustee shall accept such certificate and opinion as sufficient evidence of the satisfaction of the conditions precedent set forth in clauses (i) and (ii) of the preceding paragraph of this Paragraph 10(b), in which event it shall be conclusive and binding on the Holders.

(c) The Notes shall be redeemable, at the option of the Company or Braskem, in whole or in part, at any time prior to January 22, 2041, at a Redemption Price equal to the greater of the following amounts, plus accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the Redemption Date:

(i) 100% of the principal amount of the Notes to be redeemed; and

(ii) the sum of the present values of the Remaining Scheduled Payments.

In determining the present values of the Remaining Scheduled Payments, such payments will be discounted to the Redemption Date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) using a discount rate equal to the Treasury Rate plus 0.50%.

For purposes of this Paragraph 10(c), the following terms have the following meanings:

"**Treasury Rate**" means, with respect to any Redemption Date, the rate per annum equal to the semi-annual equivalent yield to maturity or interpolated yield to maturity of the Comparable Treasury Issue. In determining the Treasury Rate, the price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) will be assumed to be equal to the Comparable Treasury Price for such Redemption Date.

"**Comparable Treasury Issue**" means the United States Treasury security selected by an Independent Investment Banker as having an actual or interpolated maturity comparable to the

remaining term of the Notes to be redeemed that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of the Notes.

"**Independent Investment Banker**" means one of the Reference Treasury Dealers appointed by Braskem.

"**Comparable Treasury Price**" means (A) the arithmetic average of the Reference Treasury Dealer Quotations for such Redemption Date after excluding the highest and lowest Reference Treasury Dealer Quotations, or (B) if Braskem obtains fewer than four Reference Treasury Dealer Quotations, the arithmetic average of all Reference Treasury Dealer Quotations for such Redemption Date.

"**Reference Treasury Dealer Quotations**" means, with respect to each Reference Treasury Dealer and any Redemption Date, the arithmetic average, as determined by Braskem, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to Braskem by such Reference Treasury Dealer by 3:30 p.m. (New York City time) on the third business day preceding such Redemption Date.

"**Reference treasury dealer**" means at least three primary U.S. government securities dealers in New York City, New York designated by the Company not later than the fifth business day preceding such redemption date.

"**Remaining Scheduled Payments**" means the remaining scheduled payments of the principal and interest that would be due after the applicable Redemption Date but for such redemption; **provided**, **however**, **that**, if such Redemption Date is not an Interest Payment Date, the amount of the next scheduled interest payment thereon will be reduced by the amount of interest accrued and unpaid thereon to such Redemption Date.

(d) The Notes will be redeemable, at the option of the Company or Braskem, in whole or in part, on January 22, 2041 or at any time thereafter, at a Redemption Price equal to 100% of the principal amount of the notes to be redeemed, plus accrued and unpaid interest and additional amounts, if any, to, but excluding, the Redemption Date.

(e) (i) Notice of redemption shall be mailed to each Holder of any Note to be redeemed by first-class mail, postage prepaid, at its address as it appears in the Register at least five Business Days but not more than 60 days before the Redemption Date. So long as the Notes continue to be listed on the Singapore Stock Exchange and the rules of such exchange so require, notices shall also be published in a leading English language newspaper having general circulation in Singapore (which is expected to be *The Business Times (Singapore Edition)*).

(ii) The Company or Braskem may enter into an arrangement under which Braskem or a subsidiary of Braskem may, in lieu of redemption by the Company or Braskem, purchase for a purchase price equal to the full Redemption Price any Note to be redeemed pursuant to Section 3.01 of the Indenture or this Paragraph 10.

(f) If a Change of Control that results in a Ratings Decline occurs, unless the Company has exercised its option to redeem the Notes as described above in this Paragraph 10, Braskem, acting on behalf of the Company, shall make, directly or through a Designated Affiliate, an offer to purchase all of the Notes pursuant to an Offer to Purchase described in Section 3.08 of the Indenture at a price in cash equal to 101% of the principal amount thereof plus accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the Offer to Purchase Payment Date. Not later than 30 days after the occurrence of a Change of Control that results in a Ratings Decline, Braskem or a Designated Affiliate shall send notice of such Offer to Purchase, together with a letter of transmittal, by first class mail, with a copy to the Trustee, to each Holder at the address of such Holder appearing in the Register or otherwise in accordance with the procedures of the Depositary and containing the information specified in Section 3.08(a) of the Indenture.

(i) On or before the Offer to Purchase Payment Date, Braskem or a Designated Affiliate shall, to the extent lawful: (I) accept for payment for all Notes properly tendered and not withdrawn pursuant to the Offer to Purchase; (II) deposit with a Paying Agent an amount equal to the aggregate Offer to Purchase Payment in respect of all Notes or portions thereof so tendered; and (III) deliver, or cause to be delivered, to the Trustee for cancellation the Notes so accepted together with an Officer's Certificate stating that such Notes or portions thereof have been tendered to and purchased by Braskem or a Designated Affiliate.

(ii) Notwithstanding Section 3.08(a) of the Indenture or this Paragraph 10(f), Braskem shall not be required to make an Offer to Purchase upon a Change of Control that results in a Ratings Decline if (I) a third party makes an offer to purchase Notes in the manner, at the times and otherwise in compliance with the requirements set forth in Section 3.08 of the Indenture applicable to an Offer to Purchase made by Braskem and such third party purchases all Notes properly tendered and not withdrawn under such offer, or (II) a notice of redemption for all Outstanding Notes has been given pursuant to Section 3.01 of the Indenture and this Paragraph 10, unless and until there is a default in payment of the applicable Redemption Price. Notwithstanding anything to the contrary contained herein or in the Indenture, an Offer to Purchase may be made in advance of a Change of Control, conditioned upon the consummation of such Change of Control, if a definitive agreement is in place for the Change of Control at the time the Offer to Purchase is made.

(iii) Braskem shall not purchase any of the Notes if there has occurred and is continuing on the Offer to Purchase Payment Date an Event of Default, other than an Event of Default resulting from the failure to make a Offer to Purchase Payment when due.

(iv) Braskem and any Designated Affiliate will comply with Rule 14e-1 under the Exchange Act (to the extent applicable) and all other applicable laws in making any Offer to Purchase. To the extent that the provisions of any securities laws or regulations conflict with the provisions of the Indenture, the provisions of the Indenture and this Paragraph 10(f) shall be deemed to be modified to the extent necessary to permit such compliance. If the provisions of such securities laws or regulations cannot be complied

with as a result of such deemed modifications, Braskem shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under Section 3.08 of the Indenture or this Paragraph 10(f) by virtue thereof.

(v) In the event that the Holders of not less than 90% of the aggregate principal amount of the outstanding notes accept an Offer to Purchase and Braskem or a third party purchases all the notes held by such Holders, the Company and Braskem will have the right, on not less than 30 nor more than 60 days' prior notice (with a copy to the Trustee), given not more than 30 days following the purchase pursuant to the Offer to Purchase described above, to redeem all of the Notes that remain outstanding following such purchase at the purchase price equal to that in the Offer to Purchase plus, to the extent not included in the Offer to Purchase payment, accrued and unpaid interest and Additional Amounts, if any, on the Notes that remain outstanding, to the date of redemption.

11. **Denominations; Transfer; Exchange**. The Notes are in fully registered form without coupons attached in minimum denominations of U.S.$200,000 and integral multiples of U.S.$1,000 in excess thereof. A Holder may transfer or exchange Notes in accordance with the Indenture. The Trustee or Transfer Agent, as the case may be, may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and to pay any taxes and fees required by law or permitted by the Indenture.

The Trustee or Transfer Agent, as the case may be, need not register the transfer or exchange of any Notes for a period of 15 days preceding a Redemption Date or any Payment Date.

12. **Persons Deemed Owners**. The registered Holder of this Note may be treated as the owner thereof for all purposes.

13. **Unclaimed Money**. Subject to applicable law, the Trustee and the Paying Agents shall pay to the Company or Braskem upon request any monies held by them for the payment of principal, premium, if any, or interest that remains unclaimed for two years, and thereafter, Holders entitled to such monies must look to the Company or Braskem for payment as general creditors.

14. **Defeasance**. Subject to the terms of the Indenture, the Company and Braskem at any time may terminate some or all of their obligations under the Indenture, the Notes and the Guarantees if the Company or Braskem irrevocably deposits in trust with the Trustee money or U.S. Government Obligations sufficient for the payment of principal of and premium, if any, and interest on all the Notes to Maturity.

15. **Amendment; Waiver**. Subject to certain exceptions set forth in the Indenture, the Indenture, the Notes or the Guarantees may be amended or supplemented with the written consent of the Holders of at least a majority in principal amount of the Outstanding Notes, and an existing Default or Event of Default and its consequences or compliance with Section 4.06, 4.8 or 5.3 of the Indenture may be waived with the consent of the Holders of at least a majority in

principal amount of the Outstanding Notes. However, without the consent of each Holder affected thereby, an amendment may not:

(i) reduce the rate of or extend the time for payment of interest on any Note;

(ii) reduce the principal of or extend the Stated Maturity of any Note;

(iii) reduce the amount payable upon the redemption of any Note or upon an Offer to Purchase or change the time at which any Note may be redeemed or purchased upon an Offer to Purchase;

(iv) change the currency or place of payment of principal of or premium, if any, or interest on any Note;

(v) impair the right to institute suit for the enforcement of any payment on or with respect to any Note;

(vi) waive a Default or Event of Default in payment of principal of and premium, if any, and interest on the Notes;

(vii) amend or modify any provisions of the payment obligations under Guarantees in a manner that would materially and adversely affect the holders;

(viii) reduce the principal amount of Notes whose Holders must consent to any amendment, supplement or waiver; or

(ix) make any change in the first paragraph of Section 9.02 of the Indenture.

The Company and the Trustee may, without notice to or the consent or vote of any Holder of the Notes, amend or supplement the Indenture, the Notes or the Guarantees, for the following purposes:

(i) to cure any ambiguity, omission, defect or inconsistency (including any inconsistency between the text of the Indenture, the Notes or the Guarantees and the description of the Indenture, the Notes or the Guarantees contained in the final Offering Memorandum relating to the Notes dated July 19, 2011);

(ii) to comply with Article V or Article XI of the Indenture;

(iii) to add guarantees or collateral with respect to the Notes;

(iv) to add to the covenants of the Company or Braskem for the benefit of the Holders;

(v) to surrender any right herein conferred upon the Company or Braskem;

(vi) to evidence and provide for the acceptance of an appointment by a successor Trustee;

(vii) to comply with any requirements of the U.S. Securities and Exchange Commission in connection with any qualification of the Indenture under the U.S. Trust Indenture Act of 1939, as amended;

(viii) to provide for the issuance of additional Notes; or

(ix) to make any other change that does not materially and adversely affect the rights of any Holder;

**provided that**, in the case of clause (i) or (ii) above, the Company has delivered to the Trustee an Opinion of Counsel and an Officer's Certificate, each stating that such amendment or supplement complies with the provisions of Section 9.01 of the Indenture.

16. **Defaults and Remedies**. An "**Event of Default**" occurs if:

(i) the Company or Braskem defaults in any payment of interest (including any related Additional Amounts) on any Note when the same becomes due and payable, and such Default continues for a period of 30 days;

(ii) the Company or Braskem defaults in the payment of the principal (including premium, if any, and any related Additional Amounts) of any Note when the same becomes due and payable upon its Stated Maturity, redemption or otherwise;

(iii) the Company or Braskem fails to comply with any of its covenants or agreements in the Notes or the Indenture (other than those referred to in clauses (i) and (ii) of this Paragraph 16), and such failure continues for 60 days after the notice specified below;

(iv) Braskem or any Significant Subsidiary defaults under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Debt for money borrowed by Braskem or any such Significant Subsidiary (or the payment of which is guaranteed by Braskem or any such Significant Subsidiary) whether such Debt or guarantee now exists, or is created after the date of the Indenture, which default (a) is caused by failure to pay principal of or premium, if any, or interest on such Debt after giving effect to any grace period provided in such Debt on the date of such default ("**Payment Default**") or (b) results in the acceleration of such Debt prior to its express maturity and, in each case, the principal amount of any such Debt or Guarantee, as applicable, together with the principal amount of any other such Debt or Guarantee under which there has been a Payment Default or the maturity of which has been so accelerated, aggregates U.S.$100,000,000 (or the equivalent thereof at the time of determination) or more in the aggregate;

(v) one or more final judgments or decrees for the payment of money of U.S.$100,000,000 (or the equivalent thereof at the time of determination) or more in the aggregate are rendered against Braskem or any Significant Subsidiary and are not paid (whether in full or in installments in accordance with the terms of the judgment) or otherwise discharged and, in the case of each such judgment or decree, either (a) an enforcement proceeding has been commenced by any creditor upon such judgment or

decree and is not dismissed within 90 days following commencement of such enforcement proceedings or (b) there is a period of 90 days following such judgment during which such judgment or decree is not discharged, waived or the execution thereof stayed; or

(vi) certain events of bankruptcy, reorganization or insolvency of the Company or any Significant Subsidiary as set forth in the Indenture.

A Default under clause (iii) above is not an Event of Default until the Trustee or the Holders of at least 25% in principal amount of the Outstanding Notes notify Braskem of the Default and Braskem does not cure such Default within the time specified after receipt of such notice.

The Trustee is not to be charged with knowledge of any Default or Event of Default or knowledge of any cure of any Default or Event of Default unless either (i) a Responsible Officer of the Trustee has actual knowledge of such Default or Event of Default or (ii) written notice of such Default or Event of Default has been given to the Trustee by Braskem, the Company or any Holder and received by the Trustee.

If an Event of Default (other than an Event of Default specified in clause (vi) above) occurs and is continuing, the Trustee or the Holders of not less than 25% in principal amount of the Outstanding Notes may declare all unpaid principal of and premium, if any, and accrued interest on all Notes to be due and payable immediately, by a notice in writing to the Company (and to the Trustee, if the notice is given by the Holders), stating that such notice is an "acceleration notice," and upon any such declaration such amounts shall become due and payable immediately. If an Event of Default specified in clause (vi) above occurs and is continuing, then the principal of and premium, if any, and accrued and unpaid interest on, all Notes shall become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

Subject to the provisions of the Indenture relating to the duties of the Trustee in case an Event of Default shall occur and be continuing, the Trustee shall be under no obligation to exercise any of its rights or powers under the Indenture at the request or direction of the Holders, unless such Holders shall have offered to the Trustee indemnity reasonably satisfactory to it. Subject to such provision for the indemnification of the Trustee, the Holders of a majority in aggregate principal amount of the outstanding Notes shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee.

At any time after a declaration of acceleration has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee as provided in the Indenture, the Holders of a majority in principal amount of the Notes by written notice to the Company and the Trustee may rescind or annul a declaration of acceleration if (i) the Company has paid or deposited with the Trustee a sum sufficient to pay all overdue interest on Outstanding Notes, all unpaid principal of, and premium, if any, on, the Notes that have become due otherwise than by such declaration of acceleration, to the extent that payment of such interest on the Notes is lawful, interest on such overdue interest (including any Additional Amounts) as

provided in the Indenture and all sums paid or advanced by the Trustee under the Indenture and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and (ii) all Events of Default have been cured or waived as provided in Section 6.13 of the Indenture other than the nonpayment of principal that has become due solely because of acceleration.

In the case of any Event of Default referred to in clauses (iv)(a) and/or (iv)(b) above, such Event of Default will be automatically rescinded or annulled if the Payment Default and/or the acceleration of the Debt referred to therein is remedied or cured by Braskem or such Significant Subsidiary or waived by the holders of such Debt within 60 days after the Payment Default and/or acceleration in respect of such Debt.

No such rescission or annulment referred to in either of the two preceding paragraphs shall affect any subsequent Default or Event of Default or impair any right consequent thereto.

17. **Trustee Dealings with the Company**. The Trustee in its individual or any other capacity, may deal with and collect obligations owed to it by the Company or its Affiliates and may otherwise deal with the Company, Braskem or their respective Affiliates with the same rights it would have if it were not Trustee.

18. **Governing Law**. THE INDENTURE, THIS NOTE AND THE GUARANTEES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

19. **No Recourse Against Others**. No director, officer, employee, direct or indirect shareholder or incorporator, as such, of the Company, Braskem or the Trustee shall have any liability for any obligations of the Company, Braskem or the Trustee, respectively, under the Indenture, the Notes or the Guarantees or for any claim based on, in respect of or by reason of such obligations or their creation. By accepting a Note, each Holder waives and releases all such liability. The waiver and release are part of the consideration for the issue of the Notes.

20. **CUSIP and ISIN Numbers**. Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused CUSIP or ISIN numbers, as applicable, to be printed on the Notes and has directed the Trustee to use CUSIP or ISIN numbers, as applicable, in notices of redemption as a convenience to Holders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

The Company shall furnish to any Holder upon written request and without charge a copy of the Indenture, which includes the form of this Note. Requests may be made to:

BRASKEM AMERICA FINANCE COMPANY
1735 Market Street
28th Floor
Philadelphia, PA 19013
USA

BRASKEM S.A.
Avenida das Nações Unidas, 8501
24th Floor
São Paulo, SP
CEP 05425-070
Brazil

**SCHEDULE OF INCREASES OR DECREASES IN GLOBAL NOTE**

The following increases or decreases in this Global Note have been made:

| Date of Increase or Decrease | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee |
|---|---|---|---|---|

## EXHIBIT B

## FORM OF GUARANTEE

For value received, Braskem S.A. (including any successor Person under the Indenture (the "**Indenture**") referred to in the Note to which this Guarantee is annexed) hereby unconditionally guarantees, on a senior unsecured basis (such guarantee being referred to herein as the "**Guarantee**"):

(1) the full and punctual payment of the principal of and premium, if any, and interest (including any Additional Amount) on such Note when and as the same shall become due and payable, whether at Stated Maturity, upon declaration of acceleration or redemption or otherwise, all in accordance with the terms of such Note and of Article X of the Indenture, and all other amounts payable by the Company under the Indenture; and

(2) in case of the failure of the Company punctually to make any such payment, Braskem hereby agrees to pay or cause such payment to be made punctually when and as the same shall become due and payable, whether at Stated Maturity, upon declaration of acceleration, redemption or otherwise, and as if such payment were made by the Company.

This Guarantee shall be effective in accordance with the provisions of Article X of the Indenture and its terms shall be evidenced therein. All terms used in this Guarantee that are defined in the Indenture shall have the meanings assigned to them in the Indenture.

The obligations under this Guarantee are, to the extent and in the manner provided in the Indenture, equal in right of payment with all other existing and future senior unsecured obligations of Braskem, subject to certain statutory preferences under applicable law (including labor and tax claims), and senior in right of payment to Braskem's subordinated debt; and effectively subordinated to debt and other liabilities (including subordinated debt).

No director, officer, employee, direct or indirect shareholder or incorporator, as such, of Braskem shall have any liability for any obligations of Braskem under this Guarantee or for any claim based on, in respect or by reason of such obligations or its creation.

This Guarantee shall not be valid or obligatory for any purpose until the certificate of authentication on the Notes to which this Guarantee is annexed shall have been executed by the Trustee or Authenticating Agent under the Indenture by the manual signature of one of its authorized signatories.

BRASKEM S.A.

By:______________________________________
Name:
Title:

By:______________________________________
Name:
Title:

Witnesses:

By:________________________________
Name:

By:________________________________
Name:

# EXHIBIT C

## FORM OF
## TRANSFER NOTICE

FOR VALUE RECEIVED, the undersigned Holder hereby sell(s), assign(s) and transfer(s) unto

Insert Taxpayer Identification No.

______________________________________________________________________

Please print or typewrite name and address, including postal zip code, of assignee

______________________________________________________________________

this Note and all rights hereunder, hereby irrevocably constituting and appointing

__________________ attorney to transfer said Note on the books of Braskem America Finance Company with full power of substitution in the premises.

______________________________

In connection with any transfer of this Note occurring prior to the date [which is one year after the original issue date of the Notes,]* [which is on or prior to the 40th day after the Closing Date (as defined in the Indenture governing the Notes),]** the undersigned confirms that:

[Check one]

☐ (a) This Note is being transferred to a person whom the Holder reasonably believes is a qualified institutional buyer (as defined in Rule 144A under the U.S. Securities Act of 1933, as amended (the "**Securities Act**"), in a transaction meeting the requirement of Rule 144A;

☐ (b) This Note is being transferred in an offshore transaction in accordance with Rule 904 under the Securities Act;

☐ (c) This Note is being transferred pursuant to an exemption from registration under the Securities Act (if available);

☐ (d) This Note is being transferred pursuant to an effective registration statement under the Securities Act; or

☐ (e) This Note is being transferred to Braskem America Finance Company or Braskem S.A.,

in each of cases (a) through (e) above, in accordance with any applicable securities laws of any State of the United States.

If none of the foregoing boxes is checked, the Transfer Agent shall not be obligated to register this Note in the name of any Person other than the Holder hereof unless and until the

______________________________

* Include in Restricted Note.

** Include in Regulation S Note.

conditions to any such transfer of registration set forth herein and in Section 2.07 of the Indenture shall have been satisfied.

Date: __________

______________________________________________

NOTICE: The signature to this assignment must correspond with the name as written upon the face of this instrument in every particular, without alteration, enlargement or any other change whatever.

# EXHIBIT D

## FORM OF CERTIFICATE FOR TRANSFER FROM RESTRICTED GLOBAL NOTE OR CERTIFICATED NOTE BEARING A SECURITIES ACT LEGEND TO REGULATION S GLOBAL NOTE OR CERTIFICATED NOTE NOT BEARING A SECURITIES ACT LEGEND

The Bank of New York Mellon
101 Barclay Street, 4E
Global Finance Americas
New York, New York 10286
United States
Attn: Global Finance Americas

Re: **7.125% Notes due 2041 (the "Notes")**

Reference is hereby made to the Indenture, dated July 22, 2011 (the "**Indenture**"), among Braskem America Finance Company, Braskem S.A. and The Bank of New York Mellon, as Trustee, Registrar, Transfer Agent and Paying Agent. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

This letter relates to U.S.$__________ principal amount of Notes which are held in the form of [a beneficial interest in the Restricted Global Note (CUSIP No. 10554CAA0) with the Depositary in the name of the undersigned] [a Certificated Note bearing a Securities Act Legend].

The undersigned has requested a transfer of such [beneficial interest] [Certificated Note] to a Person who shall take delivery thereof in the form of [a beneficial interest of equal principal amount in the Regulation S Global Note (ISIN No. USU1065PAA94) to be held with [Euroclear]* [Clearstream]* through the Depositary] [a Certificated Note of equal principal amount not bearing a Securities Act Legend]. In connection with such transfer, the undersigned does hereby certify that such transfer has been effected in accordance with the transfer restrictions set forth in the Indenture and the Notes and pursuant to and in accordance with Rule 903 or 904 of Regulation S under the U.S. Securities Act of 1933, as amended (the "**Securities Act**"), and, accordingly, the undersigned further certifies that:

(1) the offer of the Notes was not made to a U.S. Person (as defined under Regulation S);

[(2) at the time the buy order was originated, the transferee was outside the United States or the undersigned and any Person acting on behalf of the undersigned reasonably believed that the transferee was outside the United States;]*

---

* Indicate appropriate clearing system.

[(2) the transaction was executed in, on or through the facilities of a designated offshore securities market and neither the undersigned nor any Person acting on behalf of the undersigned knows that the transaction was prearranged with a buyer in the United States;]*

(3) no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or 904(b) of Regulation S, as applicable;

(4) the undersigned is not the Company, a distributor, an affiliate of either the Company or a distributor, or a Person acting on behalf of any of the foregoing; and

(5) the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act.

This certificate and the statements contained herein are made for your benefit and for the benefit of Braskem America Finance Company and Braskem S.A. Terms used in this certificate and not otherwise defined in this Indenture have the meanings set forth in Regulation S.

[INSERT NAME OF TRANSFEROR]

By:______________________________________
Name:
Title:

Dated: _____, __

cc: Braskem America Finance Company
Braskem S.A.

**EXHIBIT E**

**FORM OF TRANSFER CERTIFICATE FOR TRANSFER FROM REGULATION S GLOBAL NOTE OR CERTIFICATED NOTE NOT BEARING A SECURITIES ACT LEGEND TO RESTRICTED GLOBAL NOTE OR CERTIFICATED NOTE BEARING A SECURITIES ACT LEGEND**

The Bank of New York Mellon
101 Barclay Street, 4E
Global Finance Americas
New York, New York 10286
United States
Attn: Global Finance Americas

Re: **7.125% Notes due 2041 (the "Notes")**

Reference is hereby made to the Indenture, dated July 22, 2011 (the "**Indenture**"), among Braskem America Finance Company, Braskem S.A. and The Bank of New York Mellon, as Trustee, Registrar, Transfer Agent and Paying Agent. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

This letter relates to U.S.$________ principal amount of Notes which are held in the form of [a beneficial interest in the Regulation S Global Note (ISIN No. USU1065PAA94) with the Depositary in the name of the undersigned] [a Certificated Note not bearing the Securities Act Legend].

The undersigned has requested a transfer of such [beneficial interest] [Certificated Note] to a Person who shall take delivery thereof in the form of [a beneficial interest in the Restricted Global Note (CUSIP No. 10554CAA0) to be held through the Depositary] [a Certificated Note bearing the Securities Act Legend]. In connection with such transfer, the undersigned does hereby confirm that such transfer has been effected in accordance with the transfer restrictions set forth in the Indenture and the Notes and pursuant to and in accordance with Rule 144A under the U.S. Securities Act of 1933, as amended, and accordingly, the undersigned represents that:

(1) the Notes are being transferred to a transferee that the undersigned reasonably believes is purchasing the Notes for its own account or one or more accounts with respect to which the transferee exercises sole investment discretion; and

(2) the transferee and any such account is a "**qualified institutional buyer**" within the meaning of Rule 144A, in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction.

This certificate and the statements contained herein are made for your benefit and for the benefit of Braskem America Finance Company and Braskem S.A.

[NAME OF UNDERSIGNED]

By:________________________________________
Name:
Title:

Dated: __________, __

cc: Braskem America Finance Company
Braskem S.A.

# EXHIBIT F

## FORM OF CERTIFICATE FOR REMOVAL OF THE SECURITIES ACT LEGEND ON A CERTIFICATED NOTE

The Bank of New York Mellon
101 Barclay Street, 4E
Global Finance Americas
New York, New York 10286
United States
Attn: Global Finance Americas

Re: **7.125% Notes due 2041 (the "Notes")**

Reference is hereby made to the Indenture, dated July 22, 2011 (the "**Indenture**"), among Braskem America Finance Company, Braskem S.A. and The Bank of New York Mellon, as Trustee, Registrar, Transfer Agent and Paying Agent. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

This letter relates to U.S.$________ principal amount of Notes which are held in the form of [a beneficial interest in the Restricted Global Note (CUSIP No. 10554CAA0) with the Depositary]* [[a] Certificated Note(s) in the name of the undersigned.]*

The undersigned has requested for the restrictive Legend on the Certificated Note(s) to be removed.

In connection with such transfer, the undersigned does hereby certify that such transfer has been effected only (i) in an offshore transaction in accordance with Rule 904 under the Securities Act, (ii) pursuant to an exemption from registration under the Securities Act provided by Rule 144 thereunder (if available) or (iii) pursuant to an effective registration statement under the Securities Act, in each of cases (i) through (iii) in accordance with any applicable securities laws of any State of the United States.

* Indicate form in which Notes are held.

This certificate and the statements contained herein are made for your benefit and for the benefit of Braskem America Finance Company and Braskem S.A.

[NAME OF UNDERSIGNED]

By:______________________________________
Name:
Title:

Dated: __________, ___

cc: Braskem America Finance Company
Braskem S.A.